UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PROMOTE THE VOTE, a Michigan ballot
question committee, JAMES MURRAY,
LAUREN LEGNER, and KELLIE KONSOR,

     Plaintiffs,

v.                             Case No.

RUTH JOHNSON, in her official capacity as   Hon.
Michigan Secretary of State, NORMAN D.
SHINKLE, JULIE MATUZAK, JEANNETTE
BRADSHAW and COLLEEN PERO, in their
official capacities as members of the Michigan
Board Of State Canvassers, and SALLY
WILLIAMS, in her official capacity as Director of
the Department of State Bureau of Elections,

     Defendants.
_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Promote the Vote, James Murray, Lauren Legner, and Kellie

Konsor, by and through their undersigned attorneys, for their complaint for

declaratory and injunctive relief against Defendants Ruth Johnson, Norman D.

Shinkle, Julie Matuzak, Jeannette Bradshaw, Colleen Pero, and Sally Williams,

state as follows:

## INTRODUCTION

1.  In creating and approving Michigan's Constitution in 1963, Michigan citizens reserved to themselves the fundamental right to amend their Constitution by means of a citizens' initiative to place a proposed amendment on the statewide ballot for a vote of the electors. Plaintiff Promote the Vote ("PTV") has sponsored a proposed constitutional amendment to strengthen and secure the right to vote in Michigan elections, by, among other things: guaranteeing the secrecy of the ballot, securing the integrity and reliability of election results through an audit, ensuring timely distribution of ballots to military and overseas voters, giving citizens more freedom to register to vote, and providing registered citizens with access to an absentee ballot without having to give a reason. Michigan lags behind many other states that already have adopted these commonsense measures. Plaintiffs Murray, Legner, and Konsor support the PTV proposal and/or have signed PTV's petition to put the proposal on the November 6, 2018 ballot. Defendants are state election officials who function as the gatekeepers to Michigan's ballot, and by their unconstitutional application of Michigan election rules described herein, they have obstructed and delayed Plaintiffs' efforts to put the Promote the Vote proposal before Michigan voters to approve or reject. Specifically, by their application of standardless

and arbitrary signature comparison practices to reject petition signatures, without giving notice and an opportunity to be heard to voters whose signatures are not counted, and by applying disparate treatment to the proposal's proponent, Defendants have violated the equal protection and due process rights of PTV and the individual Plaintiffs, as well as the individual Plaintiffs' constitutional right to vote. As state law deadlines quickly near, and with election campaigning already in full swing, without this Court's intervention, Plaintiffs will suffer irreparable deprivation of their constitutional rights and injury to their collective cause of making the vote more secure and accessible in Michigan.

## **PARTIES**

2.  Plaintiff Promote the Vote ("PTV") is a Michigan ballot question committee, organized and registered under Michigan law for the purpose of undertaking a petition drive to place on the November 6, 2018, Michigan general election ballot a proposal for a constitutional amendment to secure elections and voting rights. PTV maintains its registered headquarters in Detroit, Michigan.

3.  Plaintiff James Murray is a registered voter in Meridian Township, Michigan who is familiar with PTV and who wants to vote "yes" on the question in the November election.

4.    Plaintiff Lauren Legner is a registered voter in Bay City, Michigan, who signed the petition to place the PTV proposal on the ballot and who wants the ability to vote "yes" on the question in the November election. She learned from a representative of PTV that her petition signature had been rejected by the Bureau of Elections on the ground that it was not genuine. She was shown a copy of the petition she had signed and she provided a sworn affidavit stating that she signed the PTV petition.

5.    Plaintiff Kellie Konsor is a registered voter in Bay City, Michigan who signed the petition to place the PTV question on the ballot and who wants the ability to vote "yes" on the question in the November election. She learned from a representative of PTV that her petition signature had been rejected by the Bureau of Elections on the ground that it was not genuine. She was shown a copy of the petition she had signed, and she provided a sworn affidavit stating that she signed the PTV petition.

6.    Defendant Ruth Johnson is the Michigan Secretary of State and the chief election officer of the state, M.C.L. § 168.21, with supervisory control over the administration of elections in the state and over the Bureau of Elections, a bureau with the Department of State. She is sued in her official capacity.

