UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PROMOTE THE VOTE, a Michigan ballot
question committee, JAMES MURRAY,
LAUREN LEGNER, and KELLIE KONSOR,

     Plaintiffs,

v.                                  Case No. 2:18-cv-12692

RUTH JOHNSON, in her official capacity as     Hon. Terrence G. Berg
Michigan Secretary of State, NORMAN D.
SHINKLE, JULIE MATUZAK, JEANNETTE
BRADSHAW and COLLEEN PERO, in their
official capacities as members of the Michigan
Board Of State Canvassers, and SALLY
WILLIAMS, in her official capacity as Director of
the Department of State Bureau of Elections,

     Defendants.

_____/

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiffs Promote the Vote, James Murray, Lauren Legner and Kellie Konsor, by their attorneys, move for a Temporary Restraining Order and/or Preliminary Injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs seek an injunctive order prohibiting Defendants from refusing to accept conclusive proof of the validity of signatures submitted in support of their ballot proposal and from failing and refusing to immediately

certify the Promote the Vote proposal for the November 6, 2018 Michigan statewide ballot.

Intervention by this Court is necessary to protect Plaintiffs' fundamental rights because the failure to certify Promote the Vote's ballot proposal will impair Plaintiffs' rights under the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution, as well as the individual Plaintiffs' right to vote, in violation of 42 U.S.C. § 1983.

Plaintiffs' motion is supported by the Complaint and attachments, and by the Brief filed in support of the motion and the exhibits attached hereto.

Plaintiffs request expedited consideration as the deadline for preparing ballots for printing prior to the November 6, 2018 election is fast approaching.

Local Rule 7.1 requires Plaintiffs to ascertain whether this motion will be opposed. Counsel has sought concurrence in this relief from Denise Barton in the Michigan Attorney General's office, by leaving both a voice mail and an electronic mail message. A response has not yet been received.

WHEREFORE, Plaintiffs ask that the Court enter a Preliminary Injunction ordering Defendants (i) to immediately accept PTV's petition signer affidavits and certify that the PTV proposal has sufficient voter support for placement on the November 6, 2018, Michigan statewide ballot based on the first Bureau of Elections petition signature sample; and/or (ii) to take such other or further action

as necessary to certify the PTV proposal for placement on the November 6, 2018, Michigan statewide ballot; and granting such other relief as the Court deems just and proper.

Respectfully submitted,

|  |  |
|---|---|
| | */s/Andrew Nickelhoff*_____ |
| Sharon Dolente (P67771) | Andrew Nickelhoff (P37990) |
| Daniel S. Korobkin (P72842) | Mary Ellen Gurewitz (P25724) |
| Michael J. Steinberg (P43085) | Sachs Waldman, P.C. |
| American Civil Liberties Union | 2211 E. Jefferson Ave., Ste. 200 |
|   Fund of Michigan | Detroit, MI 48207 |
| 2966 Woodward Ave. | (313) 496-9429 |
| Detroit, MI 48201 | anickelhoff@sachswaldman.com |
| (313) 578-6838 | megurewitz@sachswaldman.com |
| sdolente@aclumich.org | |
| dkorobkin@aclumich.org | Attorneys for Plaintiff Promote the Vote |
| msteinberg@aclumich.org | |

Julie A. Ebenstein*
Emily R. Zhang*
Dale E. Ho*
American Civil Liberties Union
  Foundation
Voting Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
ezhang@aclu.org

Attorneys for Plaintiffs Murray, Legner
  and Konsor

\* E.D. Mich. application for admission forthcoming

Dated:  August 30, 2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PROMOTE THE VOTE, a Michigan ballot
question committee, JAMES MURRAY,
LAUREN LEGNER, and KELLIE KONSOR,

      Plaintiffs,

v.                                        Case No. 2:18-cv-12692

RUTH JOHNSON, in her official capacity as      Hon. Terrence G. Berg
Michigan Secretary of State, NORMAN D.
SHINKLE, JULIE MATUZAK, JEANNETTE
BRADSHAW and COLLEEN PERO, in their
official capacities as members of the Michigan
Board Of State Canvassers, and SALLY
WILLIAMS, in her official capacity as Director of
the Department of State Bureau of Elections,

      Defendants.

_____/

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
<u>PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

STATEMENT OF QUESTION PRESENTED ........................................................ ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 4

ARGUMENT ...................................................................................................... 4

   I.    THE APPLICABLE STANDARD FOR GRANTING IMMEDIATE INJUNCTIVE RELIEF. ............................................................................ 4

   II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM THAT DEFENDANTS HAVE VIOLATED THEIR CONSTITUTIONAL RIGHTS. .......................................................... 5

     A.   Plaintiffs Have Been Denied Equal Protection Under Michigan's Election Law. .............................................................................. 5

     B.   Plaintiffs Were Denied Procedural Due Process. ............................ 15

     C.   Defendants Have Violated Plaintiffs' Fundamental Right To Vote. ........... 20

   III.   THE OTHER PRELIMINARY INJUNCTION FACTORS WEIGH HEAVILY IN PLAINTIFFS' FAVOR. ........................................... 22

     A.   Absent An Injunction, Promote the Vote Will Suffer Irreparable Harm for Which There Is No Adequate Remedy at Law. .......................... 22

     B.   The Balance of Harms Favors Granting the Injunction. .............................. 23

     C.   The Public Interest Is Served by Issuance of an Injunction. ....................... 24

CONCLUSION AND RELIEF SOUGHT ........................................................... 24

Attachments:

*Graveline v Johnson*
*Florida Democratic Party v. Detzner*
*Saucedo v. Gardner*
*La Follette v. Padilla*
*Zessar v. Helander*

## STATEMENT OF QUESTION PRESENTED

1. Did the Defendants deprive Plaintiffs of Equal Protection by refusing to certify their proposal to the ballot because of the erroneous rejection of petition signatures canvassed with a procedure which was arbitrary, subjective and standardless?

2. Did the Defendants deprive Plaintiffs of Equal Protection by refusing to accept conclusive evidence of the validity of signatures which they had erroneously rejected?

3. Did the Defendants deprive Plaintiffs of Due Process by failing to give them notice of questions regarding the validity of some signatures, failing to give them an opportunity to respond to those questions, and failing to accept conclusive evidence of the validity of questioned signatures?

4. Did the Defendants deprive Plaintiffs of Equal Protection by failing to certify their initiated proposal to the ballot, thereby depriving them of their fundamental right to vote and their rights of association, speech and petition?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

As to the denial of Equal Protection caused by the standardless canvass procedure:
***Bush v Gore,*** 531 U.S. 98 (2000)

As to the deprivation of due process:
***Matthews v Eldridge,*** 424 U.S. 319 (1976)

As to the denial of Equal Protection of the right to vote:
***Anderson v Celebrezze***, 460 U.S. 780 (1983)
***Burdick v Takushi***, 504 U.S. 428 (1992)

## INTRODUCTION

Plaintiffs seek injunctive relief to stop Defendants from rejecting signatures on PTV's petition to deny a proposed constitutional amendment a place on the ballot for the November 6, 2018, Michigan general election. The operative facts are set forth in the Complaint for Declaratory and Injunctive Relief.

Plaintiffs are exercising their rights under Michigan's Constitution, Const. 1963, art XII, § 2, to put a proposed constitutional amendment to a vote of the people by means of a citizens' initiative. The proposed amendment would strengthen and secure the right to vote in Michigan elections, by, among other things: guaranteeing the secrecy of the ballot, securing the integrity and reliability of election results through an audit, ensuring timely distribution of ballots to military and overseas voters, giving citizens more freedom to register to vote, and providing registered citizens with access to an absentee ballot without having to give a reason. Michigan lags behind many other states that already have adopted these commonsense measures.

PTV is the Michigan ballot question committee proposing the amendment. Plaintiff Murray is a Michigan resident who wishes to vote for PTV. Plaintiffs Legner and Konsor signed PTV's petitions in support of a vote on the proposal but their signatures were rejected. Defendants are state election officials who function as the gatekeepers to Michigan's ballot. By their unconstitutional application of

1

Michigan election rules, as described herein, they have obstructed and delayed Plaintiffs' efforts to put the Promote the Vote proposal before Michigan voters to approve or reject.

PTV was required to file petitions with at least 315,654 voter signatures to qualify for the ballot. They submitted many more. Under the supervision of Defendant Williams, the Bureau of Elections rejected 120 signatures from a random sample of 500, leaving PTV 10 or 11 signatures short of the number needed for a recommendation that the Board of Canvassers certify the proposal for placement on the ballot. A number of these rejected signatures were designated, under Bureau of Elections informal guidelines, as "incomplete". Plaintiffs understand that to mean that they did not match the voters' signatures on file with the Michigan Secretary of State – apparently leading the Bureau to conclude that the signatures were not "genuine." As shown below, comparing signatures is a science that should be left to forensic experts. The Bureau of Elections personnel examining the signatures are lay persons, not experts, and they compare signatures without any standards, training, or adequate equipment.

The shortcomings in the Bureau's use of imprecise, non-uniform and unscientific procedures to disqualify PTV's petition was made glaringly clear when PTV submitted the sworn affidavits of 13 petition signers whose signatures the Bureau had rejected as "incomplete." The voters stated in their affidavits that

they had signed the petitions and that the signatures on the petitions were theirs. The 13 signatures authenticated by affidavit were sufficient to require certification of the proposal under the Bureau's own standards.

Nevertheless, in the face of this evidence showing the flaws in its arbitrary and subjective procedures, the Bureau insisted on continuing with a larger sample of 3,300 additional signatures (totaling 3,800 combined with the first sample) rather than proceeding to recommend certification. The Board of Canvassers refused PTV's request that the proposal be approved based on the uncontested affidavit evidence that the signatures were genuine.

If the same standardless signature comparison process is used to reject signatures from the larger sample, PTV will have no meaningful way to demonstrate that those signatures are genuine. By insisting on proceeding with a larger sample in the face of convincing evidence refuting its original findings, the Bureau has effectively deprived PTV, and other voters who signed its petitions, of the opportunity to contest the Bureau's decisions.

By their actions, Defendants have violated the equal protection and due process rights of PTV and the individual Plaintiffs, as well as the individual Plaintiffs' constitutional right to vote. State law deadlines are quickly nearing, and with election campaigning already is in full swing. Without this Court's intervention, Plaintiffs will suffer irreparable deprivation of their constitutional

3

rights and injury to their collective cause of making the vote more secure and accessible in Michigan.

## STATEMENT OF FACTS

In lieu of a recapitulation of the factual allegations set forth in the Complaint, Plaintiffs request that the Court refer to the Complaint's Factual Allegations (¶¶ 12-47) and the attached Exhibits. Where necessary, references to additional evidence will be made in the course of Plaintiffs' legal arguments below.

## ARGUMENT

## I.   THE APPLICABLE STANDARD FOR GRANTING IMMEDIATE INJUNCTIVE RELIEF.

Decisions on motions for preliminary relief are governed by a four-factor test that examines: (1) likelihood of success on the merits, (2) irreparable harm in the absence of relief, (3) the balance of equities, and (4) the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Bays v. City of Fairborn,* 668 F.3d 814, 818-19 (6th Cir. 2012). These are "factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  A court may, for example, grant a preliminary injunction "where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least

4

shows serious questions going to the merits and irreparable harm which decidedly

outweighs any potential harm to the defendant." *Id.* at 1229.  The same factors are

considered on a motion for a temporary restraining order.  *See Tocco v. Tocco*, 409

F. Supp. 2d 816, 823-24 (E.D. Mich. 2005).

## II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM THAT DEFENDANTS HAVE VIOLATED THEIR CONSTITUTIONAL RIGHTS.

### A.   Plaintiffs Have Been Denied Equal Protection Under Michigan's Election Law.

In sponsoring the PTV proposal, signing a petition for it and supporting it,

the Plaintiffs, acting individually and collectively, are exercising their fundamental

rights as citizens:

> The myriad of laws passed to protect the sanctity of petitions and the public measures that incorporate the petition into the decision-making process provide ample support for the proposition that petition signers possess a legally protected interest in having their signatures validated, invalidated, empowered or disregarded according to established law – not the political whimsy of a rogue signature counter, clerk, or delivery man. Petitions are a vital means of gathering the collective assent of the people, and if the law will not protect a petition signer's interest in the proper use of the signature, then those opposed to the petition may quickly find themselves without an adversary.

*Deleeuw v. Bd. of State Canvassers*, 268 Mich. App. 497, 505-506 (2004) (*per*

*curiam*). Granting a preliminary injunction against enforcement of Michigan's

election law regarding the petition process for qualifying independent candidates

for placement on the ballot, Judge Roberts recently wrote as follows:

5

> Ballot access laws . . . 'place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'

*Graveline v Johnson,* No. 2:18-cv-12354, 2018 WL 4057396, *4 (E.D. Mich. Aug. 27, 2018) [attached], slip op. at p. 7 (quoting *Williams v Rhodes*, 393 U.S. 23, 30-31 (1968)).

Once Michigan established the citizen-initiated process for amending its Constitution, the Equal Protection Clause of the Fourteenth Amendment gives Plaintiffs the right to participate in that process on an equal footing with other citizens and groups, pursuant to a procedurally fair system that gives everyone an equal chance to have their voice heard, their vote registered, or their petition signature counted. *See Meyer v. Grant*, 486 U.S. 414 (1988) (recognizing that while the right to an initiative is not guaranteed by the federal Constitution, once an initiative procedure is created, the state may not place restrictions on the exercise of the initiative that unduly burden First Amendment rights); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ( "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). Michigan's procedures for the processing and acceptance of petitions for a constitutional amendment, as

applied to Plaintiffs, fail to satisfy Equal Protection requirements.

> **1.  Defendants Violated Plaintiffs' Right to Equal Protection By Refusing to Certify PTV For the Ballot Based on a Signature Match Process That Is Arbitrary, Subjective and Standardless.**

As stated in *Bush v. Gore* and in other cases cited above, a state violates Equal Protection if it applies vague, amorphous standards that are amenable to differential treatment of voters, or as here, petition proponents and signers. Michigan election law, M.C.L. § 168.476, requires the Bureau to verify the "genuineness" of petition signatures by matching them against a digitized signature in the state's electronic voter file, the QVF.[1] No objective rules or standards are used for that determination. As this case illustrates, the laxity in Michigan's petition canvass process opens the door to arbitrary and unequal treatment.

The election law requires the Secretary of State to promulgate administrative rules for, among other things, "establishing uniform standards for state and local nominating, recall, and ballot question petition signatures." M.C.L. § 168.31(2).

---

[1] M.C.L. § 476(1) provides in relevant part: "Upon receiving notification of the filing of the petitions, the board of state canvassers shall canvass the petitions to ascertain if the petitions have been signed by the requisite number of qualified and registered electors. The qualified voter file shall be used to determine the validity of petition signatures by verifying the registration of signers and the genuineness of signatures on petitions when the qualified voter file contains digitized signatures. . . . . If the board is unable to verify the genuineness of a signature on a petition using the digitized signature contained in the qualified voter file, the board may cause any doubtful signatures to be checked against the registration records by the clerk of any political subdivision in which the petitions were circulated, to determine the authenticity of the signatures or to verify the registrations."

The statute specifically suggests the promulgation of rules "establishing uniform standards for determining the genuineness of the signature of a petition signer, including the use of digitized signatures for comparison." M.C.L. § 168.31(2). However, the Secretary of State has not acted on the legislature's directive and no rules have been adopted to guide the review and comparison and authentication of petition signatures.

In the absence of administrative rules, the Bureau of Elections has developed loose guidelines in an effort to provide some assistance to the public. *Circulating and Canvassing Countywide Nominating and Qualifying Petitions* (March 2015). (Complaint, Exh. A.) The Guidelines state that "incomplete" signatures should be coded as "IN" and rejected, and provide the following examples of an incomplete signature: "Mrs. Smith, Mr. Smith, Jane John." (*Id.* p. 5)  The Guidelines also state that "illegible" signatures, printed signatures, and signatures with a first initial and last name are all an "Acceptable Signature Variation." (*Id.*)  The Bureau designates signatures that appear to be insufficiently similar to the digitized QVF signature as "IN," even though such signatures are not "incomplete" and they may be "illegible," which is not a stated basis for rejection. Defendant Director of Elections has stated that the Bureau uses the "Incomplete" code to identify signatures that are perceived as not matching the signature in the QVF. (Exh. 1: August 24, 2018 Meeting Transcript, at 28:20-22) As discussed below in

8

connection with procedural due process, neither PTV nor the individual signers of its petitions have access to the QVF signature that would allow them to assess the Bureau's judgment as to why their petition signatures may have been rejected as non-genuine, and the only explanation provided by the Bureau for rejecting a signature is the cryptic coding, "incomplete."

No doubt the statutory directive to establish rules for signature comparison – which has gone unanswered -- arose from Michigan's long history of distrusting the highly subjective exercise of signature comparison for purposes of implementing the election law. *See*, *e.g.*, *People ex rel. Wright et al*, *v. Kelly*, 294 Mich. 503, 513-14 (1940)(holding that the state had to accept numerous variations of an elector's signature because the "[c]onstitution does not prescribe what form the signatures must take" and the term signature was broad enough to encompass them); *Jaffe v Allen*, 87 Mich. App. 281, 285 (1978)("[i]t has long been recognized that handwriting similarity is so much a matter of opinion and so indefinite that generally it may not be acted upon in canvassing petitions."); *Thompson v. Vaughan*, 192 Mich. 512, 527 (1916) ("[S]imilarity of handwriting is too much a matter of opinion."). As noted in *Jaffe v Allen*: "It is common knowledge that signatures change with age or illness. Penmanship when first registering is often different from a signature in later life. Handwriting hastily affixed to a petition at a

shopping center or while standing on a street corner differs materially from handwriting leisurely affixed sitting at a desk." (*Id*. at 285)[2]

The conclusion reached by Michigan's courts is consistent with modern science. Plaintiffs' expert, Dr. Linton Mohammed, is a well-respected Forensic Document Examiner. As Dr. Mohammed states in his attached Declaration (Exh. 2), determining whether a signature is genuine is a difficult task even for a trained Forensic Document Examiner, as signatures are written in different styles with varying levels of readability and variability. (*Id.* at ¶ 19) Untrained examiners have a significantly higher rate of error in determining whether signatures are genuine. (*Id.*) Significantly, people without training are also more likely to wrongly determine that authentic signatures are not genuine than to make the opposite error. (*Id.* at ¶¶ 24-26) In other words, insufficiently trained elections officials "are more likely than trained examiners to make an incorrect signature-comparison determination – and importantly – they are particularly likely to incorrectly decide

---

[2] Other courts have recently recognized the unreliability of signature comparison and have refused to allow this procedure to deprive voters of their fundamental electoral rights. *E.g.*, *Florida Democratic Party v. Detzner*, No. 4:16-cv-607-MW-CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) *2 ("A vote-by-mail ballot will be considered illegal and not be counted if the signature on the voter's certificate does not match the signature on record.")[attached]; *Saucedo v. Gardner*, 2018 WL 3862704, *1 (D. N.H. Aug. 14, 2018)(a signature does not "appear 'to be executed by the same person'") (internal quotation marks excluded)[attached].

that the signatures are not genuine." (*See Id.* at ¶ 19)[3] As Dr. Mohammed

concludes, "the number of erroneous determinations is likely to be substantial in

Michigan because of an inadequate number of comparison signatures, a

comparison between digitized and ink signatures, a lack of necessary equipment

and time, and an inability of untrained laypersons to distinguish between signature

variations of one individual and signature differences between multiple

individuals." *Id.* at p. 18.

Using a standardless signature comparison process virtually guarantees that

the application of the signature genuineness determination will not be uniformly

applied from one ballot initiative to the next.[4] The subjective assessment of

"genuineness" by one set of Bureau staff members reviewing a petition may differ

---

[3] Dr. Mohammed further opines that the comparison of two signatures under Michigan's election law is likely to lead to additional erroneous determinations. (*See Id.* at ¶ 22) More than two signature samples are required for an accurate genuineness determination to account for an individual's signature variability. (*Id.* at ¶ 22) Also, the quality of the signature impacts a reviewer's ability to accurately determine whether it is genuine. (*Id.* at ¶ 36) Digitized signatures make for poor signature samples because the signatures are normally written with a stylus on an electronic touch-screen, and may appear different than the pen-and-paper signatures given by petition signers. *Id.*

[4] An empirical indication of the uneven application of the Bureau's signature analysis is the fact that PTV's petition signatures yielded approximately 4 times as many rejected signatures coded as "Incomplete" than other petitions filed for the November election. (Exh. 4 Sharon Dolente Supplemental Affidavit, ¶ 14)

significantly from the conclusions of another group reviewing earlier filed petitions or the findings of Bureau staff in previous elections.

### 2.   Defendants Also Have Violated Equal Protection By Refusing to Accept Evidence that Rejected Signatures Are Genuine.

Compounding Defendants' disparate treatment of Plaintiffs is the fact that Defendants apparently are unwilling to take into account evidence provided by PTV that signatures rejected as "Incomplete" are genuine. The Bureau rejected 24 signatures as "Incomplete" in its review of the first sample. Based in part on this finding, the Bureau concluded that PTV had submitted 380 valid signatures out of the first sample of 500. The statistical threshold for the Bureau to recommend to the Board of Canvassers that PTV be certified for the ballot was 390 or 391.[5]

On August 21 and 22, 2018, PTV submitted signer affidavits of 13 of the 24 signatures rejected as "incomplete" by the Bureau. The Affidavits are attached to the Complaint as Exhibit F. They state that the signer was registered to vote, that the signer had reviewed his or her signature on the copy of the petition attached to the affidavit and confirmed that the signature on the petition was theirs, that they

---

[5] The Bureau uses a set of ranges or "break points" (referred to as the statistical matrix) to determine whether a sample contains a sufficient number of valid signatures for the Bureau to recommend that the Canvassers approve the proposal for the ballot. The Bureau determined that the number of valid signatures put PTV in the "gray area" between rejection and acceptance, prompting it to draw a second, larger sample.

had signed the petition and that the information entered on the petition was correct, and in some cases explained any perceived difference between the voter's petition signature and any prior signature on file (e.g., "I have carpal tunnel in my right hand and writing is difficult" or "I was in a hurry").[6]   PTV was not been able to reach all of the signers whose signatures were rejected, but every one of the signers that PTV was able to contact confirmed that the signature on the petition was in fact theirs. (Complaint Exh. I, Sharon Dolente August 21, 2018, Affidavit filed with Defendant Williams)

Based solely on the affidavits, PTV established that there was a sufficient number of signatures in the first sample (393) for the Bureau to confidently recommend that the Canvassers certify the petition. At a meeting on August 24, 2018, the Board of Canvassers declined to act on PTV's request that the affidavits be accepted and considered. This decision was inconsistent with past practice applied to other petitions. Earlier this year, in fact, the Board of Canvassers was presented with affidavits and other extrinsic evidence (including photographs, tax records, and other documents) by the proponents of and the challengers to a legislative initiative petition, "Protecting Michigan Taxpayers". The minutes of the

---

[6]  Sharon Dolente stated in her affidavit, also submitted to Defendants (Complaint, Exh. I), as well as in her supplemental affidavit filed herewith (Exh. 4 hereto), that every one of the rejected petition signers that PTV was able to contact confirmed that the signature on the petition was in fact theirs.

Canvassers' meeting on April 26, 2018, reflect extensive discussion of affidavits submitted to show that petition circulators' addresses were genuine. (*See* Exh. 3, 4/26/18 Tr. pp. 25, 26-27, 39, 46, 53.) Despite ongoing inquiries from PTV, neither the Bureau nor the Board of Canvassers has advised PTV as to whether they will reverse their signature determinations based on the signer affidavits that PTV submitted.

### 3. Defendants Also Denied Equal Treatment By Truncating the Procedure Applied to Other Ballot Proposals, Depriving Plaintiffs of an Equal Opportunity to Establish their Qualification for the Ballot.

An additional indication of the unequal treatment of PTV as compared to other petitions is the petition review procedure applied by the Bureau. As indicated in ¶ 13 of Exh. 4, Sharon Dolente's Supplemental Affidavit and Exh. A attached thereto, other petition sponsors have been given an adequate amount of time to respond to the Bureau's findings after the challenge deadline has elapsed, before the Bureau issues its final Staff Report to the Board of Canvassers. The shortest period allotted to other petition proponents on the 2018 ballot was 11 days.  By comparison, PTV has been told it will have 2 days after the August 28th challenge deadline before the Bureau issues its Staff Report on Friday, August 31st. (Exh. 4, ¶ 12) That time frame leaves PTV without adequate time to respond to the challenges. This schedule also denies PTV procedural due process, which is discussed in Part I(B) below.