7.    Defendants Norman D. Shinkle, Julie Matuzak, Jeannette Bradshaw and Colleen Pero are sued in their official capacities as members of the Michigan

Board of State Canvassers. The Board of State Canvassers is a body established under Michigan's Constitution and election law with the responsibility, in accordance with M.C.L. § 168.476, to canvass petitions seeking a constitutional amendment, which have been filed pursuant to M.C.L. § 168.471, and to certify proposed amendments to the ballot, following a determination that the petition is supported by a sufficient number of valid signatures.

8.   Defendant Sally Williams is the Director of the Bureau of Elections which provides staff support to the Board of State Canvassers. She is sued in her official capacity.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1343(a).

10.   This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202.

11.   Venue in this district is proper pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

12.   Michigan citizens, in Article XII, § 2 of the Michigan Constitution of 1963, reserved to themselves the right to amend the constitution, and set forth the procedure for doing so.

5

13.   Citizens proposing an amendment must submit a petition containing the text of the proposed amendment, signed by at least ten percent of the total votes cast for governor in the preceding general gubernatorial election.   The petition must be filed at least 120 days prior to the election at which the proposed amendment is to be voted on. The current number of valid petition signatures required, based on the last gubernatorial election, is 315,654.

14.   Const. 1963, Art. XII, § 2 further requires that the person authorized by law to receive the petition should determine the sufficiency and validity of the signatures and make an official announcement of this determination at least 60 days prior to the election at which the proposed amendment is to be voted on by the electorate.

15.   The "person authorized by law" to receive and process such petitions is the Board of State Canvassers. M.C.L. § 168.474.   The Board of State Canvassers has four members appointed by the Governor, two of whom are affiliated with each major political party. Const. 1963 art. XII, § 7; M.C.L. §§ 168.22, 168.22a.

16.   M.C.L. § 168.476(1) provides that the Board must ascertain the genuineness of a signature by comparing it to a digital voter signature on file with the Secretary of State: "The qualified voter file shall be used to determine the validity of petition signatures by verifying the registration of signers and the

6

genuineness of signatures on petitions when the qualified voter file contains digitized signatures." In the absence of a digitized QVF signature the Bureau may compare a doubtful signature to the records on file with the local clerk.

17. The Canvassers are assisted in performing their petition canvassing duties by the staff of the Michigan Bureau of Elections, under the supervision of the Director of Elections, who also serves *ex officio* as the Board's non-voting Secretary.

18. The Board of Canvassers is empowered to hold hearings, issue subpoenas, and take sworn testimony as it deems necessary for investigating petitions. M.C.L. § 168.476(2). The Board makes a final determination regarding its petition canvass at a public meeting. At least two business days before the meeting, the Bureau of Elections is required to make public a staff report "concerning challenges to and sufficiency of a petition." *Id* The Board must make its official declaration certifying the sufficiency of a petition at least two months before the election – no later than September 7, 2018, for petitions filed for placement on the November 6, 2018, general election ballot. Const. 1963, art. XII, § 2; M.C.L. 168.477.

19. Because the Bureau of Elections, acting for the Board of State Canvassers, cannot canvass each of the hundreds of thousands of signatures submitted in support of petitions for constitutional and legislative initiatives, the Bureau

has developed a procedure for canvassing a randomly selected sample of the signatures. This sampling procedure was recently summarized in a published Bureau Staff Report as follows:

> Under the Board's established procedures, there are two different random sampling options: (1) A single-stage process whereby a relatively large sample is taken (usually 3,000 to 4,000 signatures depending on the percentage of signatures which must be valid in order for the petition to qualify); or (2) A two-stage process where a much smaller sample is drawn (approximately 500 signatures), and the result of that sample determines: a. Whether there is a sufficient level of confidence in the result to immediately recommend certification or the denial of certification, or b. If the result of the small sample indicates a "close call," a second random sample must be taken (usually 3,000 to 4,000 signatures) to provide a result with the maximum confidence level that can be obtained.