14

### B.    Plaintiffs Were Denied Procedural Due Process.

Plaintiffs' have been denied their right to procedural due process under Section 1 of the Fourteenth Amendment to the U.S. Constitution, which prohibits states from depriving "any person of . . . liberty . . . without due process of law." The court should make two inquiries to determine whether procedural due process has been denied: (1) whether the invalid rejection of petition signature as "incomplete" implicates Plaintiffs' legally-protected interests that are entitled to due process protection; and (2) if such an interest exists, whether Defendants provided a constitutionally adequate process. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Once it is established that a Plaintiff has asserted a cognizable interest, the procedural due process inquiry turns to consideration of  three factors: (a) the private interest that will be affected by the official action; (b) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (c) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.  *Mathews*, 424 U.S. at 335.

### 1.  Plaintiffs Have a Legally-Protected Interest.

As stated earlier, Plaintiffs Legner and Konsor have constitutionally protected interests in supporting and assisting PTV's effort to put its proposal

15

before Michigan voters. (See Sec. I(A)) PTV and its supporters have First Amendment speech and associational interests in collectively seeking placement of the PTV proposal on the ballot, and in obtaining ballot access for their proposal upon submission of the requisite number of valid signatures pursuant to Michigan law. These protected interests are grounded in the First Amendment freedoms of speech and association, as well as in Michigan's constitutional grant of the right to amend the Constitution by citizen initiative.

### 2. Defendants Have Not Provided Constitutionally Adequate Process.

Defendants failed to provide constitutionally adequate process to Plaintiffs Legner and Konsor when it rejected their petition signatures without prior notice or providing a meaningful opportunity to contest the determination. Defendants did not provide PTV a meaningful opportunity to confirm the genuineness of petition signatures and contest their rejection. PTVs attempt to overcome the absence of pre-deprivation due process by presenting signers' affidavits to the Bureau and the Board of Canvassers was rebuffed. And if the same standardless signature comparison process is used to reject signatures from a larger sample, PTV will be left with no meaningful way to demonstrate that those signatures are genuine. As discussed in part (II)(A)(3) above, PTV will have virtually no time to contest the Bureau's action.

Despite voters' significant interest in having their valid petition signatures

counted, Plaintiff signers did not receive any pre-deprivation notice "reasonably calculated, under all the circumstances, to apprise" them of the deprivation, *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950), and informing them of the means for contesting the deprivation, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14-15 (1978).[7]

Michigan provides no established mechanism for reversing the Board's "genuineness" decision; "incomplete" signatures are simply excluded from the sample, notwithstanding the fact that each sample signature can be pivotal in a petition canvass.

With the August 28, 2018, challenge deadline for the Bureau's second sample results, and the projected date for the Bureau's Staff Report (just days before Michigan's September 7th constitutional and statutory deadline to finalize the ballot), there will not be sufficient time for PTV to identify and contact voters who may be similarly affected by the Bureau's unfair procedure, much less for rejected petition signers to provide proof of the genuineness of their signatures. If the court does not order Defendants to certify the proposal based on the corrected first sample, there will be no opportunity to submit evidence prior to the second

---

[7] It should be added that, while not in itself sufficient to satisfy procedural due process, *e.g., Saucedo v. Gardner*, at \*13; *La Follette v. Padilla*, (Cal. Superior Ct. No. CPF-17-515931 at p. 5)[attached], Michigan does not even require notice to signers at the time they are signing petitions that their signatures must match the QVF and could be rejected on that basis.

sample and Plaintiffs will have lost the opportunity to have the ballot initiative placed on the 2018 ballot.

Statutes in New Hampshire, Florida, and California that failed to provide process to eligible voters before rejecting their absentee ballots based on a similar signature mismatch determination have been struck down. *See Saucedo v. Gardner*, at *4 (striking down New Hampshire's absentee ballot signature match requirement that two signatures "appear" to be made by the same person, as an unconstitutional violation of the due process clause); *Detzner*, at *2 (holding that Florida's failure to provide pre-deprivation notice and opportunity to cure signatures determined to "not match" violates the due process and equal protection clauses of the Constitution); *La Follette v. Padilla*, at p. 3 (striking down California's signature match requirement as violative of the California and U.S. Constitutions); *see also Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. March 13, 2006)(striking down prior Illinois regime that failed to provide due process)[attached]. Unlike here, in none of these cases did the defendant decline to consider extrinsic evidence of genuineness submitted by the voter. Pre-deprivation process is critical here because, under the current system, the risk of an erroneous rejection of an elector's petition is great due to the subjective nature of the

signature match determination. *See* Section II.B.[8]

As to the third factor in the *Mathews* balancing test, the government's interest, i.e., "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-71 (1970)), is relatively minimal compared to the important rights at stake. Any interest the State could possibly claim in matching signatures to prevent fraud cannot justify refusing to accept evidence of genuineness more reliable than officials' subjective, visual, and standardless signature match determination. *Saucedo*, 2018 WL 3862704, *13 ("additional procedures further the state's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised."); *Detzner*, 2016 WL 6090943 at *7 ("[L]etting mismatched-signature voters cure their vote by proving their identity further prevents voters fraud[.]"). The government does not have a legitimate interest in rejecting genuine petition signatures using a standardless, subjective,

---

[8] Given the risk of erroneous signature determinations by laypersons, an opportunity to contest "incomplete" signature determinations pre-deprivation is critical. There are no do-overs once the Bureau has excluded the initiative from the ballot. *See Zessar*, 2006 U.S. WL 642646, at *9 ("This Court finds that a post-deprivation hearing provides only prospective relief in that it allows the rejected voter to correct something about her registration for future elections. . . . Once rejected, the ballot cannot be rehabilitated and cast after a post-deprivation hearing. The voter's right to vote would have been irremediably denied."); *Detzner*, 2016 WL 6090943, *2 ("although those would-be-voters have an opportunity to update their registration signatures, that opportunity is too late for those votes to be counted in the same election cycle.").

and demonstrably error-prone process that has the effect of denying ballot access to those who are legally entitled to it.

### C.    Defendants Have Violated Plaintiffs' Fundamental Right To Vote.

In sponsoring the PTV proposal, and signing a petition for it and supporting it, Plaintiffs, acting individually and collectively, are exercising their fundamental rights as citizens, guaranteed by the First and Fourteenth Amendments. "Associating for the purpose of getting a candidate's name or a legislative proposal on the ballot is protected activity under the First Amendment." *Deleeuw v. State Bd. of Canvassers*, at 504. The Fourteenth Amendment safeguards the "precious" and "fundamental" right to vote. *Harper v. Va. State Bd. Of Elections,* 383 U.S. 663, 670 (1966).

As explained in *Anderson v. Celebrezze,* 460 U.S. 780, 788-89 (1983), and in *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992), a court reviewing a challenge to a burdensome voting law, regulation or procedure must apply a balancing test that weighs the severity of the burden (that is, its "character and magnitude") imposed on the exercise of the franchise against the state's "precise interests" proffered as justifications for the law. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). This balancing test is a "flexible" sliding scale standard, where the "rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens [voting] rights."

*Burdick*, 504 U.S. at 434. Applying this standard, the degree of scrutiny applied to the state's justifications becomes more rigorous with the increasing severity of the burden on the right to vote. *Id.*; *see Green Party of Arkansas v. Priest*, 159 F. Supp. 2d 1140, 1143 (E.D. Ark. 2001). Even a restriction imposing a less severe burden on the right to vote is subject to appropriate balancing and scrutiny and requires that "[h]owever slight [the] burden may appear ... it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 211 (2008) (internal quotation marks omitted).

Two courts in the Eastern District have recently struck down Michigan election laws, applying the *Anderson-Burdick* framework. In *Mich. A. Philip Randolph Inst. v. Johnson*, 2018 WL 3769326, *17 (E.D. Mich. Aug. 9, 2018), the court held that the elimination of straight party voting burdened plaintiffs rights, without a balancing justification, and in *Graveline v. Johnson*, at 23, another court in the Eastern District struck down ballot access provisions of Michigan election law which limited the ability of an independent candidate to run for the office of attorney general.

There is no legitimate governmental interest which justifies rejecting petition signatures when the validity of those signatures has been confirmed, in a timely fashion, by affidavit testimony from the signers themselves. Any asserted interest

21

in preventing voter fraud is not served by denying Plaintiffs an opportunity to present reliable extrinsic evidence establishing the validity of signatures initially thought not to match those in the QVF. Considering affidavits offered by electors verifying the genuineness of their signature would, in fact, serve these government interests. *See Saucedo*, 2018 WL 3862704, *13 ("Additional procedures would simply allow for more probative extrinsic evidence to be considered. Thus, if anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised."), citing *Detzner*, 2016 WL 6090943, at *7 ("[L]etting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted.").

## III. THE OTHER PRELIMINARY INJUNCTION FACTORS WEIGH HEAVILY IN PLAINTIFFS' FAVOR.

### A. Absent An Injunction, Plaintiffs Will Suffer Irreparable Harm for Which There Is No Adequate Remedy at Law.

Defendants' violation of Plaintiffs' constitutional rights is alone sufficient to establish irreparable harm. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[I]f . . . a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Irreparable harm is presumed where constitutional rights are imperiled or abridged. *See Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

### B.    The Balance of Harms Favors Granting the Injunction.

While the harm flowing from the *denial* of an injunction is concrete, substantial, and irreparable, enjoining an unconstitutional application of a state statute does not cause harm.  "[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001).  In fact, where "there is a likelihood that [a law] will be found unconstitutional," it is "questionable whether the [State] has any 'valid' interest in enforcing [it]." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987); *see also ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012) ("[I]f the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."); *Tyson Foods v. McReynolds*, 865 F.2d 99, 103 (6th Cir. 1989) ("[Defendant] has suffered no injury as a result of the preliminary injunction [because it] has no right to the unconstitutional application of state laws.").

23

To the extent Defendants raise any "harm" that might result from crediting the signatures of individual plaintiffs and other signers to the "integrity" of the initiative process, the integrity of the initiative process is clearly enhanced, not impaired, by counting plaintiffs' and others' valid rejected signatures that are validated by sworn affidavits showing their "genuineness."

### C.     The Public Interest Is Served by Issuance of an Injunction.

Finally, the public is best served by including the Promote the Vote initiative on the ballot because "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.(SMART)*, 698 F.3d 885, 896 (6th Cir. 2012). It is "always in the public interest to prevent violation of a party's constitutional rights." *Déjà vu of Nashville*, 274 F.3d 377,400 (6th Cir. 2001) (*quoting G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

### CONCLUSION AND RELIEF SOUGHT

For the above reasons, the Court should enjoin Defendants from continuing to reject signatures pursuant to the challenged practices and should order Defendants to correct the unconstitutional rejection of signatures and certify Promote the Vote's initiative for the ballot at the November 2018 general election, as more specifically requested in Plaintiffs' Motion.

Respectfully submitted,

*/s/Andrew Nickelhoff*

|  |  |
|---|---|
| Sharon Dolente (P67771) | Andrew Nickelhoff (P37990) |
| Daniel S. Korobkin (P72842) | Mary Ellen Gurewitz (P25724) |
| Michael J. Steinberg (P43085) | Sachs Waldman, P.C. |
| American Civil Liberties Union Fund of Michigan | 2211 E. Jefferson Ave., Ste. 200 |
|  | Detroit, MI 48207 |
| 2966 Woodward Ave. | (313) 496-9429 |
| Detroit, MI 48201 | anickelhoff@sachswaldman.com |
| (313) 578-6838 | megurewitz@sachswaldman.com |
| sdolente@aclumich.org |  |
| dkorobkin@aclumich.org | Attorneys for Plaintiff Promote the Vote |
| msteinberg@aclumich.org |  |

Julie A. Ebenstein*
Emily R. Zhang*
Dale E. Ho*
American Civil Liberties Union
  Foundation
Voting Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
ezhang@aclu.org
dho@aclu.org

Attorneys for Plaintiffs Murray, Legner
  and Konsor

* E.D. Mich. application for admission
  forthcoming

Dated:  August 30, 2018

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30th day of August 2018, a true and accurate copy of the foregoing was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's filing system.  Parties may access this filing through the Court's system.

*/s/Andrew Nickelhoff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER GRAVELINE, et al.,

      Plaintiffs,

v.                               Case No. 18-12354
                                      Honorable Victoria A. Roberts

RUTH JOHNSON, et al.,

      Defendants.

_____/

**OPINION AND ORDER GRANTING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION [ECF No. 4]**

## I.    INTRODUCTION

In this ballot access case, Christopher Graveline ("Graveline") and three of his supporters ("Plaintiff-Voters"; collectively "Plaintiffs") challenge three Michigan statutes which they say operate in combination to deprive them of substantial associational and equal protection rights under the First and Fourteenth Amendments to the United States Constitution.

First, Plaintiffs say these statutes severely burden Graveline's right to appear on the November general election ballot as an independent, non-partisan candidate for attorney general. Second, they say that because of Graveline's exclusion from the ballot, the Plaintiff-Voters are unable to "cast a meaningful and effective vote"; they only have major party candidates to choose from, but they believe that Michigan's attorney general should be a non-partisan actor.

Plaintiffs contend that Michigan's statutory scheme functions as an absolute bar to independent candidates for statewide office (i.e., the offices of governor, lieutenant

governor, attorney general, and secretary of state) seeking access to the general election ballot. Additionally, they say that their freedom to associate for the advancement of their ideas and beliefs is hampered by the monopolization of the attorney general ballot by party candidates.

Defendants fail to address the combined burdens and collective impact argument made by Plaintiffs. They also fail to address Plaintiffs' argument that Michigan's long history of failing to qualify an independent candidate for statewide office has served to exclude all independent candidates for attorney general from the ballot for thirty years, and that this failure should be considered by the Court as a reliable indicator of the unconstitutionality of Michigan's statutes.

The Court finds that Plaintiffs meet their burden to show that the character and magnitude of their injuries is significant and that the Michigan statutes – in combination – severely burden the constitutional rights not only of Graveline, but also of the Plaintiff-Voters. On balance, the interests that Defendants seek to protect – guaranteeing that independent candidates have a "modicum of support" and protecting the integrity of the election process by regulating the number of candidates on the ballot to avoid voter confusion – are not sufficiently weighty to justify the reach and breadth of the challenged statutes. In addition, it appears that there are less restrictive means by which Defendants can achieve their goals.

Accordingly, the Court finds that Plaintiffs show they have a strong likelihood of success on their claims that Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) are unconstitutional as applied to them, in relation to Graveline's independent candidacy for Michigan attorney general.

Plaintiffs' motion for preliminary injunction is **GRANTED**.

## II.    BACKGROUND

### A.    Michigan's Current Ballot Access Laws

To be eligible for the office of Michigan Attorney General, a person must be a registered and qualified elector in the State of Michigan on the date that he or she is nominated.  See Mich. Comp. Laws § 168.71.  Beyond that, Michigan law provides different filing and eligibility requirements for Attorney General candidates based on their affiliation and/or candidacy type:

Major Party Candidates:  Candidates for Attorney General from a major party (i.e., Republican, Democratic, and Libertarian Parties) are nominated at their party's nominating convention, which must be held "not less than 60 days before the general November election."  Mich. Comp. Laws § 168.591(1).  This year, that date falls on September 7, 2018.  Party officials then have one business day to file an Affidavit of Identity and Certificate of Nomination documenting the person nominated.  § 168.686.  Candidates from these parties do not have to circulate nominating petitions or obtain signatures in support of their candidacies.

Minor Party Candidates:  Candidates for Attorney General from a minor party (i.e., a party from which no candidate received "at least 5% of the total vote cast for all candidates for secretary of state at the last preceding election at which a secretary of state was elected") are nominated at their party's nominating convention, which must be held no later than the August primary election.  Mich. Comp. Laws §§ 168.686a(1), 168.532.  This year, the primary election was held on August 7, 2018.  Party officials then have one business day to file an Affidavit of Identity, Certificate of Nomination, and

a Certificate of Acceptance for their selected candidates. § 168.686a(4). Candidates from these parties do not have to circulate nominating petitions or obtain signatures in support of their candidacies.

Independent Candidates: To be placed on the general election ballot, a candidate for Attorney General without political party affiliation, like Graveline, must file an Affidavit of Identity and qualifying petition with at least 30,000 signatures of registered voters no later than "the one hundred-tenth day before the general election." Mich. Comp. Laws §§ 168.590c(2), 168.544f. This year, the filing deadline fell on July 19, 2018. To ensure they have enough valid signatures, unaffiliated candidates may submit as many as 60,000 signatures. § 168.544f. However, a candidate can only begin collecting signatures 180 days before the deadline, and, as part of the minimum number of signatures requirement, a qualifying petition must be signed by at least 100 registered voters in each of at least half of Michigan's 14 congressional districts. *See* § 168.590b(3),(4).

Write-In Candidates: A write-in candidate for Attorney General must file a Declaration of Intent with the Secretary of State by October 26, 2018. Mich. Comp. Laws § 168.737a(1).

## B. Graveline's Campaign Efforts

Graveline filed a Statement of Organization announcing his campaign for Michigan Attorney General on June 4, 2018. As alleged in the complaint, Graveline began collecting signatures on June 7, 2018. Over the next 42 days – up until the July 19, 2018 deadline for submission of his nominating petition – he and 231 volunteers collected 7,899 signatures for submission. Graveline supplemented volunteer efforts by

4

retaining a professional signature-gathering firm, SMI Enterprises. SMI charged $6 per "billable signature" and collected over 6,000 signatures for a total expense to his campaign of $37,258. A billable signature is defined as a signature that is collected, processed, and reviewed for any apparent defects; SMI guaranteed that at least 75% of the billable signatures it collected would be valid.

Despite these efforts, Graveline fell well short of the minimum number of required signatures; over the 42 days, his campaign collected 14,157 signatures, with at least 100 signatures in 12 of Michigan's 14 congressional districts, at a cost of approximately $38,000 and with over 1,000 volunteer hours spent. Graveline attempted to file his nominating petition on July 19, 2018, but the Bureau of Elections rejected his filing as incomplete.

Graveline and Plaintiff-Voters – Willard Johnson, Michael Leibson, and Kellie Deming – filed this case on July 27, 2018. Each of the Plaintiff-Voters is a registered Michigan voter who wishes to vote for Graveline as an independent candidate for Attorney General.

Plaintiffs' complaint contains three causes of action; each asserts a violation of First and Fourteenth Amendment rights. In Count I, Plaintiffs allege Mich. Comp. Laws § 168.590c(2) is facially unconstitutional because its filing deadline unduly burdens independent candidates for office and is not narrowly tailored to meet a compelling or legitimate state interest. In Count II, Plaintiffs allege that § 168.590c(2) is unconstitutional as applied in combination with the requirements in §§ 168.544f and 168.590b(4), because adding the signature requirements to the deadline imposed in § 168.590c(2) multiplies the undue burden on Plaintiffs, and the requirements are not

narrowly tailored to serve a compelling state interest.  Count III sets forth the same as applied challenge as Count II, but solely on behalf of Plaintiff-Voters, as a violation of their rights to cast effective votes.

The Defendants are Ruth Johnson, in her official capacity as Michigan's Secretary of State, and Sally Williams, in her official capacity as the Director of Michigan's Bureau of Elections (collectively, "the State").

Plaintiffs seek an order: (1) declaring Mich. Comp. Laws § 168.590c(2) unconstitutional on its face; (2) declaring §§ 168.590c(2), 168.544f, and 168.590b(4) unconstitutional "as applied in combination to Plaintiffs"; and (3) directing the State to place Graveline on the ballot as an independent candidate for Attorney General in the upcoming November 2018 election.  They also seek an award of attorney fees pursuant to 42 U.S.C. § 1988.

On August 3, 2018, Plaintiffs filed a motion for preliminary injunction; the motion is fully briefed.  On August 22, 2018, the Court held a hearing.  During the hearing, Plaintiffs abandoned their Count I facial challenge to § 168.590c(2).  Thus, the Court need only analyze Plaintiffs' as applied challenge to the statutory scheme as set forth in Counts II and III.

### III. PRELIMINARY INJUNCTION STANDARD

"A district court must balance four factors when considering a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of*

*Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012).  "In First Amendment cases, 'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits [since] the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the state action.'"  *Bays*, 668 F.3d at 819 (citations omitted).  A preliminary injunction is an extraordinary remedy that will only be granted if Plaintiffs show that circumstances clearly demand it.  *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## IV.   ANALYSIS

An independent candidate for Michigan attorney general will not appear on the general election ballot unless he or she satisfies the early filing deadline and signature and distribution requirements in Mich. Comp. Laws §§ 168.590c, 168.544f, and 168.590b(4), described earlier.

Ballot access laws, such as these, "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."  *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *see also Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters." (citation omitted)).

Although "[b]oth of these rights . . . rank among our most precious freedoms," *Williams*, 393 U.S. at 30, "[t]his does not mean . . . that all state restrictions on political parties and elections violate the Constitution," *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006).  Indeed, states must enact reasonable regulations to

7

ensure campaigns and elections are orderly and fair. *Id.*; *see also Storer v. Brown*, 415 U.S. 724, 730 (1974). As such, not all election laws are subjected to heightened scrutiny analysis. *Id.* The Supreme Court set forth the appropriate analytical framework for reviewing state election regulations in *Anderson* and *Burdick v. Takushi*, 504 U.S. 428 (1992).

Under the *Anderson-Burdick* framework, the Court first looks at the "character and magnitude of the asserted injury" to Plaintiffs' asserted constitutional rights. *Anderson*, 460 U.S. at 789. After assessing Plaintiffs' injury, the Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* In doing this, the Court must "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* Finally, the Court must weigh these factors to determine whether the state law is constitutional. *Id.* The level of scrutiny "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434.

"When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest."). "If regulations enacted do not seriously burden a plaintiff's rights, a state's important

8

regulatory interests will typically be enough to justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788.

### A.    The Character and Magnitude of Plaintiffs' Asserted Injury

First, the Court must determine whether the burdens imposed by the statutes are severe based on the "character and magnitude" of Plaintiffs' asserted injury.  As the Sixth Circuit instructed, "to accurately apply this test, [the Court] must first determine the exact nature of the burden placed upon [independent attorney general candidates] and their voter-supporters." *Libertarian Party of Ohio*, 462 F.3d at 586.

### i. *The Character of Plaintiffs' Rights*

#### a.    What Rights Do Plaintiffs Say are Burdened?

Plaintiffs allege Michigan's regulations harm them in several ways, including by: (1) infringing upon Graveline's right to appear on the November general election ballot as an independent, non-partisan candidate for attorney general; (2) violating the Plaintiff-Voters' right to "cast a meaningful and effective vote"; and (3) hindering their freedom to associate for the advancement of their political beliefs by precluding independent candidates for attorney general from qualifying for the ballot.

#### b.    What Do Plaintiffs Rely on to Say This is a Significant Burden?

Plaintiffs say Michigan's ballot access statutes significantly burden their rights because the deadline requires that independent candidates conduct their petition drives well before the major party nominees are known, and before voters are paying attention to, much less actively engaged in, the electoral process.  They contend that the early filing deadline imposed by § 168.590c(2) is even more burdensome as applied in

9

conjunction with the high signature requirement imposed by § 168.544f and the signature distribution requirement in § 168.590b(4).

Plaintiffs say Michigan's 30,000-signature requirement for independent candidates for statewide office is among the most restrictive in the nation; only five states impose higher requirements. In support of this assertion, Plaintiffs rely on the declaration of Richard Winger, who has been accepted as an expert witness concerning ballot access for minor parties and independent candidates in ten states. [*See* Winger Declaration, ECF No. 1-2, PgID 20, 22]; *see also Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1348 (N.D. Ga. 2016), *aff'd*, 674 Fed. Appx. 974 (11th Cir. 2017) ("Courts have considered Mr. Winger's expert testimony in many other cases and this Court finds that he is a reliable witness. Moreover, the Court primarily has relied on Mr. Winger as a gatherer of data, and there is no suggestion here that the data are inaccurate.").

The State does not challenge the opinion of Winger, nor does it contradict his conclusions. The Court accepts his conclusions as true for purposes of considering Plaintiffs' motion.

Plaintiffs say the difficulty of complying with Michigan's high signature requirement is further compounded by the substantial financial and human resources needed to satisfy the distribution requirement, which necessitates fielding petition circulators in half the congressional districts in the state. Plaintiffs say their efforts to comply with Michigan's statutes – as summarized above – demonstrate the nature of these burdens. Though Graveline spent approximately $38,000 and received over 1,000 volunteer hours from 231 individuals, his campaign only made it roughly halfway

10

to Michigan's high signature requirement. The State says this is due to Graveline's late start in collecting signatures.