20.     For each size sample, the Bureau develops a probability matrix, which is a set of "break points" used to determine whether the number of valid signatures in a sample is sufficient to establish with a ninety per cent (90%) degree of confidence that the sample outcome reliably reflects the total number of qualifying signatures filed. In each case, the number of signatures determined to be valid must meet or exceed the statistical break point established by the Bureau for each sample, in order for the Board to recommend that the Canvassers certify the proposal. If it is determined, with a sufficient level of confidence, that there is an insufficient number of valid signatures based on the first sample, the Bureau will recommend that the

8

Canvassers not certify.  If the Bureau cannot make a recommendation either to certify or not certify with a sufficient level of confidence, the Bureau will draw a second, larger sample.  The Bureau is required, under M.C.L. § 168.476(3), to issue a Staff Report, which contains a breakdown of valid and invalid signatures (along with the causes for rejection) and the statistical matrix applied to the sample.

21.   While, as set forth above, the election law requires the Canvassers to verify the genuineness of petition signatures, there is no clear guidance on how that function is to be performed. The election law provides that the Secretary of State "*shall* promulgate rules [under Michigan's Administrative Procedures Act] establishing uniform standards for . . . ballot question petition signatures", which may include standards for "[d]etermining the genuineness of the signature of a circulator or individual signing a petition, including digitized signatures." M.C.L.  § 168.31(2)(b). The Secretary of State has not adopted administrative rules to guide the review and comparison of petition signatures or inform the proponent of a constitutional amendment and members of the public on obtaining petition signatures.

22.   In the absence of administrative standards from the Secretary of State, the Bureau of Elections has issued informal guidance to assist the public in undertaking the formidable task of preparing, circulating and filing voter

signatures for placement of a proposed constitutional amendment or other measures on the ballot. (Michigan Bureau of Elections "Circulating and Canvassing Countywide Nominating and Qualifying Petition Forms" March 2015) (the "Bureau Guidelines"). [Ex. A attached hereto]

23. The Bureau Guidelines do not provide specific direction or standards for comparing petition signatures with the digitized signatures on file with the Secretary of State. The Bureau Guidelines state that "incomplete" signatures should be coded as "IN" and rejected, and provide the following examples of an incomplete signature: "Mrs. Smith, Mr. Smith, Jane John." (Ex. A p. 5) The Guidelines also state that "illegible" signatures, printed signatures, and signatures with a first initial and last name are all an "Acceptable Signature Variation" (*Id*)  On information and belief, the Bureau assigns signatures that they deem insufficiently similar to the digitized QVF signature as "IN," even though such signatures are not "incomplete" and they may be "illegible," which is not a stated basis for rejection.

24. Defendants have not established a procedure for providing notice to a petition signer that his or her signature has been rejected as not "genuine." There are no procedures allowing a petition signer to contest the rejection of his or her signature on a petition. The petition format specified in the election law, M.C.L. § 168.544c, does not include notice to a petition signer

that his or her petition signature should be same as the signature on file with the Secretary of State or with a local clerk.

25.   In the months before an election when the Bureau may be reviewing many filed ballot question and nominating petitions (as well as performing myriad other pre-election duties), the Bureau's regular staff may be augmented with temporary employees (upon information and belief, many of whom are college students) to assist with the canvass of petitions. On information and belief, neither the Bureau employees nor the temporary employees regularly receive adequate or detailed instruction in signature analysis and comparison.

26.   Signature comparisons made by people who are untrained are known to be highly unreliable. In addition, studies have shown that signature comparisons by untrained people carry a high risk of false negatives, that is, there is a higher probability that the examiner will find that signatures do not match when in fact they are written by the same person.

27.   On February 9, 2018, before circulating its petition, PTV submitted the petition to the Board of State Canvassers for approval as to form. A copy of the PTV petition (including the proposed amendment) is attached hereto as Exhibit B.   The Canvassers approved the form of the petition at their meeting on February 13, 2018.   In the ensuing weeks, PTV obtained, by its

count, 432,124 voter signatures – significantly more than the 315,654 needed for placement on the ballot.