Plaintiffs argue that, taken together, Michigan's provisions impose burdens so severe that they function as an absolute bar to independent candidates for statewide office seeking access to Michigan's general election ballot.

c.     Analyzing the Character of Plaintiffs' Rights

The nature of Plaintiffs' alleged injuries involve some of our most fundamental rights and go to the heart of being able to effectively participate in the election process; indeed, "[t]he right to cast an effective vote 'is of the most fundamental significance under our constitutional structure[,]' and [t]he rights of political association and free speech occupy a similarly hallowed place in the constitutional pantheon." *Libertarian Party of Ohio*, 462 F.3d at 585 (quoting *Burdick*, 504 U.S. at 433); *see also California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."); *Green Party of Mich. v. Land*, 541 F. Supp. 2d 912, 917 (E.D. Mich. 2008); *Mogk v. City of Detroit*, 335 F. Supp. 698, 700 (E.D. Mich. 1971) ("*Reynolds*, *supra*, and *Williams*, *supra*, hold that a citizen has a right to vote effectively and, by logical extension, that means that he is to be given a wide latitude in his choice of public officials. His right to support a candidate of his choice – including himself – cannot be arbitrarily restricted."); *Bolanowski v. Raich*, 330 F. Supp. 724, 727 (E.D. Mich. 1971) ("The Supreme Court has also made it clear that when the right of association and the right to vote effectively are infringed, 'only a compelling state interest in the regulation of

11

a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms. *NAACP v. Button*, 371 U.S. 415, 438 (1963)'" (quoting *Williams*, 393 U.S. at 31)).

### ii. *The Magnitude of Plaintiffs' Injury*

In determining the magnitude of the burden imposed by a state's election laws, the Sixth Circuit instructs the Court to consider the associational rights at issue, including: (1) "evidence of the real impact the restriction has on the process"; (2) "whether alternative means are available to exercise those rights"; and (3) "the effect of the regulations on the voters, the parties and the candidates." *Libertarian Party of Ohio*, 462 F.3d at 587. Courts must also take into account "the interests of the state relative to the scope of the election." *Id.* The Court will address the interests of the State after determining the severity of the burden imposed by the challenged regulations.

Importantly, the Court must consider the "combined effect" of the challenged regulations, rather than each statute's requirement by itself. *See id.* at 586 ("Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights.").

Consideration of these three associational rights leads the Court to conclude that the combined effect of Michigan's statutory scheme severely burdens Plaintiffs' fundamental rights.

### a. Evidence of the Real Impact the Restrictions Have Had on the Process Supports a Finding of Severe Burden

In evaluating the "real impact" election laws have on the process, a number of courts examine historical data on ballot access that independent candidates (or minor

parties) have been able to obtain.  *Libertarian Party of Ohio*, 462 F.3d at 589-90 ("While

not conclusive in and of itself, the Supreme Court has noted that a historical record of

parties and candidates being unable to meet the state's ballot-access requirements is a

helpful guide in determining their constitutionality.").  Indeed, in *Storer*, the Supreme

Court remanded the case and instructed the district court to consider whether

> "a *reasonably diligent* independent candidate [could] be expected to
> satisfy the signature requirements, or will it be only rarely that the
> unaffiliated candidate will succeed in getting on the ballot? Past
> experience will be a helpful, if not always an unerring, guide: it will be one
> thing if independent candidates have qualified with some regularity and
> *quite a different matter if they have not*."

*Storer*, 415 U.S. at 742 (emphasis added); *Fishbeck v. Hechler*, 85 F.3d 162, 164-65

(4th Cir.1996) (examining historical data to determine severity of burden on minor party

candidates).  *See also Jenness v. Fortson*, 403 U.S. 431, 438 (1978) (considering

whether state's elections laws "operate[d] to freeze the political status quo").

      Michigan's history is telling.

      The current Michigan statutory scheme was adopted in 1988.  In the thirty years

since, no independent candidate for statewide office has qualified for the ballot.  This

historical evidence paints a clear picture of the "real impact the restriction[s] ha[ve]" on

Plaintiffs and demonstrates the severe burden Michigan's statutory scheme has on

independent candidates for statewide office.

      Although Graveline was a *reasonably diligent* candidate, he was unable to satisfy

all the statutory requirements.  Because independent candidates for statewide office

have *never* qualified for the ballot under Michigan current regulations – let alone

qualified with some regularity – the Court finds that the State's election laws "operate to

freeze the political status quo," and effectively bar independent candidates from

accessing the ballot. *See Jenness*, 403 U.S. at 438; *Storer*, 415 U.S. at 742. *See also Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008) (finding that Arizona filing deadline for independent candidates "severely burdened" speech, voting, and associational rights of independent candidate and supporters where history showed that no independent candidate had appeared on the ballot since 1993, when Arizona changed its filing deadline from 10 days after the primary election to 75 days before the primary election); *Delaney v. Bartlett*, 370 F. Supp. 2d 373, 377-78 (M.D.N.C. 2004) (finding that North Carolina regulation "severely disadvantage[d]" independent candidates and warranted strict scrutiny where the "historical evidence of ballot exclusion" of independent candidates in comparison with party candidates showed that "only one unaffiliated candidate has been placed on the ballot as a contender for statewide office" over the preceding 20 years).

The fact that no independent candidate for statewide office has ever satisfied Michigan's current statutory scheme to qualify for the ballot demonstrates "that the regulations impose a severe burden that has impeded ballot access." *See Brewer*, 531 F.3d at 1038.

        b.   <u>No Alternative Means are Available to Plaintiffs to Exercise Their Rights</u>

During the hearing, the State argued that Michigan's statutory scheme does not impose a severe burden on Graveline or the Plaintiff-Voters because Michigan allows an independent candidate for attorney general who did not qualify for the ballot to run as a write-in candidate by filing a Declaration of Intent by October 26, 2018. This argument is unavailing. The Supreme Court has indicated that "[t]he realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls far short of access in

14

terms of having the name of the candidate on the ballot." *Lubin v. Panish*, 415 U.S. 709, 719 n. 5 (1974); *see also Anderson*, 460 U.S. at 799 n. 26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidates name appear on the printed ballot").

There are no alternative means for Graveline to appear on the ballot as an independent candidate. Moreover, because the Michigan statutory scheme has prevented independent candidates for attorney general from accessing the ballot, Plaintiff-Voters have no alternative means to exercise their right to cast their vote effectively; while they could write in Graveline as an independent candidate, this is not an adequate substitute. This factor strongly suggests that the challenged regulations severely burden Plaintiffs' rights.

        c.     The Combined Effect of the Regulations Demonstrates that They Severely Burden Plaintiffs' Rights

In analyzing the issues presented by this case, the Court is not limited to an examination of how the statutes at issue affect the associational rights of the Plaintiff-Voters and Graveline's ability to appear at all on the general election ballot. In cases analyzing ballot access, "the Supreme Court [also] 'focuses on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity.'" *Libertarian Party of Ohio*, 462 F.3d at 588 (internal brackets omitted) (quoting *Anderson*, 460 U.S. at 793. "'A burden that falls unequally on . . . independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates – and of particular importance – against those

15

voters whose political preferences lie outside the existing political parties.'" *Id.* (quoting *Anderson*, 460 U.S. at 793-94).

Courts further note that "[u]naffiliated candidates enhance the political process by challenging the status quo and providing a voice for voters who feel unrepresented by the prevailing political parties." *Delaney*, 370 F. Supp. 2d at 377 (citing *Anderson*, 460 U.S. at 794). Moreover, "independent candidates in particular play an important role in the voter's exercise of his or her rights." *Green Party of Georgia*, 171 F. Supp. 3d at 1352. In light of this, and because independent candidates are more responsive to emerging issues and less likely to wield long term or widespread governmental control, "independent candidacies must be accorded even more protection than third party candidacies." *Cromer v. South Carolina*, 917 F.2d 819, 823 (4th Cir.1990).

Michigan's election laws fail to account for these important considerations. The historical evidence shows that no independent candidate for statewide office has appeared on the ballot since 1988. This is twice as long as the historical evidence considered in *Brewer*, *supra*, and ten years longer than the historical data considered in *Delaney*, *supra*; both courts held that the effect of the state laws' exclusion of independent candidates from the ballot severely burdened the rights of the independent candidates and their supporters.

The same is true here. "By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, [Michigan's ballot access regulations] threaten to reduce diversity and competition in the marketplace of ideas." *See Anderson*, 460 U.S. at 794.

16

In sum, the Court finds that Plaintiffs satisfy their burden to show that, as applied, the combination of Michigan's ballot access regulations severely burdens their fundamental rights under the First and Fourteenth Amendments.

### iii. *The State Does Not Address the Combined Effect of the Regulations and Ignores the Historical Evidence*

The State spends a significant portion of its brief arguing that Plaintiffs' rights are not severely burdened because other courts have upheld state laws requiring a candidate or party to collect 30,000 signatures to gain access to the ballot. Nowhere, however, does the State discuss the combined effect of the statutory scheme. This is contrary to the applicable standard recognized by the Supreme Court and set forth in *Libertarian Party of Ohio*. *See id.*, 462 F.3d at 593 ("It is this combined burden on the party's rights that we must address.").

By failing to address the combined effect of the regulations, the State – like the defendant in *Libertarian Party of Ohio* – "misses the point" and fails to address the appropriate inquiry. *See id.* at 592-93.

Beyond discussing the signature requirement, the State summarily relies on *Erard v. Johnson*, 905 F. Supp. 2d 782 (E.D. Mich. 2012), in which a judge in this district determined that Michigan's ballot access requirements for a new minor political party – which were similar to the requirements for independent candidates challenged here – did not severely burden the plaintiff's rights. *Id.* at 806.

In blindly relying on *Erard*, the State failed to address several material differences between that case and this one.

First, *Erard* focuses on new (minor) party ballot access as opposed to an independent candidate. As Plaintiffs point out, this is a distinction of consequence. *See*

17

*Storer*, 415 U.S. at 745 ("the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other"). Of particular note is the fact that, in 2002, Michigan made it easier for minor parties to access the ballot. *See Erard*, 905 F. Supp. 2d at 804-05.

In addition, in reaching its conclusion that Michigan's ballot access regulations did not severely burden new political parties, *Erard* relied significantly on historical evidence showing that minor political parties were able to access the ballot: "perhaps *most significant*[] is that minor political parties have a history of gaining access to Michigan's ballots." *Id.* at 803-04 (emphasis added). As discussed in depth above, the historical evidence in this case is the polar opposite of "perhaps [the] most significant" evidence *Erard* used to conclude that the regulations did not impose a severe burden.

Moreover, the relevant date for comparing the filing deadline in *Erard* was the primary election deadline, which has no relevancy here. Because major parties will select their attorney general nominees at their nominating conventions, which can be as late as September 7, 2018, that date is what is most relevant to Plaintiffs' claims. That date is 50 days after Graveline's deadline to file. Although Plaintiffs raise this distinction, the State fails to address it.

With the foregoing distinctions in mind, the State's reliance on *Erard* – and *conclusory* assertion that the regulations do not severely burden independent candidates for statewide office because *Erard* found that similar requirements did not severely burden the rights of *new political parties* – ignores the principle that, "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike . . . ." *Green Party of Tennessee v. Hargett*, 791 F.3d

18

684, 694 (6th Cir. 2015) (quoting *Jenness*, 403 U.S. at 441-42). Like in *Green Party of Tennessee*, the differences between independent candidates and minor parties, and the historical lack of access to the ballot for independent candidates for statewide office in Michigan, "justify having less onerous burdens on [independent candidates] than [minor] political parties." *See id.*

In sum, the State fails to address the combined effect of the statutory scheme on Plaintiffs' rights, and it ignores the historical evidence showing independent candidates for statewide office have had no meaningful access to the ballot. The State falls well short of demonstrating that the collective effect of the regulations does not severely burden Plaintiffs' rights.

### B.      The Interests of the State

Because the combined application of Michigan's ballot access regulations severely burdens Plaintiffs' rights, the State must set forth precise interests of compelling importance and show that the regulations are necessary and narrowly tailored to advance those interests. *See Timmons*, 520 U.S. at 358; *Anderson*, 460 U.S. at 789.

Despite this requirement, the State, like the State in *Libertarian Party of Ohio*, "has made no clear argument regarding the precise interests it feels are protected by the regulations at issue in the case, relying instead on generalized and hypothetical interests identified in other cases." *See id.*, 462 F.3d at 593.

The State asserts the following generalized interests:

> But even if this Court determines that the challenged provision substantially burdens First Amendment laws or invidiously discriminates against independent candidates, triggering strict scrutiny, the State has a compelling interest in protecting the integrity of its election process, *see*

19

> *American Party*, 415 U.S. at 781[,] in preventing the clogging of the state's election machinery, and in avoiding voter confusion. *See Socialist Workers Party*, 412 U.S. at 589 (citing *Bullock v. Carter*, 405 U.S. 134, 145 (1972)); *see also Socialist Party*, 412 Mich. at 591, n. 14 (noting that the Supreme Court in *American Party of Texas v. White* described "preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion" as compelling state interests). The Supreme Court has also recognized the State's interest in screening out frivolous candidates and discouraging party-splintering and factionalism. *Timmons*, 520 U.S. at 367.

> Michigan has a recognized interest in ensuring that candidates for statewide office demonstrate a modicum of statewide support, and to do so, voters must necessarily publicly show their support at the petition stage.

[ECF No. 8, PgID 123-24]. This is the extent of the State's effort to address its interests.

At the August 22 hearing, the State argued most vociferously that candidates must demonstrate a modicum of support.

Plaintiffs contend that the State's position that 30,000 signatures is the minimal number necessary for candidates for statewide office to demonstrate a "modicum of support" is a completely arbitrary number. The Court agrees. For example, in Mich. Comp. Laws § 168.544f, the State sets forth the number of signatures of qualified and registered electors necessary for nominating petitions, based on the population of the district. A candidate from a district with a population up to 4,999,999 – just one person short of the 5 million statewide figure – need only obtain a minimum of 12,000 signatures on a qualifying petition to make it on a ballot, as opposed to the 30,000 minimum needed for a population of just one more – albeit on a statewide qualifying petition. That a statewide candidate must also obtain at least 100 signatures from half of Michigan's 14 congressional districts does not account for this discrepancy.

20

If demonstration of a "modicum of support" is the driver for the number of signatures that must be obtained, what is the State's rationale for requiring 18,000 more signatures on a qualifying petition with a population difference of one person? The United States Supreme Court addressed such a discrepancy in *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). There, the Court considered an Equal Protection challenge to the Illinois Election Code, which required new political parties and independent candidates to obtain the signatures of 25,000 qualified voters in order to appear on a ballot for statewide elections, but applied a different – and higher – standard in elections for offices in political subdivisions of the state. *Id.* at 175-76. The scheme required potential candidates for office in the City of Chicago to collect more than 25,000 signatures. *Id.* The Court held the discrepancy rendered the Illinois Election Code unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 186-87.

The Court recognized that the size of the pool from which signatures are requested could have significance in explaining the different standards, but also said that "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Id.* at 185 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973)). The Supreme Court held that discrepancies tied solely to a population standard and "historical accident," without more, "cannot constitute a compelling state interest." *Id.* at 187.

While the State's interests certainly are "important regulatory interests," *see Anderson*, 460 U.S. at 786, they are far from the precise interests required under the *Anderson-Burdick* framework to justify ballot access laws that severely burden a

21

candidate's and individual voters' rights.  *See Libertarian Party of Ohio*, 462 F.3d at 593 ("Reliance on suppositions and speculative interests is not sufficient to justify a severe burden on First Amendment rights.").  Thus, like in *Libertarian Party of Ohio*, the State's reliance on generalized and unsupported interests are insufficient to justify the statutory scheme's severe burden on Plaintiffs' First and Fourteenth Amendment rights.  *Id.* at 593-94.  Moreover, the State does not show – much less attempt to demonstrate – that the challenged statutes are narrowly tailored to meet their interests, as required under the *Anderson-Burdick* framework.

The State falls far short of satisfying its burden to show that the severe burdens caused by the scheme are justified.

### C.    Other Preliminary Injunction Factors

The remaining preliminary injunction factors – whether Plaintiffs would suffer irreparable injury absent an injunction; whether an injunction would cause substantial harm to others; whether the public interest would be served by an injunction – weigh in favor of an injunction.  Because Plaintiffs show a strong likelihood that Michigan's ballot access regulations violate their First and Fourteenth Amendment rights as applied to them, they would suffer irreparable injury without an injunction; this outweighs the interest considered in the other factors.  *See Bays*, 668 F.3d at 819; *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) ("[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights.").

## V.  CONCLUSION

Plaintiffs demonstrate both a strong likelihood of success on Counts II and III of their complaint and that the circumstances justify a preliminary injunction.

Accordingly, the Court **GRANTS** Plaintiffs' motion for preliminary injunction.

## VI.  REMEDY

Plaintiffs sought – and won – a declaration that Michigan's election laws – Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) – are invalid as applied to them.  The Court makes no finding that Michigan's election laws have no constitutional application whatsoever.  Consideration of that may be left to another day.

As a court of equity, this Court has flexibility to fashion a remedy that is in line with its finding that the above statutes are unconstitutional as applied to these Plaintiffs. *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.").  The Court can go far in crafting a remedy that gives due attention to the legitimate concerns of all parties.  *Id.*

Plaintiffs ask the Court to simply place Graveline on the general election ballot without signature verification.  But such a remedy would not honor Michigan's compelling state interest to preserve the integrity of its electoral process and regulate the number of people on the general election ballot.  *See Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) ("*Jenness* and *American Party* establish with unmistakable clarity that States have an 'undoubted right to require candidates to make

23

a preliminary showing of substantial support in order to qualify for a place on the ballot.'").

On the other hand, the status quo in Michigan dishonors Plaintiffs' constitutional rights to ballot access and a wide latitude in their choice of public officials; to freely associate and advance their political beliefs; and to cast their votes meaningfully and effectively.

With this in mind, the Court picks a number that is supported by the limited evidence in this case, and which it "believes provides a constitutionally valid balancing of the competing interests at stake in this dispute." *See Jones v. McGuffage*, 921 F. Supp. 2d 888, 902 (N.D. Ill. 2013) (finding that 3,444 valid signatures was sufficient for showing "substantial modicum of support").

Based on an analysis of election returns for all 50 states over fifty years, Plaintiffs' expert opines that states that require 5,000 signatures for general election ballot access for independent candidates or new parties for statewide office will not have a crowded ballot.  [*See* Winger Declaration, ECF No. 1-2, PgID 22].  It would follow that such states believe that this same signature requirement of not less than 5,000 signatures can satisfactorily demonstrate a sufficient level of community support for a candidate for statewide office in Michigan.

The Court accepts Winger's declaration as evidence on these points because: (1) Winger's conclusions appear to be based in fact and supported by reliable data; (2) Winger has been accepted as an expert witness concerning ballot access for minor parties and independent candidates in 10 states; and (3) the State does not challenge his declaration or any conclusion he makes.  This is a preliminary finding only; the Court

does not certify him as an expert on other issues, and the State is not foreclosed from challenging his reliability as a witness if this case proceeds.

The Court orders:

1.     Graveline must immediately present his qualifying petition – with all materials he tried to submit on July 19, 2018, including the signatures of registered voters that he collected – to the Bureau of Elections;

2.     The State must accept Graveline's filing as complete and determine the validity of the signatures in time to place Graveline on the ballot if he has sufficient valid signatures; and

3.     If Graveline has at least 5,000 valid signatures, and at least 100 valid signatures from registered voters in each of at least half of the 14 congressional districts of the state, his name must be placed on the November 6, 2018 general election ballot as an independent candidate for the Office of Michigan Attorney General.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: August 27, 2018



ⓘ Cited
As of: August 21, 2018 3:36 PM Z

## *Fla. Democratic Party v. Detzner*

United States District Court for the Northern District of Florida, Tallahassee Division

October 16, 2016, Decided; October 16, 2016, Filed

Case No. 4:16cv607-MW/CAS

**Reporter**
2016 U.S. Dist. LEXIS 143620 *; 2016 WL 6090943

FLORIDA DEMOCRATIC PARTY, AND THE DEMOCRATIC NATIONAL COMMITTEE, Plaintiffs, v. KEN DETZNER, IN HIS OFFICIAL CAPACITY AS FLORIDA SECRETARY OF STATE, Defendant.

**Counsel:** **[\*1]** For FLORIDA DEMOCRATIC PARTY, DEMOCRATIC NATIONAL COMMITTEE, Plaintiffs: AMANDA R CALLAIS, ELISABETH C FROST, PRO HAC VICE, BRUCE V SPIVA, MARC E ELIAS, LEAD ATTORNEY, PERKINS COIE LLP - WASHINGTON DC, WASHINGTON, DC; MARK HERRON, LEAD ATTORNEY, ROBERT JOHN TELFER, III, MESSER CAPARELLO & SELF PA - TALLAHASSEE FL, TALLAHASSEE, FL.

For KEN DETZNER, IN HIS OFFICIAL CAPACITY AS FLORIDA SECRETARY OF STATE, Defendant: DAVID ANDREW FUGETT, LEAD ATTORNEY, FLORIDA DEPARTMENT OF STATE OFFICE OF GENERAL COUNSEL, TALLAHASSEE, FL; ADAM SCOTT TANENBAUM, FLORIDA DEPARTMENT OF STATE - RA GRAY BUILDING, OFFICE OF THE GENERAL COUNSEL, TALLAHASSEE, FL; ROBERT WAYNE PASS, W DOUGLAS HALL, CARLTON FIELDS JORDEN ETC PA - TALLAHASSEE FL, TALLAHASSEE, FL; STEVEN C DUPRE, CARLTON FIELDS JORDEN ETC PA - TAMPA FL, TAMPA, FL.

**Judges:** Mark E. Walker, United States District Judge.

**Opinion by:** Mark E. Walker

# Opinion

## ORDER GRANTING PRELIMINARY INJUNCTION[1]

"At the root **[\*2]** of the present controversy is the right to vote—a 'fundamental political right' that is 'preservative of all rights.'" *Williams v. Rhodes, 393 U.S. 23, 38, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968)* (quoting *Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L. Ed. 220 (1886))*. Voting is a "precious" and "fundamental" right. *Harper v. Va. State Bd. of Elections, 383 U.S. 663, 670, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966)*. By definition, that right includes "the right of qualified voters within a state to cast their ballots and *have them counted* . . . ." *United States v. Classic, 313 U.S. 299, 315, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)* (emphasis added).

This is a case about vote-by-mail ballots. For years, the State of Florida has consistently chipped away at the right to vote. It limits the time allotted to register to vote to the greatest extent permissible under federal law. *See 52 U.S.C. § 20507(a)(1) (2012)* (requiring each state to allow voters to register, at a minimum, up to thirty days prior to Election Day); *§ 97.055(1)(a), Fla. Stat.* (2016) (closing the Florida voter registration books twenty-nine days prior to Election Day). It limits the methods for voter registration. *See § 97.053, Fla. Stat.* (2016) (disallowing online voter registration and same-day registration on Election Day). It limits the number of early voting days. *See id. § 101.657* (allowing only seven days for early voting). This is just a sampling.

In light of those limitations, many Florida voters choose to vote by mail. And that option has become increasingly popular in recent years—six percent more voters **[\*3]** cast vote-by-mail ballots in the 2012 General Election than the

---

[1] This Court recognizes that time is of the essence inasmuch as the supervisors of elections have received thousands of vote-by-mail ballots. Moreover, this Court wishes to afford the parties a meaningful opportunity to file an appeal. Accordingly, this order issues on an expedited basis.

2008 General Election. ECF No. 3, at 8-9. What vote-by-mail voters likely do not know, however, is that their vote may not be counted. In Florida, if a voter's signature on a vote-by-mail ballot does not match the signature on file with the supervisor of elections office then the ballot is declared "illegal" and their vote is not counted. Moreover, that voter only receives notice that their vote was not counted *after* the election has come and gone and, further, is provided no opportunity to cure that defect. On the other hand, if a vote-by-mail voter doesn't bother to sign the ballot in the first place, that voter is immediately notified and provided an opportunity to cure.

The issue in this case is whether Florida's statutory scheme, which provides an opportunity to cure no-signature ballots yet denies that same opportunity for mismatched-signature ballots, is legally tenable. The answer is a resounding "no."