28.    On July 9, 2018, PTV timely submitted its petitions to the Bureau of Elections.

29.    On August 8, 2018, after its initial check resulted in 421,355 facially valid signatures, the Bureau issued a notice that it had drawn a small sample of 500 signatures in accordance with its two-step review procedure. The sample was made available to the public and the Bureau set a deadline of August 22, 2018, for filing a challenge.  (Exh. C)

30.    In the normal course, the Bureau would have been expected to wait for the challenge deadline to elapse, consulted with the petition sponsor regarding any challenges, and accepted input from the sponsor regarding any signatures found by the Bureau to be invalid, and then issued a Staff Report containing its analysis of the sample and recommendation to the Board of Canvassers. The Staff Report would include the probability matrix applied by the Bureau and a breakdown of its analysis of the sample signatures.

31.    However, on August 14, 2018, just six (6) days after its initial notice and over a week before the declared challenge deadline for the first sample, the Bureau issued a second notice stating that its "review of the 500 signatures within the first stage of the random sample is complete." (Exh.  D)  The

notice stated that the first sample of 500 was found to contain an insufficient number of valid signatures to recommend either certification or denial of certification, and that as a result a second sample of approximately 3,300 was being drawn. The notice announced a challenge deadline of August 28, 2018, for the second sample. While the notice stated that the review of the first sample was "complete," PTV had not been provided with any information about the Bureau's analysis of the first sample and had not been provided any opportunity to respond to the Bureau's signature validity determinations.

32.   On the following day, August 15, 2018, PTV received by email "preliminary results" of the Bureau's review of the first sample, which stated that it was "a **DRAFT** that is **SUBJECT TO CHANGE** pending further review." (Exh. E to Complaint: August 21, 2018 filing with Sally Williams, Exh. 5, cover email message) The email provided the purportedly preliminary results regarding signatures which had been rejected and the reasons for the rejection. The email did not provide the probability matrix used to determine that the first sample was deficient. The Bureau did not respond to PTV's subsequent requests for the first sample probability matrix, and as of the filing of this Complaint the Bureau has not disclosed it to PTV. The Bureau rebuffed PTV's repeated requests for a meeting with the Bureau to discuss

the first sample results. PTV has inquired whether the Bureau of Elections intends to issue a Staff Report showing its analysis of the first sample, and is it PTV's understanding that it does not intend to do so until a complete Staff Report covering both samples is released.

33. The "preliminary" information provided by the Bureau showed that of the 500 signatures in the sample, 380 were valid signatures and 120 were rejected for various reasons.  While the probability matrix was not provided, PTV was advised that 390 or 391 valid signatures were required to qualify the petition for certification.

34. According to the information provided by the Bureau, out of the 500 signatures in the sample, twenty-four (24) were rejected as "incomplete." Upon Plaintiffs' review of those 24 signatures, it does not appear that any of them meet the definition or examples of "incomplete" signatures delineated in the Bureau Guidelines. Instead, it appears that these 24 signatures may have been rejected based on a subjective and standardless determination by Bureau staff that the signatures did not match the voters' signatures in the QVF.

35. PTV contacted twenty-four (24) voters whose signatures had been rejected as "incomplete" in the Bureau's review of the first sample. PTV secured from thirteen (13) of these petition signers sworn, notarized affidavits that

their signatures on the petitions (copies of which were provided to them) were, in fact, their genuine signatures on the petitions. (Exh. F)  PTV has not been able to reach all of the signers whose signatures were rejected as "incomplete," but every one of the signers that PTV was able to contact confirmed that the signature on the petition was in fact theirs. (Exh. I, Sharon Dolente Affidavit)

36.  Each affidavit stated that the signer was registered to vote, that the signer had reviewed his or her signature on the copy of the petition attached to the affidavit, confirmed that the signature on the petition was theirs and that they had signed the petition and that the information entered on the petition was correct, and in some cases explained any perceived difference between the voter's petition signature and any prior signature on file (e.g., "I have carpal tunnel in my right hand and writing is difficult" or "I was in a hurry"). These affidavits established that the Bureau had incorrectly rejected those signatures as "incomplete" based on a standardless and subjective signature comparison.

37.  Based solely on the affidavits, PTV established that there was, under the Bureau's established procedure, a sufficient number of valid signatures in the first sample (393) for the Bureau to recommend that the Board of Canvassers certify the petition.