I

Like many states, Florida allows its registered eligible voters, without an excuse, to cast their ballots by mail (as opposed to casting their votes at their assigned precinct on Election Day). *§ 101.62, Fla. Stat.* (2016). And that option **[*4]** is becoming more and more popular—2.37 million vote-by-mail ballots were submitted in the 2012 General Election, and even more are expected for the 2016 General Election. ECF No. 4, at 3. Those voters who opt to vote by mail have to jump through a few simple administrative hoops. For example, vote-by-mail voters must send their ballot back in a specially marked secrecy envelope. *§ 101.65, Fla. Stat.* (2016). Those voters also must insert that envelope in another mailing envelope, seal that mailing envelope, and fill out the "Voter's Certificate" on the back of the mailing envelope. *Id.*

A different requirement lies at the heart of this case. For a vote-by-mail ballot to be counted, the envelope of that ballot must include the voter's signature. *Id.* Once the vote-by-mail ballots are received, county canvassing boards review those ballots to verify that the signature requirement has been met. If the vote-by-mail ballot lacks the voter's signature, it is considered an "illegal" ballot and "will not be counted." *Id.* But the would-be-voter has an opportunity to cure that "no-signature" ballot and cast an effective vote in the same election cycle until 5:00 p.m. the day before an election by "complet[ing] and submit[ting] an affidavit **[*5]** in order to cure the unsigned vote-by-mail ballot." *Id. § 101.68(4)(b).* That affidavit must be accompanied by one of the enumerated identification forms and then mailed, faxed, e-mailed, or delivered in person to the applicable county supervisor of elections. *Id. § 101.68(4)(d).* As explained by Leon County Supervisor of Elections Ion Sancho, the affidavit is issued by the Florida Secretary of State's office. The specific instructions for each individual supervisor of elections, however, are listed on their individual websites, along with

the state-issued affidavit and any necessary contact information. *Id. § 101.68(4)(e).*

But the county canvassing boards do not just review the vote-by-mail ballots to verify that they are *actually* signed; they also compare those signatures to voters' signatures submitted in the registration process. *Id. § 101.68(2)(c)(1).* These county canvassing boards are staffed by laypersons that are not required to undergo—and many do not participate in—formal handwriting-analysis education or training.[2] If the canvassing board believes that the signature on the vote-by-mail ballot does not correspond to the signature on file with the supervisor of elections office, the ballot is deemed "illegal" and is therefore rejected. **[*6]** *Id. § 101.65* ("A vote-by-mail ballot will be considered illegal and not be counted if the signature on the voter's certificate does not match the signature on record.").[3] In other words, the vote does not count. When that occurs, the local supervisor of elections will mail a new registration application to the voter after the election, "indicating the elector's current signature." *Id. § 101.68.*

Prior to 2004, the same opportunity to cure was provided to "mismatched-signature" voters and no-signature voters. But that is no longer the case.[4] Rather, unlike the "no-signature" voters, those would-be-voters who, in fact, comply with Florida law and sign their ballot appropriately do not have an opportunity to cure before the election is over.[5] That is **[*7]**

---

[2] The canvassing boards consist of "the [local] supervisor of elections; a county court judge, who shall act as chair; and the chair of the board of county commissioners." *§ 102.141, Fla. Stat.* (2016). Substitute members can be appointed as necessary. *Id.*

[3] It bears noting that handwriting experts are often challenged under *Daubert*. There is no way that any member of a canvassing board could survive a *Daubert* challenge yet the State of Florida empowers them to declare ballots illegal.

[4] The tortured history of this statute is quite complicated. Prior to 2004, the procedures for curing vote-by-mail ballots varied from county to county. In 2004, the Florida legislature enacted a statute that rejected all mismatched-signature ballots and no-signature ballots without an opportunity to cure. Fla. H.R. Comm. on Ethics & Elections, Bill CS/HB 7013 (2013) Staff Analysis 1, 5. In 2013, the Florida legislature amended that statute to allow no-signature ballots to be cured but did not provide that same opportunity for mismatched-signature ballots. Ch. 2013-57, *§ 101.68*, Laws of Fla. That amendment took effect in 2014. *Id.*

[5] It is true that voter signatures may be updated "at any time using a voter registration application submitted to a voter registration official." *§98.077, Fla. Stat.* (2016). That option, however, is effectively foreclosed for mismatched-signature voters. For those

because, although those would-be-voters have an opportunity to update their registration signatures, that opportunity is too late for those votes to be counted in the same election cycle. Instead, the updated signature can only be used in future election cycles.

Furthermore, the State of Florida has no formalized statewide procedure for canvassing boards to evaluate whether the signature on a vote-by-mail ballot matches the signature on file with the elections office. And the procedures in place vary widely by county. ECF No. 4, at 7-9. As a result of these varied procedures, the number of mismatched-signature ballots that are rejected *also* varies widely by county. *See* ECF No. 3-3, at 30. In the 2012 General Election, for example, Pinellas County rejected approximately .25% of all vote-by-mail ballots cast, while Broward County rejected close to 1.5%. *Id.*

To help understand some of these differences, this Court called Ion Sancho, Leon County Supervisor of Elections, as a court witness pursuant to *Federal Rule of Evidence 614(b)*. He explained that some counties go above and beyond that required under Florida law to make [*9] sure that all Florida citizens have a fair opportunity to vote and have their votes counted. Leon County, for example, will go so far as to call or email no-signature voters to make sure that they have notice as to their voting deficiency. He also explained that vote-by-mail ballots submitted in Leon County are first reviewed by a computer software. If the computerized comparison raises any issues, then a human inspection of that signature is conducted. If the elections staff is still unable to ascertain the validity of that signature, then the signature is brought before the canvassing board for adjudication. While that procedure is crucial in larger counties, Supervisor Sancho testified that it is not necessary (and, to his knowledge, is not used) in rural counties. In fact, financial limitations may make it unfeasible to conduct that exhaustive of a review in those smaller counties. Even though these procedures vary from county to county, Supervisor Sancho testified that he and two other supervisors of elections agree that there is no reason why mismatched-signature ballots cannot be treated the same as no-signature ballots during the review (and cure) process.[6]

Plaintiffs brought this case arguing that Florida's vote-by-mail procedures unconstitutionally burden the rights of Florida's mismatched-signature voters. Specifically, Plaintiffs seek an in-junction enjoining Defendants and anyone under their supervision from rejecting mismatched-signature ballots without first affording those voters an opportunity to cure in the same election cycle. ECF No. 4, at 25.[7]

II

Before this Court reaches the merits, a few housekeeping matters must be addressed.

The first is standing, "as it is a threshold matter required for a claim to be considered by the federal courts." *Via Mat Int'l S. Am. Ltd. v. United States, 446 F.3d 1258, 1262 (11th Cir. 2006)*. Associations or organizations, in certain scenarios, have standing to assert claims based on injuries to itself or its members if that organization or its members are affected in a tangible way. *See United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996)*. More specifically, organizations can "enforce the rights of its members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1342 (11th Cir. 2014)* (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000))*.

As one of my colleagues held in another election case, political parties have standing to assert, at least, the rights of its members who will vote in an upcoming election. *Fla. Democratic Party v. Hood, 342 F. Supp. 2d 1073, 1078-79 (N.D. Fla. 2004)* (Hinkle, J.). That was so even though the

---

[6] Defendant objected [*10] to portions of Supervisor Sancho's testimony on hearsay grounds. But "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials

updated signatures to be effective in the immediate election, they [*8] must be submitted prior to the canvass. *Id. § 101.68*. But because mismatched-signature ballots are necessarily rejected *during* the canvass, that option is not available. Rather, in any given election, those voters only receive notification as to their vote's rejection after their only opportunity to update their signature for that election cycle has come and gone.

which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1995)* (quoting *Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir. 1986))*. For those same reasons, Defendant's objections to Plaintiffs' evidence are also denied. ECF No. 25. That evidence was therefore considered by this Court.

[7] This Court has not held a hearing on this matter. Under *Rule 65*, an evidentiary hearing is not required "where the material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought . . . ." *McDonald's Corp. v. Robertson, 147 F.3d 1301, 1313 (11th Cir. 1998)* (citations omitted). Because Defendant Detzner only raised jurisdictional [*11] arguments, no material facts are in dispute and this Court may (and does) address the matter solely on the papers. *See* ECF No. 30 (cancelling hearing).

political party could not identify *specific* voters that would be affected; it is sufficient [*12] that some inevitably have. Here too, Plaintiffs need not identify *specific* voters that are registered as Democrats that will have their vote-by-mail ballot rejected due to apparent mismatched signatures; it is sufficient that some inevitably will. In fact, because mismatched-signature voters do not receive notice that their vote was rejected until after the election, this Court cannot imagine who would have standing save such organizations. Plaintiffs thus have standing.

Second, this Court must address whether Defendant is the proper party to be sued in this case. It is well-established that while a state may not be sued unless it waives its sovereign immunity or that immunity is abrogated by Congress, *Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 120 S. Ct. 631, 145 L. Ed. 2d 522 (2000)*, a suit alleging a constitutional violation against a state official in his official capacity for prospective injunctive relief is not a suit against the state and, therefore, does not violate the *Eleventh Amendment*, *Ex Parte Young, 209 U.S. 123, 161, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*. That is because "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011)*.

Here, Plaintiffs seek prospective injunctive relief against the Secretary of State in his official capacity. [*13] Defendant Detzner nonetheless argues that he cannot direct the canvassing boards to comply with any order issued by this Court. ECF No. 28, at 6. That is, Defendant Detzner asserts that Florida law does not allow him to grant the sort of directive that would be required here. *See* ECF No. 29, at 13.

This is, at best, disingenuous. As noted by Plaintiffs in their reply, ECF No. 33, at 2, Florida law, on its face, establishes that, as Secretary of State, Defendant Detzner is the "chief election officer" for the State of Florida, *§ 97.012, Fla. Stat.* (2016). And as head of the Department of State, the "general supervision and administration of the election laws" in Florida are his responsibility. *Id.* *§§ 15.13*, *20.10*. Florida law therefore vests Defendant Detzner with the authority to "adopt by rule uniform standards" for the "interpretation and implementation of" the Florida Election Code (specifically, "chapters 97-102 and chapter 105"), *id.* *§ 97.012(1)*; "[p]rovide written direction and opinions to the supervisors of elections" regarding their duties under Florida's election laws, *id.* *§ 97.012(16)*; and bring actions to "enforce compliance" with those laws, *id.* *§ 97.012(14)*. This isn't some recent invention either. The Secretary of State has held this power for [*14] the last ten years. *See* Ch. 2005-278, *§ 97.012*, Laws of Fla. (codifying the pertinent changes to *§ 97.012* in 2005).

Defendant Detzner nonetheless attempts to distinguish *Grizzle* by arguing that, unlike Georgia's Secretary of State, he does not possess the power to issue orders directing compliance with Florida's election laws. But that is simply not the case. The Secretary of State has previously exercised this precise power under *§ 97.012(16)* to order the supervisors of elections to perform specific duties. *See, e.g.*, App. I, at 2. Where those directives are not followed, *section 97.012(14), Florida Statutes*, provides an enforcement mechanism that only the Secretary of State can wield. Further, just last week, this Court ordered Defendant to direct the supervisors of elections to extend the voter registration deadline in light of Hurricane Matthew. *See Fla. Democratic Party v. Scott, et al., Case No. 4:16-cv-626-MW/CAS, 2016 U.S. Dist. LEXIS 142064 (N.D. Fla. Oct. 10, 2016)*. Twice. And, by every appearance, he did so. Twice. Nonetheless, Defendant Detzner still argues that he does not have the authority to issue the same kind of directive that he did last week.[8] Sometimes actions speak louder than words.

Finally, this Court emphasizes that it is not being asked to order Defendant Detzner to direct the individual supervisors of elections to implement specific procedures (which are ordinarily discretionary) in terms of when to meet, how often to meet, or how to evaluate signatures. Defendant's defense would have more merit if that were the case. *See* ECF No. 29, at 10 ("The canvassing boards and local supervisors of elections, not the Secretary, have the final authority with respect to the signature comparison mandated by the statute."). Rather, this Court is simply asked to order Defendant to issue a directive, as he is empowered to do, copying the supervisors with this Order, explaining that a court has declared the existing statutory structure constitutionally impaired, and direct the supervisors of elections and canvassing boards to provide the same opportunity to cure mismatched-signature ballots as no-signature ballots and to follow precisely the same procedure. Because "[h]is power by [*16] virtue of his office sufficiently connect[s] him with the duty of enforc[ing]" the election laws, *Ex Parte Young, 209 U.S. at 161*, he is a proper party here, *cf. Grizzle, 634 F.3d at 1319* (holding that Georgia Secretary of State was proper party in voting case). In short, Defendant is the proper party.

III

Under *Rule 65 of the Federal Rules of Civil Procedure*, a

---

[8] Defendant Detzner attempts to distinguish *Fla. Democratic Party* and, by extension, *[*15] Grizzle*, by asserting that his authority is not as inclusive as that exercised by the Georgia Secretary of State. But given this Court's analysis of *§ 97.012*, it disagrees. *Grizzle* is therefore indistinguishable.

district court may grant a preliminary injunction "only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000)* (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty., 720 F.2d 1511, 1519 (11th Cir. 1983)* (quoting *Canal Authority v. Callaway, 489 F.2d 567, 573 (11th Cir. 1974)).* None of these elements, however, is controlling; rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare, 601 F.2d 199, 203 n.2 (5th Cir. 1979).*[9]

"No right is more **[*17]** precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders, 376 U.S. 1, 17, 84 S. Ct. 526, 11 L. Ed. 2d 481 (1964).* State and local laws that unconstitutionally burden that right are impermissible. *Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008).*

But that does not mean the right to vote is absolute. Rather, states retain the power to regulate their own elections. *Burdick v. Takushi, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992)* (citations omitted). Election laws almost always burden the right to vote. *See id.* ("Election laws will invariably impose some burden upon individual voters."). Some of these regulations must be substantial to ensure that order rather than chaos accompanies our democratic process. *Id.*

Not every voting regulation, however, is subject to strict scrutiny. Rather, courts considering a challenge to state election laws "must weigh 'the character and magnitude of the asserted injury to the rights protected by the *First* and *Fourteenth Amendments* that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it

necessary to burden the plaintiff's **[*18]** rights.'"[10] *Id. at 434* (quoting *Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983)).* "This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote." *Obama for Am. v. Husted, 697 F.3d 423, 429 (6th Cir. 2012).* When voting rights are subjected to "severe" restrictions, the regulation at issue "must be 'narrowly drawn to advance a compelling importance.'" *Id.* (quoting *Norman v. Reed, 502 U.S. 279, 289, 112 S. Ct. 698, 116 L. Ed. 2d 711 (1992)).* If the right to vote is not burdened at all, then rational basis review applies. *Ne. Ohio Coal. for the Homeless v. Husted, 696 F.3d 580, 592 (6th Cir. 2012).* But in the majority of cases where voting rights are subject to less-severe burdens, the State's interests often—but not always—are sufficient to justify the restrictions. *Anderson, 460 U.S. at 788.* In those cases, "[h]owever slight the burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Common Cause/Georgia v. Billups, 554 F.3d 1340, 1352 (11th Cir. 2009)* (quotation omitted).

Defendants raised no defense on the merits (perhaps that is because Florida's statutory scheme is indefensible). This Court nonetheless addresses the merits. During this election cycle, millions of voters across the state will march happily to their mailbox and attempt to exercise their fundamental right to vote by mailing their vote-by-mail ballot. After the election, thousands of those same voters—through no fault of their own and without any notice or opportunity to cure—will learn that their vote was not counted. If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss to what does.[11] *See Stewart v. Blackwell, 444 F.3d 843, 869 (6th*

_____

[9] Decisions of the Fifth Circuit prior to October 1, 1981, are binding within the Eleventh Circuit. *Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)* (en banc).

_____

[10] The Supreme Court has consistently held that the right to vote is analyzed under equal protection. So, this Court does so. But, left to its own devices, this Court would hold that the right to vote is a fundamental right subject to substantive due process analysis and should always be subject to strict scrutiny. *See, e.g.,* Terry Smith, *Autonomy versus Equality: Voting Rights Rediscovered,* 57 Ala. L. Rev. 261, 266 (2005) ("A **[*19]** continuing lamentation of scholars of voting is the failure of the Court to locate the right to vote within the contours of substantive due process rather than equal protection.").

[11] One could (attempt to) argue that Florida's statutory scheme does not amount to a severe burden because it does not affect a large percentage of Florida voters. And that argument would fail. It affected approximately **[*20]** *23,000* in the last election cycle. ECF No. 3-3, at 29. In the 2000 General Election, President George W. Bush won Florida (and the election) by a mere 537 votes. *2000 Official Presidential General Election Results,* FEC (Dec. 2001),

2016 U.S. Dist. LEXIS 143620, *20

*Cir. 2006)* (holding that the right to vote was severely burden where thousands of votes were not counted due to unreliable voting equipment).

As a severe burden, Florida's statutory scheme may survive only if it passes strict scrutiny. This Court does not question that preventing voter fraud is a compelling interest. *See Crawford, et al., v. Marion Cnty. Election Bd., 553 U.S. 181, 225, 128 S. Ct. 1610, 170 L. Ed. 2d 574 (2008)* ("There is no denying the abstract importance, the compelling nature, of combating voter fraud."); *see also Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 231, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989)* ("A state indisputably has a compelling interest in preserving the integrity of its election process."). That interest just has no rational relationship (let alone narrow tailoring) to Florida's statutory scheme. There is simply no evidence that these mismatched-signature ballots were submitted fraudulently. Rather, the record **[*21]** shows that innocent factors—such as body position, writing surface, and noise—affect the accuracy of one's signature.

But even assuming the evidence established that voter fraud ran rampant, that would not be determinative. Again, at issue is not the accuracy of each individual county canvassing board's review process; it is that Florida denies mismatched-signature voters the opportunity to cure. Indeed, this Court is not being asked to order that *any* specific vote be counted, let alone those that are fraudulent. Rather, this Court is simply being asked to require that mismatched-signature voters have the same opportunity to cure as no-signature voters. In fact, letting mismatched-signature voters cure their vote by proving their identity *further* prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted.

Defendant could also have asserted (but did not) a compelling interest in administrative convenience. But the evidence in this case, again, would have foreclosed that argument. To be fair, this Court elicited testimony that at least one supervisor of elections expressed concern that providing an opportunity to cure mismatched-signature **[*22]** ballots would impose an administrative inconvenience on his staff. But that testimony is the only evidence supporting that contention. In fact, two other supervisors of elections—one from a large county, and one from a small county—disagreed and explained that it would "not [be] a problem" to allow mismatched-signature

ballots the same opportunity to cure that no-signature ballots enjoy. Finally, even assuming that it *would* be an administrative inconvenience—and the evidence shows it is not—that interest cannot justify stripping Florida voters of their fundamental right to vote and to have their votes counted. *See Taylor v. Louisiana, 419 U.S. 522, 535, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975)* (explaining that "administrative convenience" cannot justify the deprivation of a constitutional right).

Finally, making matters worse is that canvassing boards across the state employ a litany of procedures when comparing signatures. Rather than enumerating specific procedures for comparing signatures, the Florida legislature "left it to the canvassing boards to make determinations using their collective best judgment as to what constitutes a signature match." ECF No. 3-3, 50 n.1. The result is a crazy quilt of conflicting and diverging procedures. And this Court is deeply **[*23]** troubled by that complete lack of uniformity. But this Court need not—and does not—address that hodgepodge of procedures.

Even assuming that some lesser level of scrutiny applied (which it does not), Florida's statutory scheme would still be unconstitutional. It is illogical, irrational, and patently bizarre for the State of Florida to withhold the opportunity to cure from mismatched-signature voters while providing that same opportunity to no-signature voters. And in doing so, the State of Florida has categorically disenfranchised thousands of voters arguably for no reason other than they have poor handwriting or their handwriting has changed over time. Thus, Florida's statutory scheme does not even survive rational basis review.

As explained above, in addition to the likelihood of success on the merits, three other factors influence the propriety of a preliminary injunction: whether "irreparable injury will be suffered unless the injunction issues," whether "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party," and whether "if issued, the injunction would not be adverse to the public interest." *Siegel, 234 F.3d at 1176*.

Plaintiffs and their members **[*24]** will undoubtedly suffer irreparable injury absent a preliminary injunction. *See, e.g., Obama for Am., 697 F.3d at 436* (finding irreparable injury because irreparable injury is presumed when "[a] restriction on the fundamental right to vote" is at issue). This is not a case where failing to grant the requested relief would be a mere inconvenience to Plaintiffs and their members. Rather, thousands of mismatched-signature voters, arguably through no fault of their own, will have their ballots declared "illegal" by canvassing boards—whose members, I might add, lack any

---

*http://www.fec.gov/pubrec/2000presgeresults.htm* . Not only is Florida's statutory scheme a severe burden on the right to vote, *cf. Ne. Ohio Coal. For the Homeless v. Husted, 696 F.3d 580, 597 (6th Cir. 2012)* (holding that disqualifying thousands of votes because they were cast in the right polling location but wrong precinct was a "substantial" burden on the right to vote), it affects enough votes to change the election results and, by extension, our country's future.

formal handwriting-comparison training or education—without the opportunity to prove they are who they say they are. Those voters are therefore robbed of one of our most basic and cherished liberties; namely, the right to vote and have that vote counted. *See Louisiana v. United States, 380 U.S. 145, 153, 85 S. Ct. 817, 13 L. Ed. 2d 709 (1965)* ("The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar."). As this Court explained in another recent case about the upcoming election, "This isn't golf: there are no mulligans." *Scott, Case No. 4:16-cv-626-MW/CAS, 2016 U.S. Dist. LEXIS 142064, at *12* Once the canvassing starts and **[\*25]** the election comes and goes, "there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014)*.

Similarly, the balance of hardships favors Plaintiffs. The State of Florida has the ability to set its own election procedures (so long as they comply with federal law). That is without question. Some of those procedures promote administrative convenience and efficiency. *See, e.g., § 99.095, Fla. Stat.* (2016) (requiring persons running for certain offices to either pay a qualifying fee or obtain signatures of 1% of the total number of registered voters, divided by the number of districts involved in that office). But there is no rational explanation for why it would impose a severe hardship on Defendant to provide the same procedure for curing mismatchedsignature ballots as for no-signature ballots. In fact, prior to 2004, before the Florida Legislature outlawed the practice, voters had the ability to cure both mismatched-signature ballots and no-signature ballots. And, as testified by Supervisor Sancho, that method was highly effective.

In 2013, with yet another reversal, the Florida Legislature made it so that no-signature ballots could be cured in a simple and effective manner. *Id. § 101.68.* There is no reason that same procedure cannot **[\*26]** be implemented (rather, re-implemented) for mismatched-signature ballots. Any potential hardship imposed by providing the same opportunity—and comfort—for mismatchedsignature voters pales in comparison to that imposed by unconstitutionally depriving those voters of their right to vote and to have their votes counted.

Finally, the injunction is in the public interest. The Constitution guarantees the right of voters "to cast their ballots and *have them counted* . . . ." *Classic, 313 U.S. at 315* (emphasis added); *see also Hunter v. Hamilton Cnty. Bd. of Elections, 635 F.3d 219, 234 (6th Cir. 2011)* ("Thus, we have held that '[t]he right to vote includes the right to have one's votes counted on equal terms with others.'" (quoting *League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 476 (6th*

*Cir. 2008)))*. Florida's statutory scheme, however, threatens that right by subjecting vote-by-mail voters to an unreasonable risk that their ballot will be tossed without any opportunity to cure, let alone any form of notice. By doing so, Florida has cemented an unconstitutional obstacle to the right to vote and has thus struck "at the heart of representative government." *Reynolds v. Sims, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964)*. The public interest is not served by depriving vote-by-mail voters of an opportunity to cure when that opportunity is already available for no-signature voters. In fact, it is just the opposite.

IV

This Order requires **[\*27]** Plaintiffs to give security for costs in a modest amount; namely, $500.00. Any party may move at any time to adjust the amount of security.

V

Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill, 481 U.S. 770, 776, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987); see also Venus Lines Agency v. CVG Industria Venezolana de Aluminio, C.A., 210 F.3d 1309, 1313 (11th Cir. 2000)* (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner v. Scott, 999 F. Supp. 2d 1278, 1292 (N.D. Fla. 2014)* (Hinkle, J.) (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so.

VI

Once again, at the end of the day, this case is about the precious and fundamental right to vote and to have one's vote counted. In our democracy, those who vote decide everything; those who count the vote decide nothing. **[\*28]** [12] Justice Stewart once quipped, in reference to pornography, "I know it when I see it . . ." *Jacobellis v. State of Ohio, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964)* (Stewart, J., concurring). Likewise, this Court knows disenfranchisement

---

[12] An infamous world leader disagreed. See Herma Percy, Ph. D., *Will Your Vote Count? Fixing America's Broken Electoral System* 43 (2009) ("'Those who cast the votes decide nothing. Those who count the votes decide everything.' Joseph Stalin, Communist Dictator").

when it sees it and it is obscene.

Accordingly,

**IT IS ORDERED**:

1. Plaintiffs' Motion for Preliminary Injunction, ECF No. 1, is **GRANTED**. Defendant's Motion to Dismiss, ECF No. 29, is **DENIED**.