38.     On August 21, 2018, PTV submitted a "Request for Certification Based on First Sample," which the Director of Elections forwarded to the Board of Canvassers. (Exh. G: August 21, 2018 letter to Sally Williams (attachments omitted)) PTV's filing included the sworn notarized affidavits of eight (8) voters who had signed the PTV petition and whose signatures had been rejected by the Bureau as "incomplete" in its review of the first sample, as well as PTV's arguments as to why a number of additional signatures that were rejected should have been counted. On the following day PTV submitted five (5) additional affidavits, raising the total of signatures authenticated by affidavits to thirteen (13), together with defenses of three additional signatures. (Exh. H)

39.     PTV attended a Board of Canvassers meeting on August 24, 2018, and addressed the Board under "Other Business."  PTV explained why the Canvassers should certify the proposal based on the first sample. Three of the four Canvassers were in attendance.  (One of the of the two Democratic Party appointees was absent.)   It appeared that the Canvassers had been given no information regarding the Bureau's processing of the PTV petition, other than PTV's August 21st and August 22nd submissions.

40.     PTV reported to the Board that, while the Bureau staff had not provided a final Staff Report and recommendation to the Board, it was clear that the

total of the 380 signatures determined by the Bureau to be valid, along with the additional 13 signatures the genuineness of which was established by the sworn affidavits, demonstrated that the PTV petition was supported by a sufficient number of valid signatures so as to require that it be certified for the ballot.

41.   PTV also presented its defenses of additional signatures rejected by the Bureau, including, among others, a number of signers rejected as not registered when in fact they were registered at the addresses entered on the petitions.

42.   Defendant Director of Elections offered to review the affidavits and issue a Staff Report on the results of the first sample. A motion by the lone Democratic canvasser to accept the affidavits and certify the proposal based on the corrected results from the first sample failed for lack of support. No action was taken on the Director's offer to examine and process PTV's affidavits or issue a Staff Report on the first sample. Under the *status quo* as left by the Board of Canvassers, the Bureau will proceed with its analysis of the second, larger sample despite having conclusive evidence that the first sample decisively supported certification of the proposal.

43.  PTV has been advised that the Bureau will not have complete results of its canvass of the second sample until August 31, 2018, and will not provide any interim results to PTV before that date.

44.  On information and belief, the Bureau and Board of Canvassers have not treated other ballot question proponents in the same manner as described herein, particularly without providing adequate information on the petition review and the opportunity to respond and submit input regarding the Bureau's findings.

45.  If the Bureau continues to use the same standardless and subjective practice in reviewing petition signatures in the second sample, it will continue to reject genuine valid signatures as it did in the canvass of the first sample. Because certification must occur before September 7, 2018, PTV will not have sufficient time to investigate, respond to, and provide corrections of, the anticipated errors in the Bureau's review of the second sample.

46.  More than 400,000 Michigan citizens have signed petitions to put PTV's ballot proposal before the voters on November 6, 2018. Their First Amendment right to associate for the purpose of initiating amendments to their constitution, and their constitutional right to vote, are threatened by the standardless and subjective canvass of PTV's petition, and their right to due process in the counting of their signatures has been violated.

47.  Plaintiffs PTV, James Murray, Lauren Legner, and Kellie Konsor, and millions of other Michigan citizens, will be denied the ability to vote on PTV's ballot proposal to reform Michigan's election law unless the Board of State Canvassers acts to certify the PTV proposal for the ballot based on the conclusive evidence that it is supported by a sufficient number of valid signatures.

## PLAINTIFFS' CLAIMS

## COUNT I – EQUAL PROTECTION

48.  Michigan's Constitution confers on its citizens the right to petition for a vote by the electors to amend the Constitution. In exercising this Michigan constitutional right of citizen initiative, PTV and its supporters and petition signers are exercising their fundamental rights under the First Amendment to the U.S. Constitution of freedom of speech and association and to petition the government. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 prohibit Defendants from burdening the exercise of those rights by application of Michigan's election law in an arbitrary, discriminatory and inconsistent manner, as has occurred here.

49.  Defendants, acting under color of state law, have applied Michigan election law, including but not limited to M.C.L.A. § 168.476, in an arbitrary,

discriminatory and inconsistent manner, to deny or delay PTV's access to the general election ballot, thereby depriving Plaintiffs and many other Michigan citizens of the equal protection of the laws guaranteed by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT II – PROCEDURAL DUE PROCESS

50.   Section 1 of the Fourteenth Amendment to the U.S. Constitution prohibits a state from depriving "any person of . . . liberty . . . without due process of law."  Under 42 U.S.C. § 1983 any person who deprives another person of her or her constitutional right to due process of law may be held liable at law and in equity.