2. Defendant Detzner is ordered to issue a directive to the supervisors of elections (with this Order attached) advising them (1) that Florida's statutory scheme as it relates to mismatched-signature ballots is unconstitutional; and (2) that in light of this Court's order they are required to allow mismatched-signature ballots to be cured in precisely the same fashion as currently provided for nonsignature ballots. For example, the supervisors of elections must provide the same notice, *see § 101.68(4)(a), Fla. Stat.* (2016) ("The supervisor of elections shall, on behalf of the county canvassing board, notify **[\*29]** each elector whose ballot was rejected as illegal and provide the specific reason the ballot was rejected . . . ."), the same process, *see id. § 101.68(4)(e)* (outlining the required process), and must allow mismatched-signature ballots to be cured up to the same date and time as currently done for no-signature ballots, *id. § 101.68(4)(b)* (allowing to cure until 5:00 p.m. the day before the election). The difference is that a separate form must be used. Accordingly, Defendant Detzner is required to submit the attached affidavit, *see* App. II, in his directive to the supervisors of elections and require them to provide that form for mismatched-signature voters to cure their ballots (with "DRAFT" removed, of course).

3. The preliminary injunction set out above will take effect upon the posting of security in the amount of $500 for costs and damages sustained by a party found to have been wrongfully enjoined. Plaintiff will immediately notify Defendant when the bond has been posted and thereafter immediately file proof of such notice through the electronic case files system.

4. Likewise, upon receipt of the notice of the posting of security, Defendant shall notify this Court whether he intends to comply with this Order **[\*30]** by filing a notice through the electronic case files system on or before 5:00 p.m. on October 17, 2016. If Defendant declares that he intends to flout this Order then this Court will take the appropriate action.

**SO ORDERED on October 16, 2016**.

**/s/ Mark E. Walker**

United States District Judge

**APPENDIX I**

**FLORIDA DEPARTMENT OF STATE**

**RICK SCOTT**

**Governor**

**KEN DETZNER**

**Secretary of State**

**MEMORANDUM**

**FROM**: Ken Detzner

Florida Secretary of State

**TO**: Supervisors of Elections

**DATE**: August 14, 2015

**SUBJECT**: Directive 2015-02—State Senate Candidate Qualifying; Year of Apportionment

Supervisors of elections have asked for clarification regarding whether the 2016 election is to be deemed to occur in a "year of apportionment' as that term is used in connection with qualifying requirements for state senate candidates in Florida. Their question arises within the context of the recent consent order issued by the circuit court in Leon County requiring the redrawing of state senate district boundaries. *See League of Women Voters of Fla. et al. v. Detzner et al.*, Case No. 2012-CA-2842, Stipulation and Consent Judgment (Fla. 2d Jud. Cir. July 25, 2015)

In an apportionment year, the qualification requirement for a state senate **[\*31]** candidate change in two significant ways. First, such a candidate may obtain signatures from electors who reside anywhere in the state (rather than from only those who reside within the district). *See § 99.09651(3), Fla. Stat.* Second, there is a different formula for calculating the minimum number of signatures required to qualify by petition. *See § 99.09651(1), (2), Fla. Stat.* These different requirements reflect the fact that the timing of redrawing of district boundaries conflicts with the ordinary process of identifying which and how many voters within a district would be required to qualify by petition. Redistricting also creates a period of uncertainty for a candidate trying to decide which specifically numbered district he or she might seek to

represent, especially in light of the fact that any state senate district that is redrawn, regardless of district number, must be on the ballot in the next general election.

The consent order that the circuit court recently entered directs the Legislature to submit "a remedial apportionment plan" for state senate districts by November 9, 2015. The Legislature has indicated its intent to convene for a special session in October 2015 to adopt that plan. In turn, while state senate **[*32]** candidates seeking 2016 ballot placement will be running for office based on newly drawn district lines, such candidates may not know in a sufficiently timely roamer from which voters they may obtain petition signatures or how many signatures they must obtain. Therefore, I conclude that the provisions in the Election Code referring to procedures to be followed in a year of apportionment" apply to state senate candidates for the purpose of qualifying in such races in Florida during the 2016 election cycle. *See §§ 99.095*, *99.09651*, Fla. Stat.

In turn pursuant to my authority under *section 97.012(1)* and *(16)*, Florida Statutes, I hereby direct the supervisors of elections in Florida to perform the duty of verifying signatures on petitions submitted to them by state Senate candidates pursuant to *section 99.095(3), Florida Statutes*, to determine whether a petition's signature is from a voter registered within the county in which it was circulated. The petitions must state that the candidate is seeking the office of state senator, but they shall not include a district number, *see § 99.09651(4), Fla. Stat.*; however, if a petition includes a district number, the district designation may be disregarded as extraneous and unnecessary information for the applicable qualifying period.

Any state **[*33]** senate candidate in Florida seeking ballot placement for the 2016 election who seeks to qualify by the petition process may obtain signatures "from any registered voter in Florida regardless of party affiliation or district boundaries." *See § 99.09651(3), Fla. Stat.* Moreover, such a candidate will need to collect 1,552 signatures. *See § 99.09651(1)*, *(2)*, Fla. Stat. (requiring a candidate for state senate in an apportionment year to collect a number of signatures equal to one-third of one percent of the "ideal population," which is a number calculated by taking the total state population based on the most recent decennial census (18,801,310 in 2010) and dividing by the number of state senators in Honda (40)).

This directive remains in effect until such lime as it is superseded or revoked try subsequent directive, law, or final cowl order.

**APPENDIX II**

**SIGNATURE CURE AFFIDAVIT FOR VOTE-BY-MAIL BALLOT**

(The affidavit is far use by a voter who returns a Vote-by-mail ballot with a signature issue on their Voter's Certificate)

**1. INSTRUCTIONS**

Use the following checklist to complete and return this form to the Leon County Supervisor of Elections Office *no later than 5 p.m. on the Monday before the election*.

☐ **Complete and sign the affidavit [*34] below: AND**

☐ **Include a copy of one of the following forms of identification am that shows your name and photograph (if the affidavit is not submitted in person)**:

> Identification Mat includes your name and photograph: Florida Drivers license; Florida ID; United States passport debit or credit card; military identification; student identification; retirement center identification neighborhood association identification; public assistance identification veteran health identification card issued by the United States Department of Veterans Affair; a Florida license to carry a concealed weapon or firearm; or an employee identification card issued by any branch, department, agency, or entity of the Federal Government, the state, a county, or a municipality.

> OR

> Identification that shows your name and current residence address: current utility bill, bank statement, government check, paycheck, or government dcoJrnent (excluding voter information card).

**Return this completed affidavit and the copy of your identification documents to the Supervisor of Elections *no later than 5 p.m. on the Monday before the election*:**

> • Deliver to our office or to an Early Voting site (by you or another person)

> • Mail diem **[*35]** to us using the included postage paid fdlIffll envelope.
> • Fax (850-606-8601) or email (vote@leoncountyfl.gov) to our office,

2016 U.S. Dist. LEXIS 143620, *35

Contact LIS if you have arty questions at 850-606-81683

## 2. VOTE-BY-MAIL BALLOT AFFIDAVIT

**I, _ (Print voter's name) am a qualified voter in this election and registered voter of Leon County, Florida. I do solemnly swear or affirm that**: I requested and returned the vote-by-mail ballot and that I have not and will not mote mare than one ballot in this election, I understand that if I commit or attempt any fraud in connection with voting, vote a fraudulent ballot, or vote more than once in an election, I may be convicted of a felony of the third degree and fined up to $5,000 and imprisoned for up 5 years. I understand that my failure to sign this affidavit means that my vote-by-mail ballot will be invalidated.

—

**(Voter's Signature)**

—

**(Voter's Address)**



Ⓐ Neutral
As of: August 21, 2018 3:35 PM Z

## *Saucedo v. Gardner*

United States District Court for the District of New Hampshire

August 14, 2018, Decided; August 14, 2018, Filed

Civil No. 17-cv-183-LM

**Reporter**

2018 U.S. Dist. LEXIS 136895 *; 2018 DNH 160

Mary Saucedo, et al. v. William Gardner, Secretary of State of the State of New Hampshire, in his official capacity, et al.

**Prior History:** *Saucedo v. Gardner, 2018 U.S. Dist. LEXIS 35175 (D.N.H., Mar. 3, 2018)*

**Counsel:** **[*1]** For Mary Saucedo, Maureen P. Heard, Thomas Fitzpatrick, Plaintiffs: Claudia Center, Dale E. Ho, Julie A. Ebenstein, LEAD ATTORNEY, PRO HAC VICE, American Civil Liberties Foundation Disability Rights Program, San Francisco, CA; Paul J. Twomey, Twomey Law Office, Chichester, NH; Gilles R. Bissonnette, American Civil Liberties Union of New Hampshire, Concord, NH.

For NH Secretary of State, in his official capacty other William Gardner, NH Secretary of State's Office, Defendant: Laura E. B. Lombardi, NH Attorney General's Office (Civil), Concord, NH; Matthew T. Broadhead, NH Department of Justice (Concord), Concord, NH.

For City of Manchester, Movant: Emily G. Rice, Peter R. Chiesa, Manchester, City of Solicitor's Office, Manchester, NH.

**Judges:** Landya McCafferty, United States District Judge.

**Opinion by:** Landya McCafferty

# Opinion

## ORDER

This case concerns New Hampshire's signature-match requirement for absentee ballots. The act of signing one's name is often viewed as a rote task, a mechanical exercise yielding a fixed signature. A person's signature, however, may vary for a variety of reasons, both intentional and unintentional. Unintentional factors include age, physical and mental condition, disability, medication, stress, **[*2]** accidents, and inherent differences in a person's neuromuscular coordination and stance. Variations are more prevalent in people who are elderly, disabled, or who speak English as a second language. For the most part, signature variations are of little consequence in a person's life.

But in the context of absentee voting, these variations become profoundly consequential. The signature-match requirement in *RSA 659:50*, III requires every local election moderator to compare the signature on a voter's absentee-ballot application to the signature on an affidavit that the voter sends with the absentee ballot. If the signature on the affidavit does not appear "to be executed by the same person who signed the application," the moderator must reject the voter's ballot. *RSA 659:50*, III. The purpose of the requirement is to ensure that the same person executes both the absentee-ballot application and the affidavit. In recent elections, however, the signature-match requirement has disenfranchised hundreds of absentee voters.

As will become evident, this signature-matching process is fundamentally flawed. Not only is the disenfranchised voter given no right to participate in this process, but the voter is not even given **[*3]** notice that her ballot has been rejected due to a signature mismatch. Moreover, moderators receive no training in handwriting analysis or signature comparison; no statute, regulation, or guidance from the State provides functional standards to distinguish the natural variations of one writer from other variations that suggest two different writers; and the moderator's assessment is final, without any review or appeal.

Plaintiffs Mary Saucedo, Maureen P. Heard, and Thomas Fitzpatrick are among the 275 absentee voters whose ballots were rejected in the 2016 General Election as a result of *RSA 659:50*, III. They bring suit against defendants William M.

2018 U.S. Dist. LEXIS 136895, *3

Gardner (New 2 Hampshire's Secretary of State), and the New Hampshire Secretary of State's Office, alleging constitutional claims under *42 U.S.C. § 1983*, and a claim under the *Americans with Disabilities Act ("ADA")*. Before the court are the parties' cross-motions for summary judgment, as well as plaintiffs' motion to strike. For the following reasons, plaintiffs' motion for summary judgment is granted in part, defendants' cross-motion for summary judgment is granted in part, and plaintiffs' motion to strike is denied.

**STANDARD OF REVIEW**

A movant is entitled to summary **[\*4]** judgment if it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. *Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013)*.

"On issues where the movant does not have the burden of proof at trial, the movant can succeed on summary judgment by showing 'that there is an absence of evidence to support the nonmoving party's case.'" *OneBeacon Am. Ins. Co. v. Commercial Union Assur. Co. of Canada, 684 F.3d 237, 241 (1st Cir. 2012)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. If the moving party provides evidence to show that the nonmoving party cannot prove a claim, the burden shifts to the nonmoving party to show that there is at least a genuine dispute as to a factual issue that precludes summary judgment. *Woodward v. Emulex Corp., 714 F.3d 632, 637 (1st Cir. 2013)*.

**BACKGROUND**

The following facts are undisputed, unless otherwise noted. As stated above, plaintiffs are voters who attempted to vote by absentee ballot in the 2016 General Election. Plaintiff Saucedo voted by absentee ballot due to a disability (blindness), and plaintiffs Fitzpatrick and Heard voted by absentee ballot because they were out of the state on Election Day. They brought suit in May 2017, after learning that their absentee ballots had been rejected. All of their **[\*5]** ballots were rejected on the basis of the signature-match requirement in *RSA 659:50*, III. Defendant Gardner, as the Secretary of State, is the "Chief Election Officer" under state law. *RSA 652:23*. Among other things, defendants produce absentee-voting forms and documents, and provide election information and materials to local officials and the public. See *RSA 652:22*; *RSA 652:23*; *RSA 657:4*; *RSA 657:7*.

The court begins by describing the general procedure by which absentee ballots are processed and counted in New Hampshire, before discussing how that procedure played out in the 2016 General Election. Then, the court summarizes the evidence the parties have proffered in support of their competing motions for summary judgment.

I. Absentee Voting in New Hampshire

New Hampshire authorizes absentee voting for certain categories of voters—namely, those who cannot appear at the polls because they are: (1) absent from the municipality on Election Day; (2) observing a religious commitment; (3) unable to vote in person due to physical disability; or (4) unable to appear because of an employment obligation. *RSA 657:1*.

The first step in the absentee-voting process is for a voter to apply for the absentee ballot. The Secretary of State creates application forms and **[\*6]** distributes them to municipalities. *RSA 657:4*, I; *RSA 657:5*. A voter may request a form from a town or city clerk, or from the Secretary of State. *RSA 657:6*. Alternatively, a voter may receive a ballot from the town or city clerk simply by providing a written statement containing all of the necessary information. *RSA 657:6*.

In the absentee-ballot application, the voter must identify the reason that she is qualified to vote by absentee ballot, and must provide basic biographical information—including name, address, phone number, and email address, though the phone number and email address are optional sections. What is most relevant here is that the application requires the voter to sign her name. Prior to and in the 2016 General Election, there was no notice on the application that the application signature would be compared with another signature; instead, below the signature line was the following statement: "Voter must sign to receive an absentee ballot." Doc. no. 49-9 at 2.

However, as a result of amendments to the absentee-ballot statutory scheme in 2017, the application now contains the following statement below the signature line: "The applicant must sign this form to receive an absentee ballot. The signature on **[\*7]** this form must match the signature on the affidavit envelope in which the absentee ballot is returned, or the ballot may be rejected." *RSA 657:4*, I. In addition, there is a new section, which provides notice that "[a]ny person who assists a voter with a disability in executing this form shall make a statement acknowledging the assistance on the application form to assist the moderator when comparing signatures on election day." Id. Below the notice, there are lines for the assistant to print and sign her name.

Upon receipt of a properly executed application, the clerk provides the voter with: (1) an absentee ballot; (2) an affidavit

envelope; and (3) a return envelope.[1] *RSA 657:15*, I; *RSA 657:7*, I-III. The voter marks the ballot and places the ballot in the affidavit envelope. *RSA 657:17*. On the face of the affidavit envelope is an affidavit that the voter must execute. The affidavit requires the voter to again certify that she is voting by absentee ballot for a qualifying reason, and requires that the voter print and sign her name. As a result of the 2017 amendments to the statute, below the signature line is the following notice:

> The signature on this affidavit must match the signature on the application for an absentee **[*8]** ballot or the ballot may be rejected. A person assisting a blind voter or voter with a disability who needs assistance executing this affidavit shall make and sign a statement on this envelope acknowledging the assistance in order to assist the moderator when comparing signatures on election day.

*RSA 657:7*, II. Below, there is a space for an assistant to print and sign her name. See doc. no. 54-7 at 1.

After executing the affidavit, the voter places **[*9]** the affidavit envelope in the return envelope, and submits the package to the town or city clerk. *RSA 657:17*. The clerk attaches the voter's application to the received absentee-ballot package, but does not open or otherwise process the package

---

[1] The Secretary of State's Office also publishes a notice titled "NOTICE OF REQUIREMENTS TO USE ABSENTEE BALLOT." See doc. no. 49-19 at 17. Prior to 2016, this notice stated in pertinent part:

> The moderator will compare the signature on the written request for an absentee ballot to the signature on the Absentee Ballot Affidavit Envelope and your absentee ballot will be counted only if it appears that the same person signed both documents. Therefore, it is important to use the same signature on each form.

Id. After the 2017 amendments to the statute, the notice provides:

> The signature on this affidavit must match the signature on the application for an absentee ballot. Your absentee ballot will be counted ONLY if it appears the same person signed both forms. Therefore, it is important to use the same signature on both forms. . . . The two signatures are not compared when the voter receives assistance, provided the person assisting the voter [fills out the relevant sections acknowledging such assistance].

Doc. no. 49-25 at 2. The Secretary of State's Office encourages municipalities to send this notice to voters with their other absentee-ballot materials, but they are not required to do so. Some municipalities, including Hudson, Laconia, and Manchester, do not send the form to voters.

prior to Election Day. *RSA 657:18*.

On Election Day, the clerk delivers the absentee-ballot packages to the local moderator. *RSA 657:23*. The moderator is a local, elected position with a two-year term. *RSA 40:1*. Among other things, the moderator oversees the "conduct of voting" and the implementation of New Hampshire's election statutes in her municipality. *RSA 659:9*. Moderators "are not employees of the Department of State" and are only accountable to local voters. Doc. no. 54 at 2, 31.

Generally, moderators begin processing absentee ballots at 1:00 p.m. on Election Day, though they may open the return envelopes prior to that time. See *RSA 659:49*, I; *RSA 659:49-b*. Processing is done in public view. The moderator begins processing absentee ballots "by clearly announcing that he or she is about to open the envelopes which were delivered to him or her." *RSA 659:50*. The moderator then removes each affidavit envelope from the return envelope and compares the signature on the affidavit with the signature on the voter's application. **[*10]**

An absentee ballot is accepted if: (1) the name of the voter is on the voter checklist; (2) the affidavit "appears to be properly executed"; (3) the "signature on the affidavit appears to be executed by the same person who signed the application, unless the voter received assistance because the voter is blind or has a disability"; and (4) the "signatures appear to be the signatures of a duly qualified voter who has not voted at the election." *RSA 659:50*, I-IV. If all of these requirements are met, and the ballot is not challenged by another voter, see *RSA 659:51*, I, the moderator opens the affidavit envelope and takes out the absentee ballot to be counted. The moderator may begin counting accepted absentee ballots after polls close. *RSA 659:49*, I. If one of the requirements is not met, the moderator rejects the ballot, marks the affidavit envelope with the reason for rejection, and does not open the affidavit envelope. *RSA 659:53*.

There is no procedure by which a voter can contest a moderator's decision that two signatures do not match, nor are there any additional layers of review of that decision. In other words, the moderator's decision is final. Moreover, no formal notice of rejection is sent to the voter after Election **[*11]** Day. Rather, after the election, a voter may determine whether and why her absentee ballot was rejected via a website maintained by the Secretary of State. See *RSA 657:26*. Defendants remove this information from the website ninety days after the election, however.

## II. The Signature-Match Requirement

As noted above, each local moderator is tasked with comparing the signature on the affidavit with the signature on

the application to determine whether "[t]he signature on the affidavit appears to be executed by the same person who signed the application." *RSA 659:50*, III. As a result of the 2017 amendments to the statute, voters receiving assistance with the execution of their voting materials due to blindness or disability are exempt from the requirement. Id.

On its face, *RSA 659:50*, III gives no guidance on the questions that inevitably arise in applying the requirement, including what stylistic variations suggest that two signatures were made by different individuals, and what threshold number of variations is required to conclude that the signature on the affidavit does not "appear to be" executed by the same person who signed the application. No other state statute or regulation elaborates the standard set forth [*12] in *RSA 659:50*, III, and there does not appear to be any authoritative case law on the subject.

The record discloses only two sources that provide additional guidance to moderators: the Secretary of State's Office and, in the 2016 General Election, the New Hampshire Attorney General's Office. The Secretary of State's Office publishes an Election Procedure Manual, which offers the following:

> The test for whether the application and affidavit appear to be signed by the same person is whether this is more likely than not. Absentee ballots should be rejected because the signatures do not match only if the differences in the signatures are significant.
>
> . . .
>
> Moderators should exercise careful judgment when rejecting an absentee ballot because the signature of the voter on the affidavit does not appear to be signed by the same person who signed the absentee ballot application. The test is whether it is more likely than not that the same person signed both forms. It is a natural and common occurrence that a person's signature will change over time and will have differences even when the person writes out his or her signature several times, one immediately after another. A moderator deciding to reject an [*13] absentee ballot because the signatures do not match should be prepared to explain to the Attorney General's Office or a Superior Court judge what specific characteristics on the two signatures were the basis of the decision that they were more likely than not signed by different people. While signature verification is an important safeguard against voting fraud, as with all safeguards, the analysis starts with a presumption of validity and the decision to disenfranchise a voter must be made only when there is sufficient evidence to justify that act.

Doc. no. 49-19 at 14, 16. The Secretary of State's Office also conducts optional trainings for moderators prior to elections, at which it reiterates, but does not further elaborate on, the guidance set forth in the manual. Doc. no. 49-3 at 77, 79 (deposition of David Scanlan). The Secretary of State does not regularly monitor rates of rejection due to signature mismatch to ensure moderators' compliance with the statute, see id. at 178, 180-83, and has never engaged in a review of any statistical anomalies related to the requirement, id. at 185.

Prior to the 2016 General Election, the Attorney General's Office issued a memorandum to local election officials, which contained [*14] the following guidance:

> In determining whether signatures match, the moderator should decide whether it is more likely than not that the same person signed both forms. The more likely than not standard does not require a perfect match. . . . Moderators should be aware that a person's signature often varies depending on the circumstances, and it is often hard to tell whether two signatures were written by the same person. Because a mistake will deprive a citizen of his/her constitutional right to vote, moderators should take great care before ruling a ballot invalid because of signature differences.

Doc. no. 49-20 at 5.

In essence, the guidance provided to moderators constitutes a burden of proof (more likely than not), and a requirement that signature comparison be done based on objective criteria (whatever those criteria may be). But moderators receive no training in handwriting analysis, and they are not screened for conditions, such as poor eyesight, that may impede their ability to discern subtle variations in signatures. The assumption seems to be that the substantive task of signature comparison is one of common sense.

Defendants have also provided affidavits from a number of local [*15] election officials to show "how cities and towns actually implement *RSA 659:50*."[2] Doc. no. 54 at 8. Defendants state that the practices of these officials are consistent with the practices of election officials statewide. See doc. no. 58 at 7.

There are three practices that are worth highlighting. First, moderators normally have a team of volunteers that help them compare signatures and determine whether signatures match

---

[2] Plaintiffs move to strike these affidavits on the ground that defendants did not disclose the witnesses in their initial disclosures. Because this evidence, if anything, merely supports plaintiffs' claims, the court denies plaintiffs' motion. See *Fed. R. Civ. P. 37(c)(1)* ("[A] party is not allowed to use . . . [an undisclosed] witness to supply evidence on a motion . . . unless the failure [to disclose] was substantially justified or is harmless").

2018 U.S. Dist. LEXIS 136895, *15

for purposes *RSA 659:50*, III. Nevertheless, while volunteers may help a moderator reach a decision, the final decision "rests with the moderator." Doc. no. 54 at 10.

Second, in deciding whether to accept an absentee ballot, moderators "consider all of the evidence available to them, including their personal knowledge of the voter or the personal knowledge of another election official." Id. at 11. For example, one moderator states that, because he "know[s] the addresses of the assisted living facilities" in his town, he takes "that into account as a factor when conducting a signature match," and allows "for more variability in signatures in these cases." Doc. no. 54-15 at 2. Another moderator stated that, in one instance, he rejected a ballot based on an assistant moderator's personal knowledge [*16] of the voter. The assistant moderator had previously seen the voter's signature on medical documents, and the signature on the affidavit was inconsistent with the signature on the medical documents.

At the hearing, defendants clarified how moderators consider extrinsic evidence. They explain that state law contemplates a two-step process, citing *RSA 659:53* and *RSA 659:54* in support.[3] At the first step, a moderator compares the signature on the affidavit envelope to the signature on the application to determine whether the documents were executed by the same person, as required by *RSA 659:50*, III. This determination is made solely based on the signatures themselves and without reference to extrinsic evidence. If the moderator determines that the signatures do not pass muster under *RSA 659:50*, III based on an examination of the signatures alone, there is a second step: the moderator proceeds to determine whether there is any extrinsic evidence available to the moderator or the assistants that would allow the moderator to conclude that the same person did, in fact, execute both documents. At the hearing, defense counsel gave the example of an absentee voter who has his affidavit envelope notarized.

Third, the affidavits show that [*17] moderators conceive of the relevant standard differently. One moderator stated that

she will not reject an absentee ballot "unless the signatures on the request form and affidavit envelope are drastically different." Doc. no. 54-13 at 2 (emphasis added). By contrast, another averred that he does "not reject sets of signatures on the basis that they don't look the same, but only if there are no characteristics which suggest that they could both have been signed by the same person. In some instances, we are satisfied if one or two letters . . . share a characteristic style." Doc. no. 54-14 at 2 (emphasis added).