51.   Defendants, acting under color of state law, deprived petition signers who support placement of the PTV amendment proposal on the general election ballot of due process by rejecting and not counting their signatures on PTV petitions without first according them notice that their signatures had been rejected and providing them the opportunity to respond and contest the invalidation and rejection of their petition signatures. In addition, Defendant Johnson has failed to promulgate objective and reliable rules or standards for determining whether a petition signer's signature is "genuine," despite the directive in Michigan's election law that she do so.  M.C.L. § 168.31(2).

52.    The constitutional violates described above were aggravated by Defendants' refusal to accept sworn affidavits of petition signers submitted by PTV, in which the signers averred that they in fact signed the petitions and that their signatures on the petition was genuine.

53.    Defendants' actions have impaired and continue to impair the constitutionally-protected rights and interests of Plaintiffs and many other Michigan citizens in registering their support for placement of the PTV proposal on the ballot. Defendants' violation of constitutional rights could be ameliorated if adequate due process is provided; and Michigan would not be substantially burdened if required to provide due process.

## COUNT III – VIOLATION OF THE RIGHT TO VOTE

54.    The right to vote is a fundamental right secured against impairment by states under the Fourteenth Amendment to the U.S. Constitution.

55.    Defendants, acting under color of state law, have substantially impaired Plaintiffs Murray, Legner and Konsor's voting rights under the U.S. Constitution. While Michigan has an articulable interest in detecting fraudulent petition signatures, that interest is not served by the application of arbitrary and imprecise "signature matching" in Defendants' petition review and by denying Plaintiffs and other citizens notice that their petition

21

signatures have been rejected, and the opportunity to contest that rejection by the submission of extrinsic evidence or by other means.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this court:

A.   Declare that Defendants have violated the Equal Protection clause and the Due Process clause of the U.S. Constitution, as well as the right to vote secured by the U.S. Constitution, by their actions complained of herein;

B.   Issue a temporary, preliminary, and permanent injunction restraining Defendants from continuing to violate Plaintiffs' rights, by specifically ordering Defendants (i) to immediately accept PTV's petition signer affidavits and certify that the PTV proposal has sufficient voter support for placement on the November 6, 2018, Michigan statewide ballot based on the first Bureau of Elections petition signature sample; and/or (ii) to immediately cease and desist from rejecting petition signatures using their standardless and subjective signature comparison practice; and (iii) to take such other or further action as necessary to certify the PTV proposal for placement on the November 6, 2018, Michigan statewide ballot.

C.   Award Plaintiffs attorneys fees in this action pursuant to 42 U.S.C § 1988;

D.   Award Plaintiffs their costs in bringing this action; and

E.   Grant such other and further relief as the Court deems just.

Respectfully submitted,

*/s/Andrew Nickelhoff*

| | |
|---|---|
| Sharon Dolente (P67771) | Andrew Nickelhoff (P37990) |
| Daniel S. Korobkin (P72842) | Mary Ellen Gurewitz (P25724) |
| Michael J. Steinberg (P43085) | Sachs Waldman, P.C. |
| American Civil Liberties Union | 2211 E. Jefferson Ave., Ste. 200 |
|   Fund of Michigan | Detroit, MI 48207 |
| 2966 Woodward Ave. | (313) 496-9429 |
| Detroit, MI 48201 | anickelhoff@sachswaldman.com |
| (313) 578-6838 | megurewitz@sachswaldman.com |
| sdolente@aclumich.org | |
| dkorobkin@aclumich.org | Attorneys for Plaintiff Promote the Vote |
| msteinberg@aclumich.org | |

Julie A. Ebenstein*
Emily R. Zhang*
Dale E. Ho*
American Civil Liberties Union
  Foundation
Voting Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
ezhang@aclu.org

Attorneys for Plaintiffs Murray, Legner
  and Konsor

* E.D. Mich. application for admission
  forthcoming

Dated:  August 28, 2018

23