### III. Statistics from the 2016 General Election

In the 2016 General Election, .35% of all absentee ballots submitted were rejected due to a signature mismatch (275 rejections out of 78,430 absentee ballots).[4] See doc. no. 49-22 at 9. This extremely low rate of rejection due to a signature mismatch is consistent with the rates seen in the 2012 and 2014 General Elections.

However, there were some variances between polling places in the 2016 General Election. 74% of New Hampshire's polling places had no rejections due to a signature mismatch (236 of 318). Of the 26% that did, rates varied, [*18] sometimes significantly, both between municipalities and within them. For example, in Portsmouth Ward 3, 5.21% of all absentee ballots were rejected due to a signature mismatch; in Portsmouth Ward 2, the rate was .43%; in Bedford, .88%; in Hudson, 1.68%; in Manchester Ward 4, 2.17%; in Manchester Ward 6, .23%. See generally doc. no. 49-23. The parties dispute the significance of these disparities. Plaintiffs argue that these figures demonstrate the lack of uniform application of the signature-match requirement, while defendants assert that, absent further statistical analysis, any differences could be attributed to other variables.

Defendants provide some statistics of their own. Defendants compared, for the 2016 General Election, the municipalities whose election officials attended the training session held by the Secretary of State's Office and municipalities whose officials did not. They found that six of the eight towns with the highest rates of rejection due to signature mismatch had failed to attend the training.

Defendants also found that the towns whose officials did not attend had a higher rate of rejection due to signature mismatch—more than double per town. On this basis, [*19] defendants contend that this demonstrates that there is no fundamental flaw in the statute, and that, at most, more

---

[3] *RSA 659:53* describes the procedure a moderator should follow if she "finds that the absentee voter is not entitled to vote." Defendants infer from this language that the moderator must assess available extrinsic evidence—that is, make a "finding"—before rejecting a ballot due to a signature mismatch. Defendants bolster this interpretation by reference to *RSA 659:54*, which provides that "[n]o absentee ballot shall be rejected by the moderator for any immaterial addition, omission, or irregularity in the preparation or execution of any writing or affidavit required herein." Defendants contend that, together, these provisions empower a moderator to take into account available extrinsic evidence before rejecting a ballot due to a signature mismatch.

[4] The parties vary in their calculations of the exact figures, but the dispute is immaterial. The parties do not disagree that the rate of rejection due to a signature match is extremely low. In the 2016 General Election, well under 1% of the overall number of absentee ballots submitted were rejected.

training is required.

Plaintiffs challenge defendants' analysis of the numbers as "based on a meaningless calculation." Doc. no. 62 at 5. They argue, among other things, that analyzing rejections on a per town basis, without consideration of total absentee ballots cast and rejected in each town, masks disparities in rejection rates among towns.[5]

IV. Dr. Mohammed

Finally, plaintiffs retained an expert, Linton Mohammed, Ph. D, to support their claims. Defendants do not dispute Dr. Mohammed's opinions. Dr. Mohammed is a forensic document examiner, specializing in handwriting and signature identification. He opines that a person's signature may vary for a variety of reasons, both intentional and unintentional. Unintentional factors include age, physical and mental condition, disability, stress, accidental occurrences, inherent variances in neuromuscular coordination, and stance. Variations are more prevalent in writers who are elderly, disabled, ill, or who speak English as a second language. Dr. Mohammed explains that, in order to account for these variations and make an [*20] accurate determination, one needs extensive training, adequate magnification and lighting equipment, sufficient time, and excellent eyesight. Furthermore, a forensic document examiner will normally require at least ten exemplar signatures to compare to a questioned signature.

Dr. Mohammed opines that in applying RSA 659:50, III, moderators will likely make erroneous determinations. Lay moderators do not have the training, time, equipment, or number of exemplars necessary to make a proper determination. In addition, Dr. Mohammed states that laypeople erroneously tend to focus on the "eye-catching" features of single letters, rather than the holistic features of the signature, like alignment and slant. Dr. Mohammed opines that holistic features are the more significant characteristics in signature comparison.

Defendants also rely upon Dr. Mohammed's opinion. They cite his statement that "a signature is developed as a form of identification" to argue that the signature-match requirement serves to identify a voter and prevent voter fraud. Doc. no. 54-11 at 24. Plaintiffs challenge this inference, contending that Dr. Mohammed's point was merely to articulate the difference between a signature and handwriting [*21] generally, not to

suggest that the signature-match requirement identifies the voter.

Defendants also highlight Dr. Mohammed's testimony regarding the different styles of signatures. Dr. Mohammed divides signatures into one of three categories: text-based, mixed-style, and stylized. A text-based signature is one where the letters can be fully read; a mixed-style signature is one where some, but not all, of the characters can be read; and a stylized signature is "basically a pattern and there's . . . no characters [one] can read within that signature." Id. at 42-43. Dr. Mohammed determined that 94 of the rejected voters from the 2016 General Election used different styles in their affidavits and applications. Defendants contend that this finding shows that these voters were correctly disenfranchised because they failed to comply with the notice on the absentee-ballot instructions—that a ballot "will be counted only if it appears that the same person signed both documents." Doc. no. 54-8 at 2. Plaintiffs respond that moderators are not trained to evaluate signature styles and that, in any case, state law does not require that a voter "use the same signature style" when voting by absentee ballot. Doc. [*22] no. 62 at 9.

## DISCUSSION

Plaintiffs bring four claims challenging RSA 659:50, III. The first three are grounded in the U.S. Constitution. Plaintiffs contend that the statute facially violates their procedural due process rights (Count I), their fundamental right to vote (Count II), and their right to have their votes treated uniformly, under the principles enunciated in Bush v. Gore, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000) (Count III). On behalf of Ms. Saucedo, plaintiffs also bring an ADA claim.

Because the parties express some disagreement over how the court should analyze plaintiffs' claims, given that they are facial challenges to RSA 659:50, III, the court will provide some clarification before addressing the merits.

"The Supreme Court has articulated two formulations of the standard for assessing facial challenges to statutes." Libertarian Party of N.H. v. Gardner, 843 F.3d 20, 24 (1st Cir. 2016). "In United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Court held that a facial challenge can only succeed where the plaintiff 'establishes that no set of circumstances exists under which the Act would be valid.'" Id. Alternatively, a plaintiff bringing a facial challenge to a statute must establish that it lacks any "plainly legitimate sweep." Hightower v. City of Boston, 693 F.3d 61, 77 (1st Cir. 2012). The First Circuit recently relied on the latter formulation in a ballot-access case. See Gardner, 843

---

[5] Plaintiffs also move to strike the evidence relating to these statistics. Because this evidence is not material to the legal analysis, the court denies plaintiffs' motion. See doc. no. 56 at 15 nn.13-14 (explaining defects in defendants' statistical evidence).

2018 U.S. Dist. LEXIS 136895, *22

*F.3d at 24*. But see *Pharm. Research & Mfrs. of America v. Concannon, 249 F.3d 66, 77 (1st Cir. 2001)* (citing Salerno test favorably). **[\*23]**

These standards may obscure the relevant inquiry, however, as they could be taken to suggest that a court's task is to "conjure up" hypothetical situations "in which application of the statute might be valid." *United States v. Sup. Ct. of N.M., 839 F.3d 888, 917 (10th Cir. 2016)*. But, as courts have noted, the Supreme Court "has often considered facial challenges simply by applying the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid." *Bruni v. City of Pittsburgh, 824 F.3d 353, 363 (3d Cir. 2016)* (collecting cases); see also *Doe v. City of Albuquerque, 667 F.3d 1111, 1124 (10th Cir. 2012)*.

Therefore, in practice, "[a] facial challenge is best understood as a challenge to the terms of the statute, not hypothetical applications, and is resolved simply by applying the relevant constitutional test to the challenged statute." *Sup. Ct. of N.M., 839 F.3d at 917* (internal quotation marks and citation omitted); see also *Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449-50, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008)* ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."); *Ezell v. City of Chicago, 651 F.3d 684, 698 (7th Cir. 2011)*.

I. Procedural Due Process (Count I)

Plaintiffs first argue that *RSA 659:50*, III violates the requirements of procedural due process because it lacks any pre-deprivation process: voters receive **[\*24]** neither prior notice of, nor an opportunity to cure, a rejection due to a signature mismatch. Defendants respond that the "extremely slight risk of an erroneous deprivation," in conjunction with the "significant burden on the State" to create additional procedures, support the conclusion that *RSA 659:50*, III does not violate procedural due process. Doc. no. 54 at 22.

"To establish a procedural due process violation, [a] plaintiff must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process." *González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011)* (internal quotation marks omitted). "No rigid taxonomy exists for evaluating the adequacy of state procedures in a given case; rather, due process is flexible and calls for such procedural protections as the particular situation demands." Id. (internal quotation marks omitted). Still, "[t]he basic guarantee of procedural due process is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard in a meaningful time and in a meaningful manner." Id. (internal **[\*25]** quotation marks omitted).

Under *Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)*, "determining what process is due requires balancing three factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interests." *Collins v. Univ. of N.H., 664 F.3d 8, 17 (1st Cir. 2011)* (internal quotation marks and brackets omitted). In addition, the Mathews court emphasized that "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Mathews, 424 U.S. at 344*. As a result, and given that this is a facial challenge, the court conducts its analysis by reference to the statute's facial requirements and the undisputed, material facts relevant to the signature-matching process generally.

Two cases are particularly helpful to the court's analysis. The first is *Zessar v. Helander, No. 05-C-1917, 2006 U.S. Dist. LEXIS 9830, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006)*, in which the Northern District of Illinois considered an Illinois statute imposing a signature-match requirement for absentee voters.[6] The process for obtaining and casting an absentee ballot in Illinois was similar to that in New Hampshire. A voter received **[\*26]** an absentee ballot by executing and sending an absentee-ballot application to the appropriate authority. *2006 U.S. Dist. LEXIS 9830, [WL] at \*1*. After marking the ballot, the voter placed the ballot inside an envelope, on which was a certification form that the voter would sign and date. Id. On Election day, the package was delivered to the appropriate precinct, and the election judge "cast" the ballot for the absentee voter. *2006 U.S. Dist. LEXIS 9830, [WL] at \*2*. A ballot could be rejected if the signature on the application did not correspond to the signature on the ballot envelope or on the voter's registration card. Unlike New Hampshire law, a voter was mailed a notice after the election if his ballot was rejected. *2006 U.S. Dist. LEXIS 9830, [WL] at \*3*. Illinois law also had a procedure for provisional voting that could extend up to fourteen days after the election. *2006 U.S. Dist. LEXIS 9830, [WL] at \*4*.

---

[6] The Seventh Circuit subsequently vacated the district court's decision on the ground that it had become moot with the passage of new absentee-voting legislation in Illinois. See *Zessar v. Keith, 536 F.3d 788 (7th Cir. 2008)*.

2018 U.S. Dist. LEXIS 136895, *26

The plaintiff in Zessar, whose vote was rejected due to a signature mismatch, sued a number of local and state officials, arguing that the lack of notice and an opportunity to cure for rejected voters was unconstitutional as a matter of procedural due process. See *2006 U.S. Dist. LEXIS 9830, [WL] at *5*. The district court agreed. On the first Mathews factor, it found that, while "[t]he right to vote by absentee ballot is not, in and of itself, a fundamental right," [*27] a voter has a sufficient liberty interest once "the State permits voters to vote absentee." Id.

On the second factor, the Zessar plaintiff suggested that voters should receive immediate notice of the rejection, followed by an informal administrative hearing in front of an election authority to confirm that the absentee ballot belongs to the voter. *2006 U.S. Dist. LEXIS 9830, [WL] at *8*. The defendants responded that such procedures would be "hugely disproportionate" to the problem, and questioned whether they would even be effective for absentee voters who are absent from their residences for an extended period. Id. The Zessar court agreed that there was not a "tremendous" risk of erroneous deprivation, given that only approximately .43% of all absentee ballots returned to election authorities were rejected for any reason.[7] See id. Nevertheless, the court found that the probable value of additional procedures was great in light of the otherwise irremediable denial of absentee voters' right to vote.

On the third factor, defendants argued that election authorities "face a cascade of statutory obligations in the time period leading up to and following the election," which would make additional procedures "an untenable burden." [*28] *2006 U.S. Dist. LEXIS 9830, [WL] at *9*. The Zessar court was not persuaded. The court did recognize that new procedures would pose "some additional administrative and fiscal burden on the election authorities," but even so, the procedures would be fairly circumscribed affairs, given that election authorities have already verified that absentee voters are entitled to vote prior to issuing the absentee ballots. For that reason, the court found that any burden "would [not] be so great as to overwhelm plaintiff's interest in protecting his vote." Id.

Other courts have reached similar conclusions to that of the Zessar court. See *Raetzel v. Parks/Bellemont Absentee Election Bd., 762 F. Supp. 1354 (D. Ariz. 1990)* (concluding that Arizona absentee-voting statute, which failed to provide absentee voters with any post-deprivation notice or opportunity to be heard when their votes were challenged and

rejected, did not afford adequate procedural due process); La Follette v. Padilla, No. CPF-17-515931 (Cal. Super. Ct. Mar. 5, 2018) (concluding that provision of California Election Code, which required election officials to reject a ballot if the signatures did not "compare," was facially unconstitutional because it failed to provide pre-deprivation notice or an opportunity to cure), available at doc. no. 49-4.

*Lemons v. Bradbury, 538 F.3d 1098 (9th Cir. 2008)*, is [*29] the only case the court could find in which a signature-match requirement was upheld against a procedural due process challenge based on the fundamental right to vote.[8] There, the Ninth Circuit upheld Oregon's procedure for verifying signatures on referendum petitions. Oregon voters may approve legislation by referendum, and a referendum qualifies for statewide vote upon submission of a petition with a sufficient number of signatures. *Lemons, 538 F.3d at 1100*. In order to verify the petition signatures, the Secretary of State uses a statistical sampling method, whereby approximately five percent of the submitted signatures are cross-referenced with voter registration records. Id. If a petition signature is "genuine," it is counted. Id.

The plaintiffs argued that this procedure violated, among other things, their right to procedural due process. *Id. at 1101*. The Ninth Circuit disagreed, despite holding that Oregon's regulations on the referendum process "implicate the fundamental right to vote." *Id. at 1102*. The court determined that the value of additional procedures was negligible. *Id. at 1105*. The court reasoned that the verification process was "already weighted in favor of accepting questionable signatures," citing a number of elements [*30] of Oregon's procedure: (1) voters were notified on the referendum cover sheets that they must sign their name as they did on their voter registration; (2) the public could observe the process and object to signature-verification decisions; (3) all rejected signatures were subject to multiple layers of review; and (4) officials limited their review to a comparison between the petition signature and registration signature.

While the Ninth Circuit found additional procedures of negligible value, it assigned great weight to the administrative

---

[7] Specifically, 1,100 absentee ballots were rejected out of the "253,221 absentee ballots [that] were returned to election authorities and 191,177 absentee ballots [that] were counted." *2006 U.S. Dist. LEXIS 9830, [WL] at *8*.

---

[8] There are a few other cases in which courts have upheld such requirements against procedural due process challenges, but those courts gave less weight to the rights at issue than is given to the right to vote. See *Protect Marriage Ill. v. Orr, 458 F. Supp. 2d 562, 573-75 (N.D. Ill. 2006)* (denying procedural due process claim relating to petition signature-match requirement, and reasoning that "petition signers do not have a fundamental right to have their advisory question placed on the ballot"); *State ex rel. Potter v. Harris, No. E2007-00806, 2008 Tenn. App. LEXIS 458, 2008 WL 3067187, at *8-10 (Tenn. Ct. App. Aug. 4, 2008)*.

2018 U.S. Dist. LEXIS 136895, *30

burden of additional procedures. Election officials might process more than 100,000 signatures in each election cycle, and it could take several minutes to "identify [each] signer, find the corresponding voter registration card, determine whether the signer is an active, registered voter, and then compare the signatures." *Id. at 1104*. The court therefore rejected the plaintiffs' claim, noting that "[r]equiring the state to provide thousands of petition signers with individual notice that their signatures have been rejected and to afford them an opportunity to present extrinsic evidence during the short thirty-day verification period would impose a significant [*31] burden on . . . elections officials." *Id. at 1104-05*.

With these cases in mind, the court weighs the Mathews factors in the present case.

a. Private Interest

Plaintiffs argue that the individual interest at issue is the fundamental right to vote. Defendants respond that "the rights claimed by Plaintiff[s] should be afforded less weight than traditionally afforded the right to vote" because there is no right to vote by absentee ballot. Doc. no. 66 at 4.

The court accords this factor significant weight. It is beyond dispute that "[t]he right to vote is of the most fundamental significance under our constitutional structure." *Ayers-Schaffner v. DiStefano, 37 F.3d 726, 727 (1st Cir. 1994)* (internal quotation marks omitted); see also *Griffin v. Burns, 570 F.2d 1065, 1075 (1st Cir. 1978)* (noting that the right of suffrage is "a fundamental political right" because it is "preservative of all rights"). While "there is no corresponding fundamental right to vote by absentee ballot," *Griffin v. Roup, No. 02-C-5270, 2003 U.S. Dist. LEXIS 29351, 2003 WL 22232839, at *4 (N.D. Ill. Sept. 19, 2003)*, the privilege of absentee voting is certainly "deserving of due process," *Raetzel, 762 F. Supp. at 1358*; accord *Zessar, 2006 U.S. Dist. LEXIS 9830, 2006 WL 642646, at *5*; *Doe v. Walker, 746 F. Supp. 2d 667, 681 (D. Md. 2010)*. Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.

b. Risk of Erroneous Deprivation and Probable Value of Other Procedures

The parties dispute [*32] both elements of this factor. Plaintiffs assert that the risk of erroneous deprivation is "great" and that such risk could be easily remedied through additional procedures like a "simple telephone call." Doc. no. 48-1 at 34, 40. Defendants counter that the risk is "extremely slight" and that plaintiffs' alternative is not workable. Doc. no. 54 at 19, 22.

Defendants are correct that, based on the data available to the court, the overall rates of rejection due to a signature mismatch have been low in recent general elections. But those rates should be put into perspective. In the first place, even rates of rejection well under one percent translate to the disenfranchisement of dozens, if not hundreds, of otherwise qualified voters, election after election. See doc. no. 49-3 at 193-94 (deposition of David Scanlan) (stating that there is no indication that, in 2016 General Election, voters rejected due to signature mismatch were otherwise ineligible to vote). Given how close some races are in New Hampshire, that is a risk with real consequences. See, e.g., doc. no. 48-1 at 47 (noting one state senate race in 2016 that was decided by only seventeen votes).

More importantly, the task of handwriting [*33] analysis by laypersons, as it is contemplated under *RSA 659:50*, III, is fraught with error. Dr. Mohammed opines that individuals will naturally vary their signatures as a result of a number of intentional and unintentional factors. To account for such variations when conducting handwriting analysis, a person needs sufficient knowledge, training, equipment, and experience. The procedure under *RSA 659:50*, III, however, imposes none of these safeguards. Among other things, Dr. Mohammed notes that neither state law nor any guidance from state agencies sets forth functional standards for comparing signatures and assessing variations; election officials are not required to undergo any training in handwriting analysis;[9] moderators are not screened for disabilities that may impair the ability to make such comparisons; moderators are not required to have proper magnification or lighting equipment; and moderators do not have sufficient time to conduct each comparison. Dr. Mohammed's uncontroverted conclusion is that, as a result, election officials are likely to make erroneous signature-comparisons. In fact, laypersons are more likely "to wrongly determine that authentic signatures are not genuine than to make the [*34] opposite error." Doc. no. 49-21 at 8.

The absence of functional standards is problematic, and the likelihood of error resulting therefrom is only compounded by the lack of meaningful review or oversight. There is no feedback mechanism to ensure that moderators are applying appropriate standards: neither voters nor the general public may object to a determination; there is no appeal or review process; and the Secretary of State does not regularly monitor

---

[9] The Secretary of State does hold trainings at which the statute is discussed, but Deputy Secretary of State David Scanlan testified that these trainings do no more than reiterate the guidance set forth in the Election Procedure Manual. See doc. no. 49-3 at 77 (deposition of David Scanlan).

rates of rejection to ensure that moderators are properly applying *RSA 659:50*, III. Furthermore, the absence of direct notice to affected voters is not only troubling in itself, see *Gorman v. Univ. of Rhode Island, 837 F.2d 7, 12 (1st Cir. 1988)* (stating that notice is one of the "essential requisites of procedural due process"), it also impairs voters' ability to monitor the conduct of moderators. In law and in practice, the ultimate determination is left to the sole discretion of the moderator and is almost entirely insulated from meaningful scrutiny. As Dr. Mohammed's undisputed conclusions establish, that total reliance on untrained laypersons entails tangible risks. *RSA 659:50*, III is thus a far cry from the procedure upheld in Lemons, where the public could object to determinations and there were multiple **[*35]** layers of review. *Lemons, 538 F.3d at 1104*.

It cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable. See *Zessar, 2006 U.S. Dist. LEXIS 9830, 2006 WL 642646, at *8-9*. The one caveat is the procedure by which moderators evaluate extrinsic evidence to determine whether a ballot should be accepted notwithstanding a signature mismatch. But the evidence before the court shows that this safety valve as it currently exists is haphazard at best, since it is limited to the personal knowledge of, and information immediately available to, election officials. The instance where a moderator confirmed a rejection based on an assistant's knowledge of the voter's signature, which she had seen on medical documents, is illustrative.

Defendants counter that the risk of rejection will be significantly lower in future elections because the new absentee ballot application and affidavit envelope provide notice to the voter that the signatures must match. In support of this conclusion, they rely on Dr. Mohammed's analysis of signature styles in the 2016 General Election, which shows that 94 of the rejected ballots had signatures with different styles. Defendants argue that the new forms will "put voters on notice that they must use the **[*36]** same signature style when signing each document." Doc. no. 54 at 22. This is beside the point, however, because even excluding those 94 ballots, it still means that dozens, if not hundreds, of rejected voters used the same signature style and were still rejected in the 2016 General Election. Nor does mere notice ameliorate any of the problems identified by Dr. Mohammed that contribute to the risk of erroneous deprivation. The natural variations in a person's handwriting—many of which are unintentional or uncontrollable, like mental or physical condition—when combined with the absence of functional standards, training, review, and oversight, create a tangible risk of erroneous deprivation. *Cf.* League of United Latin Am. Citizens of Iowa v. Pate, No. CVCV056403 (Iowa Dist. Ct. July 24, 2018), available at doc. no. 71-1 at 18 (stating that

"there is potential for erroneous determinations of a mismatch" under Iowa signature-match requirement for absentee ballots, where election officials had "unbridled discretion to reject ballots based on signatures they find do not match," but did not have "official guidance or handwriting expertise"), *aff'd in part*, No. 18-1276 (Iowa Aug. 10, 2018), **[*37]** available at doc. no. 71-2 (affirming temporary injunction of Iowa signature-match requirement based on Iowa Constitution).

On the other hand, additional procedures would provide a tangible benefit. Plaintiffs point out that the absentee-ballot application already provides sections to allow a voter to submit her phone number and email address. They contend that a procedure whereby a moderator simply reaches out to the voter in one form or another would be of great value. The court agrees.

As defendants stated at the hearing, moderators already engage in a process of considering extrinsic evidence to, in defense counsel's words, "salvage" a ballot that could otherwise be rejected. Necessarily, the premise of such a process is that the consideration of extrinsic evidence can be useful in determining whether the same person executed both the affidavit envelope and application. Plaintiffs seek no more than to open up that process to allow for consideration of evidence from the best source—the voter.[10] To be sure, it may not be a perfect solution. Because many absentee voters are voting by absentee ballot due to work, religious commitment, or disability, they may not be available at the time **[*38]** the moderator is reviewing the signatures. Some may not be reachable by phone, and others may not have access to email. But with proper notice to voters that they may be contacted, a phone call or similar measure would make the process a more constructive exercise. As it stands currently, moderators consider limited and far less probative extrinsic evidence. In addition, there is evidence in the record that moderators consider evidence submitted with the affidavit envelope in deciding whether to accept an absentee ballot.[11]

---

[10] Defendants argue that a phone call would be inadequate because a moderator would not be able to verify a voter's identity over the phone. In making that argument, defendants move the goalposts. In its current form, *RSA 659:50*, III does not verify a voter's identity. Rather, its purpose is to ensure that the same person signs both the application and affidavit envelope; the signatures are not otherwise cross-referenced with a genuine exemplar of the voter's signature. Regardless, defendants' contention falls flat because they themselves assert that moderators may disregard mismatched signatures on the basis of other extrinsic evidence. Plaintiffs' suggested procedures do no more than enhance that process.

[11] For example, one section of the 2016 Election Procedure Manual describes the procedures that should be taken if a voter has a

That could provide an option to absentee voters who know they will be unreachable on Election Day and wish to ensure that their ballots will be accepted.

In short, based on the undisputed facts in the record, "[i]t is apparent that the risk of erroneous deprivation of the protected interest in absentee voting is not enormous, but the probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote." *Zessar, 2006 U.S. Dist. LEXIS 9830, 2006 WL 642646, at *9*.

c. Government's Interests

The third factor involves consideration of the government's interests, which may include "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews, 424 U.S. at 335*. Defendants argue that *RSA 659:50*, III furthers the State's interest in preventing voter fraud and protecting public confidence in the integrity of the electoral process. Further, defendants contend that, because the New Hampshire Constitution requires that all votes be counted on Election Day, it would be "extremely burdensome" to require moderators "to seek out and verify the identity of hundreds of absentee voters." Doc. no. 54 at 20.

The court agrees that the State has legitimate interests in preventing voter fraud and protecting public confidence in elections. See *Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 194-97, 128 S. Ct. 1610, 170 L. Ed. 2d 574 (2008)*. That being said, in comparison to the two instances of absentee-voter [*40] fraud that defendants cite as support, one in the 2012 General Election and the other in the 2016 General Election, hundreds of voters (approximately 740 by plaintiffs' estimate) were disenfranchised under *RSA 659:50*, III in the

---

physical disability that prevents the voter from signing her name:

> The best practice would be for the clerk to appoint someone neutral to take the absentee ballot to the voter and to verify that the stamped name is legitimate as the voter's signature. The clerk's appointee should countersign both the application and the affidavit envelope next to the stamped signature or submit a written and notarized statement to accompany the sealed affidavit envelope verifying that the voter himself or herself caused the ballot to be marked and the affidavit to be stamped with the voter's signature [*39] .

Doc. no. 54-9 at 115 (emphasis added); see also doc. no. 49-3 at 104 (deposition of David Scanlan) (stating that, prior to enactment of exemption to *RSA 659:50*, III, if a disabled voter needed assistance to complete her affidavit envelope, the assistant should have made a notation on the envelope "that the voter was unable to sign the ballot and a brief explanation as to why and then submit that to the moderator").

2012, 2014, and 2016 General Elections.[12] See doc. no. 48-1 at 21-22. Furthermore, plaintiffs point out that neither instance of absentee-voter fraud was uncovered through the signature-matching process.

In any case, the court fails to see how additional procedures would harm these interests. Moderators already consider limited forms of extrinsic evidence. Additional procedures would simply allow for more probative extrinsic evidence to be considered. Thus, if anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised. See *Fla. Democratic Party v. Detzner, No. 4:16cv607, 2016 U.S. Dist. LEXIS 143620, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 10, 2016)* ("[L]etting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted."). Likewise, improving the currently opaque, unreviewable process by which moderators compare [*41] signatures and consider extrinsic evidence would only serve to enhance voter confidence in elections. Two of the plaintiffs have expressed their anger and frustration at the treatment of their votes under the current system. See doc. no. 48-2 at 2-3; doc. no. 48-3 at 3.

Next, contrary to defendants' argument, plaintiffs' proposed procedures would not entail significant administrative burdens. Moderators already engage in a practice of considering extrinsic evidence before rejecting a ballot due to a signature mismatch. Consequently, this is a case not of foisting wholly novel procedures on state election officials, but simply refining an existing one to allow voters to participate and to ensure that the process operates with basic fairness.

While the current procedure would need to be expanded so that moderators could reach out to voters, no individual district is likely to be materially impacted. In the 2016 General Election, for example, 74% of polling places would not have been impacted at all, because they did not reject any ballots due to a signature mismatch. Only 5 of New Hampshire's 318 polling places had ten or more such rejections. That procedures already exist which could [*42]

---

[12] In discussing the existence of absentee voter fraud, defendants also state that "the signature match process prevented at least 6 ballots from being cast that were signed by a person with a different name than the person who had requested the ballot." Doc. no. 54 at 26. However, *RSA 659:50, IV* would appear to have required rejection of those ballots regardless of the signature-match requirement. See *RSA 659:50, IV* (requiring that the "signatures appear to be the signatures of a duly qualified voter who has not voted at the election").

be readily extended to provide basic guarantees of due process to voters militates against defendants' argument. See *Detzner, 2016 U.S. Dist. LEXIS 143620, 2016 WL 6090943, at *7* (finding statute requiring rejection of absentee ballot based on signature mismatch unconstitutional, where, among other things, voters who failed to sign their ballot received opportunity to cure, but voters whose signatures did not match received no such opportunity); La Follette, doc. no. 49-4, at 4 (same).

Defendants respond that the analysis is not so simple. They posit that, "[i]f plaintiffs' argument was extended to its logical conclusion, . . . then notice and an opportunity to cure could be required for every absentee ballot rejected for any reason," further burdening moderators. Doc. no. 66 at 5. The court is not persuaded. The court's conclusion rests on a careful, context-sensitive balancing of the Mathews factors. See, e.g., *Mathews, 424 U.S. at 334* ("(D)ue process is flexible and calls for such procedural protections as the particular situation demands."). The need for additional process with respect to *RSA 659:50*, III does not inevitably lead to the conclusion that other reasons for rejection will demand similar process.

Defendants make two final arguments that merit only brief comment. [*43] First, on the basis of their statistical evidence allegedly showing the success of their trainings, defendants argue that at most moderators merely applied the statute unconstitutionally in 2016. They argue that the proper remedy would be to require them to conduct additional training for those moderators who have higher rejection rates. The court is not persuaded. Defendants' statistical evidence is insufficient for the reasons articulated by plaintiffs in their briefing. Furthermore, additional training would not be a useful exercise, since defendants merely reiterate the limited guidance set forth in the Election Procedure Manual. See note 9, supra.

Second, defendants argue that plaintiffs cannot succeed on a facial challenge because they do not dispute that the absentee ballots of some voters—specifically, those who (1) omit signatures, (2) use the wrong name on a document, or (3) use a digital signature—were correctly rejected. But "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles, California v. Patel, 135 S. Ct. 2443, 2451, 192 L. Ed. 2d 435 (2015)*. Voters in those categories would be rejected regardless of *RSA 659:50*, III, as they would fail to meet independent [*44] requirements of *RSA 659:50*. See *RSA 659:50*, II (requiring that the affidavit be properly executed); *RSA 659:50*, IV (requiring that the signatures appear to be the signatures of a duly qualified voter). For the same reason, defendants are incorrect when they argue that striking down *RSA 659:50*, III would prevent

moderators from rejecting ballots that are unsigned or signed by a person with a different name than the voter.

d. Conclusion

"Procedural due process guarantees fair procedure, not perfect, error-free determinations." *Aurelio v. R.I. Dep't of Admin., Div. of Motor Vehicles, 985 F. Supp. 48, 56 (D.R.I. 1997)* (internal quotation marks omitted). One could, by taking in isolation various facets of the current process, conclude that *RSA 659:50*, III passes constitutional muster. But taken as a whole, and in light of the fundamental importance of the right to vote, the current process for rejecting voters due to a signature mismatch fails to guarantee basic fairness. The infirmity with the statute begins with vesting moderators with sole, unreviewable discretion to reject ballots due to a signature mismatch. Such discretion becomes constitutionally intolerable once other factors are taken into account: the natural variations in voters' signatures combined with the absence of training and functional standards on handwriting [*45] analysis, and the lack of any review process or compliance measures. And there is an easy fix—an existing procedure that, with minor refinement, could reduce the risk that qualified voters are wrongly disenfranchised and bolster the State's interests in preventing voter fraud and safeguarding voter confidence in elections.

Therefore, in light of the undisputed, material facts in the record, plaintiffs are entitled to summary judgment on their procedural due process claim. The court grants plaintiffs' request for declaratory relief insofar as *RSA 659:50*, III is unconstitutional under the *Fourteenth Amendment of the United States Constitution*.

The court also grants plaintiffs' request for permanent injunctive relief. Outside of their arguments on the merits, defendants do not argue that the elements for a permanent injunction are not satisfied. See *Esso Standard Oil Co. v. Lòpez-Freytes, 522 F.3d 136, 148 (1st Cir. 2008)* (listing elements for permanent injunction). The court concludes that plaintiffs have demonstrated an entitlement to permanent injunctive relief. Because "a successful facial attack means the statute is wholly invalid and cannot be applied to anyone," *Ezell, 651 F.3d at 698*, the court enjoins defendants from enforcing *RSA 659:50*, III. Although the enforcement of the provision falls primarily on local election officials, i.e., nonparties, [*46] the court is confident that the Secretary of State will take appropriate steps to ensure that this injunction is enforced.

II. Remaining Claims (Counts II, III, IV)

Having resolved Count I in plaintiffs' favor, the court declines to go further and address plaintiffs' remaining claims. This is because plaintiffs are afforded complete relief by virtue of

their success on their procedural due process claim: they will receive the declaratory relief they request and corresponding injunctive relief.

This is not to say that plaintiffs' remaining constitutional claims are "moot" in the technical sense. A case does not become moot for purposes of Article III merely because a court finds that the plaintiff is entitled to relief under one of a number of alternative theories. See *Novella v. Westchester Cty., 661 F.3d 128, 149 (2d Cir. 2011)* ("[I]t is cases rather than reasons that become moot with the meaning of Article III." (internal quotation marks omitted)); *Air Line Pilots Ass'n, Int'l v. UAL Corp., 897 F.2d 1394, 1397 (7th Cir. 1990)* ("Whether a court gives one or ten grounds for its result is not a question to which Article III prescribes an answer."). But courts also use the term "moot" to "refer to an issue that need not be decided in light of the resolution in the same opinion of another issue." *UAL Corp., 897 F.2d at 1397*. The decision to reach or **[*47]** avoid an unnecessary issue falls within the court's discretion, and will depend on the circumstances presented. See *Novella, 661 F.3d at 149*; *Clark v. Dep't of Army, 997 F.2d 1466, 1470 (Fed. Cir. 1993)*, superseded by statute on other grounds as recognized in *Kewley v. Dep't of Health & Human Servs., 153 F.3d 1357, 1361-62 (Fed. Cir. 1998)*. "Courts recognize that it may be valuable to decide alternative grounds, even though not all are necessary, and also understand that there may be excellent reasons to avoid alternative grounds." 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3533 (3d ed.) (collecting cases).

In this case, the court concludes that it is neither necessary nor prudent to reach plaintiffs' other constitutional claims. In Count II, plaintiffs target the same basic defects in the statute as they do in Count I, albeit under the auspices of a different test. And although Count III presents a distinct question, as it rests on the alleged lack of uniformity wrought by *RSA 659:50*, III, it raises sensitive legal questions, including the applicability of Bush v. Gore to this context, the standard by which such a claim should be evaluated on a facial challenge, etc. While these claims may not be moot under Article III, the same considerations undergirding the constitutional rule—judicial economy and the reluctance **[*48]** to opine on abstract propositions—support the court's decision here. See *Thomas R.W. v. Mass. Dep't of Educ., 130 F.3d 477, 479 (1st Cir. 1997)*; *Soto v. City of Cambridge, 193 F. Supp. 3d 61, 69 (D. Mass. 2016)*.

By contrast, plaintiffs' ADA claim is moot under Article III. As a result of the 2017 amendments to *RSA 659:50*, III, an absentee voter who receives assistance "because the voter is blind or has a disability" is exempt from the requirement. *RSA 659:50*, III. In her deposition, Ms. Saucedo testified that she

will "definitely" rely on her husband's assistance when she votes in the future. Doc. no. 49-5 at 7 (brackets omitted). Therefore, Ms. Saucedo—the only plaintiff with a disability—is and will be exempt from *RSA 659:50*, III, and consequently no longer has a legally cognizable interest in the outcome of the ADA claim. See *Horizon Bank & Trust Co. v. Massachusetts, 391 F.3d 48, 53 (1st Cir. 2004)* ("A case is moot when the issues are no longer live or the parties no longer have a legally cognizable interest in the outcome."). Put differently, because the court can no longer give any effectual relief to Ms. Saucedo on this claim, the claim is moot and the court may not entertain it. See id.; cf. *Steir v. Girl Scouts of the USA, 383 F.3d 7, 16 (1st Cir. 2004)* ("A federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of officials are unlawful." (internal brackets omitted)).

For these reasons, the court does not address Counts **[*49]** II, III, and IV.

## CONCLUSION

For the reasons stated herein, plaintiffs' motion for summary judgment (doc. no. 48) is granted with respect to Count I, and is otherwise denied. Summary judgment on Counts II and III is denied in light of the complete relief afforded to plaintiffs on Count I, and summary judgment on Count IV is denied because the claim is moot. Counts II, III, and IV are therefore dismissed without prejudice. Defendants' cross-motion for summary judgment (doc. no. 52) is granted on Count IV to the extent that Count IV is dismissed without prejudice as moot, and is otherwise denied. Plaintiffs' motion to strike (doc. no. 56) is denied.

As to relief under Count I, the court grants plaintiffs' request for declaratory relief insofar as *RSA 659:50*, III is unconstitutional under the *Fourteenth Amendment of the United States Constitution*. The court also grants plaintiffs' request for permanent injunctive relief, and defendants are hereby permanently enjoined from enforcing *RSA 659:50*, III.

SO ORDERED.

/s/ Landya McCafferty

Landya McCafferty

United States District Judge

August 14, 2018

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

**FILED**
San Francisco County Superior Court

MAR 0 5 2018

CLERK OF THE COURT
BY: _____ Deputy Clerk

PETER LA FOLLETTE; and THE
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA,

Case No. CPF-17-515931

                       Plaintiffs,

vs.

ALEX PADILLA, in his official capacity as
Secretary of State of the State of California;
and William F. ROUSSEAU, in his official
capacity as Clerk-Recorder-Assessor-Registrar
of Voters for the County of Sonoma,

                       Defendants.

**ORDER GRANTING PLAINTIFFS'
MOTION FOR WRIT OF MANDATE**

_____

      Plaintiffs challenge the constitutionality of a state statute by which election officials

reject mailed ballots bearing voter signatures that officials decide do not match signatures on file.

This disenfranchisement occurs without notice to the voter or opportunity to cure or show that

the ballot is proper. I GRANT the requested writ of mandate.

<u>**Findings of Fact**</u>

      In the November 8, 2016 election, well over half of California's 14.6 million voters cast

their ballots by mail. Sonoma County resident Peter La Follette tried to be one of those voters.

However, unbeknownst to La Follette, county election officials acting under Elections Code

§3019(c)(2) refused to count his votes because they decided his signature on his ballot envelope

did not match a signature they had on file.  Officials never told La Follette about their rejection, nor does §3019(c)(2) require them to – or to provide a voter an opportunity to cure or to show that his[1] ballot was proper.  La Follette only learned of his disenfranchisement eight months later, when he searched voting records on line.

In the November 2016 election, an estimated 33,000 to 45,000 voters suffered the same fate under Evidence Code §3019(c)(2) that La Follette did.  No evidence suggests that a significant number of the vote-by-mail ballots rejected for signature mismatch resulted from voter fraud.

Experts cite several reasons why a person's signature may differ on two occasions: physical disability, injury, a primary language that does not use Roman characters (*e.g.,* many Asian Americans), or simply the passage of time.  Many Californians register to vote on computer touch pads, yielding signatures that differ in appearance from those made on paper ballot envelopes.

In contrast to allegedly mismatched signatures, Election Code §3019(f)(1)(a) allows voters who completely fail to sign their ballot envelope to cure that defect, and their mailed ballots are counted if they do.  Also, in mail-only elections, election officials are required to "make a reasonable effort to inform a voter" (a) if their "ballot envelope is missing a signature" and (b) how the voter can correct that.  (*Id.* at §4006.)

Plaintiffs La Follette and the American Civil Liberties Union of Northern California request that I: (1) hold that Elections Code §3019(c)(2) is facially unconstitutional and that no ballot may be rejected based on a mismatched signature without providing the voter with notice and an opportunity to cure before election results are certified; (2) issue a writ of mandate prohibiting  California's secretary of state and Sonoma County's registrar of voters from

---

[1] I use "his," "he" and "him" in this order because La Follette is male.

rejecting vote-by-mail ballots for purportedly mismatched signatures without providing the voter with notice and an opportunity to show that the ballot is proper and (3) direct the secretary of state to inform election officials of these rulings.[2]

## **Standing**

As an initial matter, defendants argue that plaintiffs lack standing to sue them.  I disagree. La Follette has both direct and public interest standing.  (*Raetzel v. Parks/Bellemont Absentee Election Bd.* (D. Ariz. 1990) 762 F.Supp. 1354, 1355-56; *Save the Plastic Bag Coal. v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 166; *Common Cause v. Bd. of Supers.* (1989) 49 Cal. 3d 432, 439 (writ of mandate to compel officials to comply with election law).)  The ACLU has public interest standing as well as taxpayer standing under Code of Civil Procedure §526a. (*Gilbane Bldg. Co. v. Sup. Ct.* (2014) 223 Cal.App.4th 1527, 1531.)

## **Conclusions of Law**

Plaintiffs assert that Elections Code §3019(c)(2) fails to pass constitutional muster on a number of grounds.  I need look no further than the first – the due process clauses of our federal and state constitutions – because voting is a fundamental right, and notice and an opportunity to be heard are fundamental to due process.  (*U.S. v. State of Texas* (W.D. Tex. 1966) 252 F.Supp. 234, 250 ("right to vote is one of the fundamental personal rights included within the concept of liberty as protected by the due process clause"); *Peterson v. City of San Diego* (1983) 34 Cal.3d 225, 229 ("right to vote, of course, fundamental"); *Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314 (notice and opportunity to contest deprivation of right); *Gray v. Sanders* (1963) 372 U.S. 368, 380 (right to vote includes right to have vote counted).)

---

[2] La Follette and the ACLU style themselves "plaintiffs" and the secretary of state and registrar of voters "defendants."  The secretary does the same.  The registrar styles the sides "petitioners" and "respondents." Likewise, La Follette and the ACLU refer to this matter as a "motion for writ of mandate" rather than a "petition." No one suggests that these distinctions make a substantive difference.  And a writ of mandate is a proper way to challenge a statute's constitutionality or validity.  (*Jolicoeur v. Mihaly* (1971) 5 Cal.3d 565, 570 n.2.)

These due process protections apply to mailed votes just as they do to traditional ballots. No one here contends that vote-by-mail is constitutionally required, but once a state creates such a regime, it "must administer it in accordance with the Constitution." (*Zessar v. Helander* (N.D. Ill. 2006) 2006 WL 642646 at *6.)

Thus, courts across the nation have invalidated statutes like Elections Code §3019(c)(2).

In *Zessar*, a voter challenged Illinois laws by which elections officials rejected mail-in absentee ballots if officials decided the signature on the ballot application did not match the signature in their records. Illinois law was more voter-friendly than California's §3019(c)(2) in at least requiring that voters be notified of ballot rejection after the fact, allowing them to have their votes counted in future elections – something §3019(c)(2) does not do. (*See id.* at *2-3, 6.) Still, a federal court held that the laws violated due process by failing to provide voters a chance "to remedy the loss of vote in *that* election." (*Id.* at *6-7, 10.)[3]

In *Detzner*, Florida election laws similar to those here and in *Zessar* were challenged, but with two differences. Unlike California, Florida law required elections officials to mail new registration applications to voters whose ballots had been rejected for signature mismatches. (*Fla. Democratic Party v. Detzner* (N.D. Fla. 2016) 2016 WL 6090943 at *2.) Like California, Florida treated no-signature ballots more favorably than mismatch ballots, by providing an opportunity to cure before the vote was lost for the current election. (*Id.*) Again, a federal court found the election laws unconstitutional.

In *Raetzel*, voters challenged Arizona election laws that provided no notice or hearing to voters whose absentee ballots were disqualified. A federal court ruled that the laws did "not comport with the constitutional requirements of due process," finding: "Parties whose rights are

---

[3] All emphasis in this order has been added.

to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." (762 F.Supp. at 1358.)

Defendants cite no relevant contrary authority. The primary opinion they rely on – *Lemons v. Bradbury* (9th Cir. 2008) 538 F.3d 1098 – regards signature-gathering for a petition, not vote-by-mail signatures.

Defendants nonetheless claim Elections Code §3019(c)(2) "satisfies due process" with five arguments, all unavailing.

*First,* the secretary of state says the "injury" to citizens deprived of votes in the November 2016 election was "slight" in that "at most only 45,000 were rejected." However, that is the equivalent of a medium-size California city, and the U.S. Supreme Court does not consider voter disenfranchisement a "slight injury": "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." (*Wesberry v. Sanders* (1964) 376 U.S. 1, 17.)

*Second,* the secretary says a written directive "that the voter must sign the envelope in his or her own handwriting" is "*ample notice* of the importance of their signature." However, the constitutional concern here is that, under Elections Code §3019(c)(2), voters are given *no notice* when their signatures are deemed to mismatch.

*Third,* the secretary says "*if they so inquire,* voters are provided with notice regarding whether their signature matched." This "notice" is via the voter's search of an online database that election officials tell him about if he happens to inquire. How a voter is supposed to know to inquire is not indicated. Indeed, a voter could believe his ballots were being counted in election after election without ever learning they were not.

*Fourth,* the secretary claims "a compelling interest in preventing voter fraud." However, the declaration paragraphs he cites for that claim adduce no actual evidence of voter fraud.

*Fifth,* the Sonoma County voter registrar's main argument is that a "county elections official is required to implement Elections Code section 3019(c), even if she or he believes it is unconstitutional." Finding the statute unconstitutional will relieve officials of that quandary.

## Rulings and Remedies

As requested, I do hold that Elections Code §3019(c)(2) facially violates the due process clauses of our federal and state constitutions. The statute fails to provide for notice that a voter is being disenfranchised and/or an opportunity for the voter to be heard. These are fundamental rights. The parties consume considerable ink disputing what test to use in determining unconstitutionality, but §3019(c )(2) does not pass any test cited.[4]

I also grant the further requested relief: (1) no ballot may be rejected based on a mismatched signature without providing the voter with notice and an opportunity to cure before the election results are certified; (2) plaintiffs are to submit a proposed writ of mandate and (3) the secretary of state is to inform election officials of these rulings. It is argued that these rulings might not provide enough time for election officials to act, but elections are not certified for 30 days, and, as noted above, the state legislature requires similar notice in a similar context – when voter signatures are missing entirely. (Elections Code §§15372(a), 4006.)

Dated: March 5, 2018

_Richard B. Ulmer Jr._
Richard B. Ulmer Jr.
Judge of the Superior Court

---

[4] For example, as demonstrated above, the "character and magnitude" of voter injury here far outweighs the "interests put forward by the State as justification for the burden." (*Burdick v. Takushi* (1992) 504 U.S. 428, 434.)



 Positive

As of: August 21, 2018 3:37 PM Z

# *Zessar v. Helander*

United States District Court for the Northern District of Illinois, Eastern Division

March 13, 2006, Decided

No. 05 C 1917

**Reporter**

2006 U.S. Dist. LEXIS 9830 *; 2006 WL 642646

BRUCE M. ZESSAR, Plaintiff, v. WILLARD R. HELANDER, Lake County Clerk, et al., Defendants.

**Subsequent History:** Motion denied by *Zessar v. Helander, 2006 U.S. Dist. LEXIS 73646 (N.D. Ill., Oct. 10, 2006)*

**Prior History:** *Zessar v. Helander, 2006 U.S. Dist. LEXIS 12875 (N.D. Ill., Mar. 7, 2006)*

**Counsel:** **[*1]** For Bruce M Zessar, individually and on behalf of all others similarly situated, Plaintiff: Clinton A. Krislov, Elizabeth H. Neugent Dixon, Krislov & Associates, Ltd., Chicago, IL.

For Willard R Helander, Lake County Clerk, Defendant: Michael J Waller, Carla Neuschel Wyckoff, Daniel L. Jasica, Lake County State's Attorney's Office, Waukegan, IL.

For John R Keith, Chairman of State Board of Elections, Jesse Smart, Vice Chairman of the State Board of Elections, Daniel White, Executive Director of the State Board or Elections, Wanda L Rednour, Elaine Roupas, William M McGuffage, David E Murray, Albert Porter, Brian A. Schneider, Members of the Illinois State Board of Elections, Defendants: Thomas A. Ioppolo, Illinois Attorney General's Office, Chicago, IL; LeeAnn Richey, Office of the Attorney General, Chicago, IL.

**Judges:** David H. Coar, United States District Judge.

**Opinion by:** David H. Coar

# Opinion

**MEMORANDUM OPINION AND ORDER**

## I. BACKGROUND FACTS [1]

### [*2] A. Plaintiff and the November 2004 Election

Plaintiff Bruce M. Zessar is a resident of Lake County, Illinois, but works in Chicago's Loop area. In early October 2004, Zessar contacted the Lake County Clerk's office about requesting an absentee ballot because he expected to be absent from Lake County on Election Day that year. Zessar received an absentee ballot application and an absentee ballot by mail. He completed the application and returned it to the Clerk's office by mail, after checking the box indicating that he expected to be absent from Lake County and would be unable to vote in person at his precinct. Zessar provided his name, address, and business telephone number on the absentee ballot application, but did not provide his email address although there was space provided. In addition, he voted the absentee ballot, signed and dated the certification form on the accompanying envelope on October 4, 2004, and returned it by mail to the Lake County Clerk's Office, well before the November 2, 2004 General Election.

On Election Day, Zessar was absent from Lake County during polling hours. He took the 5:50 a.m. commuter train from Highland Park, Illinois (in Lake County) **[*3]** to the Loop and returned on the 7:00 p.m. commuter train from Chicago. During the days immediately before and after Election Day, Zessar did not leave the greater Chicago and Lake County area.

In mid-January 2005, some two and a half months after the November 2004 election, Zessar received a yellow Notice of Challenge postcard by mail from the Lake County Clerk's

---

[1] Unless otherwise stated, these facts are taken from the parties' *L.R. 56.1* submissions.

2006 U.S. Dist. LEXIS 9830, *3

office. The Notice of Challenge card, which had been prepared on the night of the election by Lake County election judges, informed Zessar that election officials in Moraine Precinct number 215 (Lake County) had determined that Zessar's signature on his absentee ballot did not match the signature on file on his voter registration card and that his ballot had been rejected. All parties now agree that this determination was erroneous. Zessar's vote was not cast and did not count in the election results. For the November 2004 election, Lake County reported 538 rejected ballots from a total of 458 precincts.

The final election results for Lake County had been posted on the County Clerk's website on November 17, 2004, approximately two weeks after Election Day. The results were labeled "unofficial," although the Lake County operations [*4] manager state that they were final. Under Illinois law, county offices were required to complete the abstract of votes and official canvass for county offices by November 23, 2004. The Illinois State Board of Elections must complete the official canvass and abstract of votes for state and judicial offices by 31 days after the election.

The Illinois Election Code and related regulations require that a rejected absentee voter must receive notice of the ballot rejection but otherwise give no guidance about the time frame in which such notice must be given. State law makes no provision for a rejected absentee voter to challenge the ballot rejection or to have any form of hearing prior to the rejection of the ballot or completion of the official canvass.

**B. Illinois Election Authorities**

The Illinois State Board of Elections ("The State Board") is an independent state agency created to supervise voter registration and the administration of elections throughout Illinois. Locally, elections are administered by the state's 110 election authorities, which consist of the county clerks in Illinois' 101 counties, one county election commission, and eight municipal election commissions. [*5] These local election authorities oversee local voter registration programs, train election judges, [2] identify polling places, get ballots printed, oversee election day activities, and supervise the local vote count. The State Board works with the election authorities by providing oversight and guidance, including ongoing training programs for authorities. Both the State Board and the local election authorities are governed by the Illinois Election Code and its provisions regarding absentee

ballot procedures.

**C. Absentee Ballot Procedures**

Under the Illinois Election Code, absentee ballots received prior to Election Day are placed, unopened, together with the absentee ballot application in a large, securely sealed envelope, which is endorsed by an official of the election authority with the words, "This envelope contains an absent voter's ballot and must [*6] be opened on election day." *10 Ill. Comp. Stat. 5/19-7*. The envelopes are kept in the election official's office until Election Day, when they are delivered to the polling place of the precinct where the voter resides. *10 Ill. Comp. Stat. 5/19-8*. Election judges at each precinct "cast" absentee ballots at the close of polls on Election Day. State law provides that the election judges shall open the outer envelope, announce the absent voter's name, and compare the signature on the application with the signature on the ballot envelope. If the signatures do not correspond, the applicant is not a duly qualified voter, the ballot envelope is open or has been opened and resealed, or the voter has voted in person on Election Day, the absentee ballot will be left unopened and on its face shall be marked "Rejected," along with the reason therefor. *10 Ill. Comp. Stat. § 5/19-9*. The Election Code further provides that if a challenge to an absentee ballot is sustained, "notice of the same must be given by the judges of election by mail addressed to the voter's place of residence." *10 Ill. Comp. Stat. 5/19-10* [*7] .

The State Board publishes manuals for local election officials. Under regulations contained in these instruction manuals, a majority of the election judges decides whether a challenged ballot will be counted. Acceptable reasons in addition to those provided by the Illinois Election Code include: the voter filled out the certification envelope incompletely; the information in the certificate is incorrect; the signature and/or address on the application do not match the signature and/or address on the verification record or on the certification envelope; the individual is not a qualified voter; or the individual died prior to the opening of polls on Election Day.

After agreeing to reject an absentee ballot, the election judges complete and sign a Notice of Challenge card (a yellow postcard) provided by the election authority. The election judges return the notice of challenge cards to the election authority, along with all election materials, on election night. The election authority then mails the card to the voter. Lake County's Election Judge Manual directed election judges to follow this procedure with respect to rejected absentee ballots in 2004.

[2] In Lake County, for example, there are over 6,000 individuals in the Election Judge Pool. Of these, 2,2522 Election Judges served on November 2, 2004.

2006 U.S. Dist. LEXIS 9830, *7

### D. Lake County and November [*8] 2004 Election

Lake County directed its precinct election judges to put all notice of challenge postcards in a red voting materials bag at the end of the evening and return the bags to the election authority headquarters. If there is the possibility of a discovery recount, all election materials, including the red bags, are sequestered. Such a discovery recount or election contest period does not commence until the final canvass of votes, which is not completed until 21 days after election day. The notice of challenge postcards would not be mailed until the end of the discovery recount period. If there is no possibility of a discovery recount or the recount period has ended, the red bag is opened and the envelope (Envelope #3) containing the notice of challenge postcards is removed and sent to the absentee ballot department. This department removes the postcards from Envelope #3 and mails them. In all, the process takes one to two weeks after the election.

For the November 2004 election, Lake County issued 26,578 absentee ballot applications and absentee ballots. Voters returned 23,506 absentee ballots to the Clerk's office. The absentee ballot application form used in Lake County [*9] provides space for absentee voters to provide a telephone number and email address. In the event that a "facially incomplete" application is returned well before the election or a court decrees that a candidate appear or not appear on a ballot after the ballots are printed and the absentee voting period has commenced, the Clerk's office may attempt to contact that absentee voter in order for the voter to complete the application fully or to vote the corrected ballot. Of the absentee ballot applications for the November 2004 election, approximately fifty percent lacked both an email address and a telephone number.

A total of 3,696 active voters in Lake County are enrolled in the absent student, nursing home resident, disabled, or "snowbird" voter programs administered by the County Clerk. There are approximately 4,000 additional voters serving in the military or residing overseas. Voters enrolled in these programs automatically receive an absentee ballot application and an absentee ballot; they do not have to make a specific request. [3] Of the absentee ballot requests from individuals not enrolled in these programs for the November 2004 election, approximately fifty percent were mailed [*10] to voters at addresses outside Illinois.

Five hundred thirty-eight absentee ballots submitted in Lake County were rejected on election night in November 2004. Of these, the Clerk's office received inquiries from approximately five individuals, including Zessar, after they received their rejection notification postcards.

Elections place additional burdens on county clerk's offices. For the November 2004 election, thirty-nine permanent and temporary employees at the Lake County Clerk's office were assigned to election duties. Several of these employees were diverted from their regular duties in the Tax, Vital Records, and County Board Record Departments. On Election Day, 213 additional temporary workers and volunteers assisted with opening and closing polls, replenishing supplies, handling technical problems and delivering absentee ballots. Fifteen people worked until approximately one a.m. on November 3, 2004, to finish [*11] unloading all election materials from precinct locations at the Clerk's office. From November 3, 2004 until at least January 1, 2005, Clerk's office staff were engaged in performing all their post-election statutory duties.

There were a total of 688 provisional ballots cast in Lake County during the election. Eight full time staff members worked six hours a day to process the provisional ballots completely. Of the total, 199 were found to be valid and were cast. Provisional voters are individuals who voted in person on Election day but whose registration could not be verified. Instead, they signed affidavits attesting that they were registered and eligible to vote. A provisional voter has two calendar days following the election to provide any required additional documents to the Clerk's office and the Clerk's office has fourteen calendar days after the Election to validate and, if appropriate, count the provisional ballots. *10 Ill. Comp. Stat. 5/18A-15(d)*. No more than ten provisional voters actually contacted the Clerk's office.

On November 2, 2004, there was a possibility of a discovery recount because the race for County Coroner was decided by a [*12] very small margin. Accordingly, the Lake County officials did not allow envelopes or other material to be opened until after the period for discovery recount had ended. Lake County officials determined that the Coroner's race was entitled to a discovery recount upon the completion of the election canvass. The unsuccessful candidate for Lake County Coroner, however, did not pursue his statutory right to a discovery recount during the allotted time period.

After receiving a Notice of Challenge postcard, a voter is free to re-register and update his or her signature on the registration file.

### E. November 2004 Absentee Voting In Illinois

The State Board was required to submit data to the United States Election Assistance Commission after the November

---

[3] The Lake County Clerk's office has a current mailing address on file for these voters.

2004 election. A State Board questionnaire sent to each election authority sought data on the total number of absentee ballots requested, the total number of absentee ballots returned, and the total number of absentee ballots counted. Not all counties reported the total number of absentee ballots counted.

### F. Zessar Files Suit In Federal Court

On April 1, 2005, Zessar brought a class action complaint against Willard Helander, **[*13]** the Lake County Clerk, the Lake County Board of Elections, Lake County Election Judges, the Illinois State Board of Elections and the members thereon. Zessar claims that the lack of notice and an opportunity to rehabilitate his absentee ballot before the official election canvass date violated his constitutional right to due process under the *Fourteenth Amendment to the United States Constitution*. As relief, Zessar asks this Court to declare unconstitutional certain provisions of the Illinois Election Code which relate to absentee voting, to order the State Board of Elections to require pre-deprivation notice and hearing to absentee voters whose ballots are challenged, to award reasonable attorney's fees and costs, and to grant other such legal or equitable relief as the Court finds proper. Plaintiff also filed a motion for certification of both a plaintiff and a defendant class in this matter, which this Court granted. Presently before the Court are motions for summary judgment filed by Zessar, by Willard Helander, and by the Illinois State Board of Elections. These motions have been fully briefed and are ripe for decision.

### II. STANDARD OF REVIEW

A party seeking summary **[*14]** judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP, 236 F.3d 374, 380 (7th Cir. 2001)*. "If, however, the record as a whole 'could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Id.* Once a motion for summary judgment has been filed, "the burden shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial." *Liu v. T&H Machine, Inc., 191 F.3d 790, 796 (7th Cir. 1999)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 324,*

*106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. The non-movant must provide more than a "mere **[*15]** scintilla" of evidence to carry its burden under the summary judgment standard. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. However, weighing evidence, making credibility determinations, and drawing reasonable inferences are functions of a jury, not of a judge deciding a summary judgment motion. *Id. at 255*.

### III. ANALYSIS

Zessar alleges that the Illinois Election Code violates his right to procedural due process because it does not require timely notice and an opportunity for a hearing prior to the official canvass date. Put another way, Zessar contends that the lack of timely notice and hearing under Illinois law works to deprive him of his fundamental right to vote. Plaintiff's argument is that the right to vote is a fundamental right, afforded the fullest constitutional protection. *Burdick v. Takushi, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992)*; *Ill. State Bd. Of Elections v. Socialist Worker's Party, 440 U.S. 173, 184, 99 S. Ct. 983, 59 L. Ed. 2d 230 (1979)*. The right to vote by absentee ballot is not, in and of itself, a fundamental right. But once the State permits voters to vote absentee, it must afford appropriate due process protections, **[*16]** including notice and a hearing, before rejecting an absentee ballot. *See Raetzel v. Parks/Bellemont Absentee Election Bd., 762 F. Supp. 1354 (D. Ariz. 1990)*. Defendants Helander and the State Board deny that this case addresses the right to vote. Instead, they contend that the issue turns on whether there is a constitutional interest in the right to vote absentee. Defendants also seek to characterize this as a case about Zessar's particular experience. As such, they characterize the facts as representing a "garden variety" election irregularity, with which federal courts should not interfere. *Dieckhoff v. Severson, 915 F.2d 1145, 1150 (7th Cir. 1990)*.

### A. Procedural Due Process

It is undisputed that the right to vote is a fundamental right under the United States Constitution. *Harper v. Va. Bd. of Elections, 383 U.S. 663, 666, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966)*. In this case, however, the parties disagree about whether due process protects the rights of an absentee voter. Perhaps the easiest way to answer the question is to examine what is ultimately at stake. Under the Illinois Election Code, an absentee voter in Illinois completes, certifies, and returns **[*17]** an absentee ballot to her polling place at some point during the statutorily prescribed period. She then must wait until some time after the election to learn if her ballot

was challenged and rejected. She has no opportunity to oppose the rejection or to demonstrate that it was erroneous. Her vote simply does not count in the election. At best, she has the opportunity to re-register so as to prevent a future rejection.

There is no question that the federal constitution does not require states to create absentee voting regimes. *McDonald v. Bd. of Election Comm'rs, 394 U.S. 802, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969)*. States may regulate absentee voting and determine who qualifies to vote absentee. The right to receive an absentee ballot is not the same as the right to vote, and will not receive the same constitutional protection. *Id.* It is not unconstitutional, for example, for a state to refuse to permit working mothers *qua* working mothers to vote by absentee ballot even though it might be a great hardship to require them to vote in person on Election Day. *Griffin v. Roupas, 385 F.3d 1128 (7th Cir. 2004)*. Defendants correctly assert that state regulations or restrictions **[*18]** on absentee voting do not, as a general matter, violate a fundamental constitutional right. *McDonald, 394 U.S. at 810-11*; *Griffin, 385 F.3d at 1130-31*; *Prigmore v. Renfro, 356 F. Supp. 427, 433 (N.D. Ala. 1972)*. But once they create such a regime, they must administer it in accordance with the Constitution. *Paul v. Davis, 424 U.S. 693, 710-12, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)* (an otherwise protected interest can attain "constitutional status by virtue of the fact that [it has] been initially recognized and protected by state law" if "as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished"). An absentee voter, by definition, is someone who is unable to vote in person because of physical absence or incapacity. By creating an absentee voter regime, the state has enabled a qualified individual to exercise her fundamental right to vote in a way that she was previously unable to do. The Lake County Clerk contends that an absentee voter has no right or status as an approved absentee voter until her ballot is reviewed and accepted by the election judges on election **[*19]** night. This proves too much. By this logic, an in-person voter has no right or status as an approved voter until her identity as a registered voter has been reviewed and accepted at the polling place. But the in-person voter has a right to due process. Under Helander's argument, the absentee voter does not. [4] This Court finds that the state's action in creating an absentee voting program served to alter the rights of those electors who participate in the program. Accordingly, approved absentee voters are entitled to due process protection. Under the Illinois Election Code, such voters risk the deprivation of their vote, a liberty interest, based on factual issues relating to their ballot.

**[*20] B. What Process is Due**

Due process is "flexible and calls for such procedural safeguards as the situation demands." *Gilbert v. Homar, 520 U.S. 924, 930, 117 S. Ct. 1807, 138 L. Ed. 2d 120 (1997)* (quoting *Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972))*. To determine what process is due, a court must balance three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)*. The court also must balance the interests the state asserts as justification for a rule restricting voting against the nature and degree of asserted injury to a plaintiff's *First* and *Fourteenth Amendment* rights. *Burdick, 504 U.S. at 434* (citing *Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983))*.

**1. Private Interest**

Zessar contends that the private interest at stake is the right of approved and statutorily-compliant absentee voters to cast their votes. [5] Once the state approves **[*21]** a qualified individual to vote by absentee ballot, he contends that it violates due process to reject the absentee ballot without providing notice and a pre-deprivation hearing. The State Board and Helander deny that there is a liberty interest present in an absentee voting program. In particular, Helander argues that Plaintiff's primary case law support for the proposition that absentee balloting is entitled to some minimal amount of due process is inapplicable. In *Raetzel v. Parks/Bellemont Absentee Election Board, 762 F. Supp. 1354 (D. Ariz. 1990)*, a federal district court in Arizona held that Arizona's statutory scheme regarding absentee ballots violated constitutional due process requirements because it did not provide for notice and a hearing for voters whose ballots were

---

[4] Helander contends that an elector, such as Zessar, always has the option of voting in person rather than taking advantage of the statutorily-provided absentee voting regime. But that misstates the issue. The absentee voting provisions do not--and could not--distinguish between classes of absentee voters and offer differing levels of procedural protection depending on the relative hardship the class members might face in getting to the polls in person.

---

[5] Zessar does not contend, as Defendants seem to suggest, that all absentee ballots, even those validly rejected for statutory noncompliance must be counted. Rather, he argues that all approved absentee voters have the right to notice and a pre-deprivation hearing before their ballots are rejected and their right to vote violated.

rejected. Under applicable Arizona law, only county political party chairmen received notice of a disqualified vote, and then only if the challenge was made in writing. The political parties were under no obligation to notify the individual voter about the disqualification. *Id. at 1357*. The *Raetzel* court described absentee voting as "a convenience for those unable to vote **[\*22]** in person." *Id. at 1358* (citing *Prigmore v. Renfro, 356 F. Supp. 427, 432 (N.D. Ala. 1972)*, aff'd 410 U.S. 919, 93 S. Ct. 1369, 35 L. Ed. 2d 582 (1973)*). It then went on to characterize absentee voting as "deserving of due process," and stated that "[the state] cannot disqualify ballots, and thus disenfranchise voters, without affording the individual due process protection…. [such as] advising the individual of the disqualification and the reason therefore[], and providing some means for the individual to make his or her position on the issue a matter of record before the appropriate election official." *Raetzel, 762 F. Supp. at 1358*.

This Court **[\*23]** finds that under the current statutory system, the election judges' rejection—erroneous or not—wholly deprives an absentee voter of the right to vote. There is no recourse for the voter and no way to remedy the loss of that vote in that election.

## 2. Risk of Erroneous Deprivation and Probable Value of Additional Procedures

The risk of erroneous deprivation of a protected voting right is admittedly not tremendous, but there is a risk. For the 2004 General Election, the parties estimate that at least 1,100 absentee ballots were rejected. By contrast, at least 253,221 absentee ballots were returned to election authorities and 191,177 absentee ballots were counted. These numbers fail to give the full picture, however, because not all counties reported the number of absentee ballots counted.

Plaintiff proposes that Notice of Challenge postcards should be mailed to the address on file for the voter as soon as possible after the election, but in no event more than a few days thereafter. He then envisions a kind of "informal" administrative hearing conducted by an employee of the election authority to confirm that the absentee ballot in fact belongs to the voter. An absentee voter **[\*24]** whose ballot had been challenged could submit identification in person or via written affidavit. [6] At that point, Zessar contends, the ballot in most instances would be sufficiently validated and could be counted. On behalf of Lake County, defendant Helander contends that the risk of erroneous deprivation is

very small. The Illinois Election Code provides only limited grounds for election judges to reject an absentee ballot, based on: finding that signatures do not correspond; that the applicant is not a registered voter in that precinct; that the absentee ballot envelope has been sealed and then opened and re-sealed (suggesting some kind of ballot tampering); that the absentee voter also voted in person on Election Day; or that the voter is known to have died before the start of the polling hours on Election Day. *10 Ill. Comp. Stat. 5/19-9*. Election judges, being human, may make mistakes, but Helander argues that such mistakes, if made without invidious or fraudulent intent, are not redressable in federal court. The State Board contends that Zessar's proposed remedy of immediate notice and a hearing prior to the official canvass date [7] is "hugely disproportionate" **[\*25]** to the problem. Further, the State Board questions whether the proposed procedure would remedy the deprivation for absentee voters in other factual situations, such as those who are students at colleges and universities out of their home district, military service members serving out of state or overseas, "snowbirds" living out of state for part of the year, or nursing home or hospital residents with mobility limitations.

In addition, the State Board questions the value of additional procedures in preventing what was, in the instant case at least, a good-faith **[\*26]** mistake during the signature verification stage. Plaintiff's response is that additional procedures would provide a way to safeguard his protected interest in voting. Helander contends that Zessar can offer no guarantees that the additional safeguards he seeks would be effective. [8] In particular, Helander contends that sending notice of challenge postcards to the voter's Lake County address (on file with the voter registration) would be ineffective for voters who were out of the county for an extended time period. [9]

This Court finds that a post-deprivation hearing provides only prospective relief in that it allows the rejected voter **[\*27]** to correct something about her registration for future elections. The fact that Zessar and his fellow rejected absentee voters may have been deprived of their vote through a good-faith error, rather than outright fraud, does not eliminate their due

---

[6] Zessar compares the process of showing valid identification with the "everyday" process of going through an airport or government building security checkpoint.

[7] For all practical purposes, the pre-deprivation hearing would occur within the two week period immediately following Election Day. This is also the time period during which election authorities are verifying provisional votes. *10 Ill. Comp. Stat. 5/18A-15(a)*.

[8] This Court notes that Lake County already provides some additional protection to certain absentee voters who submit "facially incomplete" ballots prior to Election Day. The Clerk may contact the voter and invite her to complete the ballot fully.

[9] Helander does not explain why notice of challenge postcards could not be sent to the address where the absentee ballot was sent.

2006 U.S. Dist. LEXIS 9830, *27

process interest in preserving their right to vote. Once rejected, the ballot cannot be rehabilitated and cast after a post-deprivation hearing. The voter's right to vote would have been irremediably denied. The defendants belief that timely notice and a pre-deprivation hearing would provide little additional value to the effort to protect the voters' interests in their voting right is unpersuasive. It is apparent that the risk of erroneous deprivation of the protected interest in absentee voting is not enormous, but the probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote.

### 3. Government's Interest

The third factor in the *Mathews* balancing test examines the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews, 424 U.S. at 335* [*28] (citing *Goldberg v. Kelly, 397 U.S. 254, 263-71, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970))*. Zessar maintains, in rather conclusory fashion, that the burden of additional procedure on the government would be slight. Although the parameters of the hearing he envisions are unclear, he asserts that an affidavit form could be created and sent to rejected absentee voters, who could then return it in person or by mail or fax. He also notes that the process would involve a relatively small number of individuals. By way of example, of the 688 provisional voters in Lake County in the November 2004 election, no more than 10 contacted the Clerk's office after the election. For the same election, Lake County reported 528 rejected absentee ballots.

The defendants cry foul with regard to the burden of additional procedures. They note that election authorities face a cascade of statutory obligations in the time period leading up to and following the election, which has only increased with the advent of in-person absentee voting or "early voting" in Illinois in the March 2006 election. *10 Ill. Comp. Stat. 5/19-2.1*. In Lake County, election authority staff worked six hours per day for fourteen [*29] days after the election to validate the 688 provisional voters who voted in the election. Additional procedure relating to absentee voters would be an untenable burden, according to Defendants. This Court is not convinced by Defendants' parade of horribles. For one thing, absentee voters and provisional voters stand in different positions before the election authority. Under *Section 5/19-4* of the Illinois Election Code, upon receipt of an application to vote absentee," [10] an election authority must examine voter

registration records to verify that the applicant is "lawfully entitled to vote as requested." *10 Ill. Comp. Stat. 5/19-4*. Only after making such a determination is the absentee ballot itself issued. Thus, the burden on the election authority staff is much less than it is with regard to provisional ballots. *10 Ill. Comp. Stat. 5/18-1 et seq.* The staff verifies that the voter is lawfully entitled to vote before the election, rather than during the fourteen days following the election. A process along the lines of that described by Zessar would pose some additional administrative and fiscal burden on the election authorities, [*30] but this Court finds that Defendants have not demonstrated that the burden would be so great as to overwhelm plaintiff's interest in protecting his vote.

### Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is granted in part and denied in part. Defendant Helander and Defendant Illinois State Board of Elections' motions for summary judgment are denied. This Court finds that the Illinois Election Code provisions regarding the casting of absentee ballots, *10 Ill. Comp. Stat. 5/19-9*, violate absentee voters' due process rights. Although plaintiffs have been damaged by the rejection of their ballots, this Court does not find that economic damages [*31] are appropriate or that equitable relief is required beyond what is necessary to implement a constitutional absentee voting system. This Court does not reach the issue of attorney's fees and costs at this stage of the proceedings.

The parties shall submit proposed procedures for providing timely notice and pre-deprivation hearing to absentee voters whose ballots have been rejected to this Court by May 1, 2006.

Enter:

/s/ David H. Coar

United States District Judge

Dated: **March 13, 2006**

---

End of Document

---

[10] By law, applications to vote absentee must be received at the appropriate election authority by mail not more than 40 days nor less than 5 days prior to the election or by personal delivery not more than 40 days nor less than one day prior to the election. *10 Ill. Comp. Stat. 5/19-4*.